UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DAVID COLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 15-01991 (EGS) (GMH) |
| | ) | |
| WALTER G. COPAN, in his official | ) | |
| capacity as Director of the National | ) | |
| Institute of Standards and Technology, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**EXHIBITS 1 - 4 IN SUPPORT OF**
**DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT 1

**Page 1**

```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA

DAVID COLE,                    )
             Plaintiff,        )
   -vs-                        ) 1:15-CV-01991-EGS/GMH
                               )
WALTER G. COPAN, in his        )
official capacity as Director  )
of the National Institute for  )
Standards and Technology,      )
et al.,                        )
             Defendants.       )
                    - - - - - - -
```

Televideo Depositions of GREGORY BRIDGES and

ERIC LETVIN, taken before Pamela C. Herrmann, RPR and

Notary Public, also via televideo, on June 30, 2022,

beginning at 10:00 a.m.

- - - - - - -

**Page 2**

APPEARANCES:  (Via Televideo)

On behalf of the Plaintiff:
     Law Office of Mick Harrison
     BY:  MICK HARRISON, ESQ.
     520 S. Walnut Street
     Bloomington, Indiana   47402
     mickharrisonesq@gmail.com

On behalf of Defendants:
     Department of Justice
     BY:  SEAN TEPE, ESQ.
     555 4th Street NW
     Washington, D.C.   20530
     sean.tepe@usdoj.gov

             Appearances ... Continued

APPEARANCES:  (Cont'd)

On behalf of the Defendants:
     Office of the General Counsel
     BY:  MICHAEL BOGOMOLNY
     1429 Corcoran Street NW
     Washington, D.C.   20009
     mbogomolny@doc.gov

     FEMA OCC
     Paula Rich, Esq.
     500 C. Street, SW
     Washington, D.C.   20024
     paula.rich@fema.dhs.gov

TECHNICIAN:  Planet Depos
     Jackson Schueler

**Page 3**

                    I-N-D-E-X

WITNESS:
     GREGORY BRIDGES
          Examination by Mr. Harrison ............   5
          Examination by Mr. Tepe ................ 103
          Further examination by Mr. Harrison .... 107

     ERIC LETVIN
          Examination by Mr. Harrison ........... 111
          Examination by Mr. Tepe ............... 151

EXHIBITS
     1 ......................................  100
       (NIST production of documents)
     2 ......................................  101
       (FEMA production of documents)
     3 ......................................  101
       (NIST responses to discovery requests)
     4 ......................................  101
       (FEMA response to production of documents)
     5 ......................................  102
       (FEMA response to interrogatories)

CERTIFICATE OF COURT REPORTER ...................  155

**Page 4**

1  TECHNICIAN:  Thank you to everyone
2  for attending this proceeding remotely, which we
3  anticipate will run smoothly.  Please remember to
4  speak slowly and do your best not to talk over one
5  another.
6  And please be aware that we are
7  recording this proceeding for backup purposes.
8  Any off-the-record discussions should be had away
9  from the computer; please remember to mute your
10 microphone for those conversations.
11 Please have your video enabled to
12 help the reporter identify who is speaking.  We
13 will provide a complimentary, unedited recording
14 of this deposition with the purchase of a
15 transcript.  And I apologize in advance for any
16 technical-related interruptions.  Thank you.
17 REPORTER:  Will counsel please
18 stipulate that in lieu of formally swearing in the
19 witness, the reporter will instead ask the witness
20 to acknowledge that his testimony will be true
21 under the penalties of perjury, that counsel will
22 not object to the admissibility of the transcript

**5**

1  based on proceeding in this way, and that the
2  witness has verified that he is in fact Greg
3  Bridges?
4        MR. HARRISON:  So stipulated.
5        MR. TEPE:  Agreed.
6        REPORTER:  Greg Bridges, do you
7  hereby acknowledge that your testimony will be
8  true under the penalties of perjury?
9        GREG BRIDGES:  Yes, it will be.
10       REPORTER:  Ms. Rich, I didn't get
11 your answer to the stipulation on the record.
12       MR. BOGOMOLNY:  Just for clarity,
13 I'm representing the Government in this
14 deposition.
15 WHEREUPON:
16       GREGORY BRIDGES,
17 having first acknowledged that his testimony will be
18 true under the penalties of perjury, thereupon
19 testified upon his oath as follows:
20 BY MR. HARRISON:
21    Q    So, Mr. Bridges, good morning.  My name
22 is Mick Harrison, I'm an attorney for the Plaintiff,

**6**

1  David Cole, and we appreciate your helping us with
2  your testimony today.  My colleague, David Colapinto,
3  may or may not be available today so you may see him
4  appear at some point.  My client, David Cole, is here.
5        We're here for, as you probably know, a
6  discovery deposition in a Freedom of Information Act
7  case, I will use the abbreviation FOIA for Freedom of
8  Information Act.  And the case is Cole versus Copan,
9  C-o-p-a-n, Case Number 1:15-cv-01991, it is before the
10 U.S. District Court for the District of Columbia.
11       Have you ever had the pleasure of being
12 deposed before, Mr. Bridges?
13    A    No, I have not.
14    Q    All right, so let me give you a heads
15 up on a couple procedures that may be helpful to know
16 in advance.  First of all, if you need a break at any
17 time, feel free to ask, we'll oblige you.
18       Second, if you don't understand a
19 question that's posed to you or you don't hear it or
20 we didn't do our jobs and speak clearly, don't
21 hesitate to let us know that; we'll repeat it for you
22 or, if we have to, we'll reword it for you, just let

**7**

1  us know.
2        Now, on occasion, counsel for the
3  Government, Mr. Tepe, may want to state an objection
4  on the record after I ask a question.  So you should
5  listen for Mr. Tepe stating an objection, and if you
6  hear him speaking, be patient, allow him to complete
7  his objection for the record before you speak.
8        At the end of Mr. Tepe's objection, he
9  may say, you know, you may answer, in which case you
10 should, Mr. Bridges, give your answer.  He may say
11 I'll instruct the witness not to answer, in which case
12 you should follow that instruction and not answer the
13 question, and I will respect that instruction and go
14 on to my next question.
15       If he says neither of those things,
16 then I will invite you to finish your answer or to
17 give your answer, and you should do so.  Is that
18 procedure clear enough?
19    A    Yes, it is.
20    Q    Thank you, Mr. Bridges.  So could you
21 state your full name, please?
22    A    Gregory Bridges.

**8**

1    Q    And what is your job title and your
2  current employer?
3    A    I work for FEMA as the Branch Chief for
4  their Disclosure Branch.
5    Q    FEMA is the Federal Emergency
6  Management Agency?
7    A    Yes, Federal Emergency Management
8  Agency under the Department of Homeland Security.
9    Q    Thank you.  And what are your job
10 duties in your current position?
11    A    I'm responsible for overseeing the
12 administration of the Agency's FOIA program.  I also
13 serve as the liaison between the general public for
14 any issues they may have with any of their requests.
15 I'm also a liaison for other agencies that may inquire
16 about the FOIA program.
17       And then I also oversee and supervise
18 the Disclosure Branch team, and supervise the
19 day-to-day operations of the Branch.  And I also am
20 responsible for making the final determination on all
21 of the information requests we receive.
22    Q    I appreciate that explanation.  How

**9**

1 long have you had this particular position?

2     A   I have been with FEMA since 2018, so

3 I've been at FEMA for four years, and I've been the

4 Branch Chief for three of those years.

5     Q   All right. Can you give us a short

6 history of your employment prior to coming to FEMA?

7     A   Prior to -- I've been doing FOIA --

8 I've been doing FOIA for the Government for about 14

9 or 15 years. Prior to FEMA, I worked at the

10 Department of Agriculture in their department FOIA

11 office, which is the main FOIA office, and also one of

12 the sub-component agencies that's called Agriculture

13 Marketing Service.

14     And then prior to that, I worked for

15 the National Oceanic and Atmospheric Administration,

16 or NOAA for short, and that is an agency under

17 Department of Commerce.

18     Q   Thank you for that. What is your

19 understanding of your role here today as a witness for

20 FEMA?

21     MR. TEPE: Objection to form.

22

**10**

1 BY MR. HARRISON:

2     Q   You may answer.

3     A   I understand my role here to be to

4 discuss the process, the FOIA process at the Agency,

5 and our approach to making the determinations and

6 responses to requests.

7     Q   All right. And I take from that answer

8 that if I have questions about how the FOIA process

9 works or should work in FEMA, you can answer those

10 questions. Do you understand also your role to be to

11 talk about Mr. David Cole's specific FOIA requests and

12 how it had been processed or how the search had been

13 done?

14     A   Yes, I do.

15     Q   Thank you for that as well. So did you

16 do any particular steps to prepare for this deposition

17 today?

18     A   When responding to any inquiry about a

19 request, we do review past actions, past notes we may

20 have on what happened for the processing of the

21 request, so --

22     MR. TEPE: I think counsel's

**11**

1 question was what did you do to prepare for

2 today's deposition --

3     MR. HARRISON: And you can --

4     MR. TEPE: -- you can answer that.

5     MR. HARRISON: That's okay.

6     MR. TEPE: Sorry.

7     MR. HARRISON: I think he might be

8 leading up to answering that question.

9 BY MR. HARRISON:

10     Q   So just to be clear, Mr. Bridges, we're

11 looking for the preparation you did for this

12 particular deposition today, which is what your

13 counsel is reminding you, properly, but I don't mind

14 hearing your background as well that you started.

15     A   Oh, well, it's really just review --

16 it's -- I'm sorry, it's really, in preparation for

17 today, it's just reviewing the actions and the notes

18 that we have on the request, and how -- and the

19 actions that the office took at the time, which is a

20 standard thing we do for any inquiry about a request.

21     Q   Thank you. Do you believe you have

22 reviewed the entire FEMA file on the David Cole FOIA

**12**

1 request?

2     A   I'm sorry, it broke up a little bit.

3 Could you repeat that question, please?

4     Q   Sorry. And always tell me if that

5 happens. Do you believe you have reviewed the entire

6 FEMA case file on the David Cole FOIA request?

7     A   Yes, to my knowledge, based on what I

8 reviewed, I have an understanding of what occurred for

9 the processing of that request.

10     Q   Okay. And just to be clear, was the

11 entire FEMA case file on Mr. Cole's FOIA request made

12 available to you?

13     A   Yes.

14     Q   Thank you. Did you have any role in

15 assisting FEMA in answering Mr. Cole's discovery

16 requests, the written discovery?

17     A   No, I did not.

18     Q   Thank you. And in addition to

19 reviewing the case file and your preparation for the

20 deposition today, did you have meetings or discussions

21 with anyone -- and I don't want you to tell me what

22 the Agency's attorney said to you or you said to

13

1  them -- but did you have any meetings with anyone to
2  help you prepare for the deposition?
3      **A    I prepared -- can I ask what do you**
4  **mean by prepare --**
5      Q    You may.
6      **A    -- just to be on the safe side so I'm**
7  **clear?**
8      Q    You may.  You can always ask clarifying
9  questions.  So I'm assuming, and maybe I should just
10 ask you, that you were not personally involved in the
11 processing of Mr. Cole's FOIA request back in the 2011
12 to 2015 time period, is that correct?
13     **A    That's correct.**
14     Q    So I'm assuming, in order to get up to
15 speed to answer questions today in the deposition, you
16 would have to essentially educate yourself on the
17 history of the case, and you have explained that
18 you've done that by reviewing the case record; I'm
19 just wondering if you also did that by talking with
20 anyone who might have been familiar with the case?
21     **A    Yes, I did talk to people familiar with**
22 **the case.**

14

1      Q    Okay.  And without telling me anything
2  that was said between you and any attorney, can you
3  tell us who you spoke with in your preparation?
4      **A    Well, who I spoke with were attorneys.**
5      Q    Okay.  Anyone else?
6      **A    No.**
7      Q    Okay.  Do you happen to know a Mr. Paul
8  Tertell?
9      **A    I know he was involved in the request**
10 **but I don't know him personally.**
11     Q    Okay.  So did you review the file to
12 the point in Mr. Cole's case of understanding that the
13 FOIA request that started this case going back in I
14 think it may have been May of 2011, I think it had
15 some iterations, but that the essence of Mr. Cole's
16 request was that he wanted the background or raw data
17 used for the FEMA 403 Building Performance Study
18 concerning the World Trade Center, including photos,
19 videos, audio, field notes, memoranda, and laboratory
20 samples; is that your understanding from reviewing the
21 file?
22     **A    Yes, it is.**

15

1      Q    And can you tell us how you first came
2  to be involved in either Mr. Cole's FOIA request or
3  this litigation?
4      **A    I wasn't involved in the request per**
5  **se, but when -- during the processing of this**
6  **litigation, I was just asked to speak on behalf of our**
7  **general processes in responding and how we respond to**
8  **requests.**
9      Q    All right.  Did you happen to -- well,
10 let me ask this a different way.  Do you know who your
11 predecessor was in this position?
12     **A    Yes, I do.**
13     Q    And who was that?
14     **A    Eric Neuschaffer.**
15     Q    Okay.  Do you happen to know what
16 Mr. Neuschaffer is doing today?
17     **A    I believe he works -- I know he works**
18 **at the FOIA, the main FOIA office for the Department,**
19 **for the Department of Homeland Security.**
20     Q    Okay, thank you.  Do you know who in
21 FEMA is responsible for maintaining Agency records
22 regarding substantive work, for example the Building

16

1  Performance Study that is the subject of this FOIA,
2  who handles the job of maintaining those types of
3  records?
4          MR. TEPE:  Objection, vague.
5  BY MR. HARRISON:
6      Q    You may answer if you understand.
7      **A    I have a clarifying question.  When you**
8  **say maintain, what are you referring to?**
9      Q    In this case, what I mean is who would
10 have responsibility to make sure that records are
11 retained for the appropriate retention period under
12 law and policy, and that they're stored in the manner
13 that they can be retrieved; do you know who has that
14 responsibility in FEMA?
15     **A    That falls under the responsibility of**
16 **the Records Management Program.**
17     Q    Okay.  Do you know the person in charge
18 of that these days?
19     **A    The person who is responsible for the**
20 **division that the Records program sits in is Tammy**
21 **Hines, she's the Senior Director for the Information**
22 **Management Division which the Records branch is a part**

17

1  of.
2      Q   Thank you.  In your preparation for
3  today and reviewing the Cole FOIA case file, did you
4  come to understand how your agency, FEMA, was
5  indexing, tracking, filing, organizing records related
6  to the Building Performance Study?
7          MR. TEPE:  Objection, compound.
8          MR. HARRISON:  Agreed.  I'll break
9  it down if necessary.
10 BY MR. HARRISON:
11     Q   Do you understand the question, sir?
12     A   I'm sorry, it came across to me like a
13 couple of questions so I'm not sure which one you want
14 me to answer.
15     Q   You're right, it's about four and I'm
16 going to ask you each one, one at a time, since it
17 will be helpful.
18     A   Okay.
19     Q   So the first part will be about
20 indexing.  Did you come to learn in your preparation
21 for today how FEMA was indexing their records related
22 to the Building Performance Study during the time

18

1  period relevant to Mr. Cole's request?
2      A   Yes.
3          MR. TEPE:  Objection to form,
4  foundation.
5  BY MR. HARRISON:
6      Q   Okay.  So what is your understanding of
7  how FEMA was indexing Building Performance Study
8  records?
9          MR. TEPE:  Objection to form.  What
10 is Building Performance Study records?
11         MR. HARRISON:  Mr. Tepe, is that an
12 objection or a clarification, or is that a request
13 for clarification from the Division?
14         MR. TEPE:  Yes, that's an objection
15 and seeking clarification from you.
16         MR. HARRISON:  Okay, so we can
17 clarify that.
18 BY MR. HARRISON:
19     Q   So for your benefit, Mr. Bridges, when
20 I say Building Performance Study records, I expect you
21 have learned in reviewing the file and preparing for
22 today that FEMA was involved some years ago, in the

19

1  2002/2003 time period, maybe late 2001, in doing a
2  study related to the performance of certain buildings
3  at the World Trade Center at the time of the 9/11
4  terrorist attack, some of which buildings collapsed at
5  the time of that attack, and that they would have
6  acquired records at various times that Mr. Cole was
7  interested in seeing to help them perform that study;
8  do you have that understanding?
9      A   Yes.
10     Q   Okay.  So in terms of those records
11 that FEMA would have collected either directly through
12 FEMA personnel by Mr. Paul Tertell or through
13 contractors for FEMA, do you understand how FEMA was
14 indexing the records they obtained for the Building
15 Performance Study?
16         MR. TEPE:  Objection, foundation.
17 BY MR. HARRISON:
18     Q   You may answer.
19     A   From my understanding and from
20 reviewing the request, that the records in question
21 that would have been responsive to this request were
22 transferred to NIST, so they were not in the

20

1  possession of the Agency at the time that the request
2  came along in 2011.  So for this one, that's how it
3  went.  And from what I reviewed, we never physically
4  had them in our possession; everything that was
5  responsive was given to NIST.
6      Q   You're getting ahead of me a little bit
7  in that answer because I haven't asked you yet what
8  happened with the records.  What I'm asking at the
9  moment, but I appreciate that answer and we'll get to
10 it, what I'm asking in the moment is before the
11 records that FEMA acquired for the Building
12 Performance Study were transferred to NIST, to the
13 extent they were, how was FEMA and its Building
14 Performance team staff, how were they indexing those
15 records, that's my immediate question, if you know?
16         MR. TEPE:  Objection.  Objection,
17 lacks foundation.  You have not established that
18 there is a FEMA staff for Building Performance
19 Study.
20         MR. HARRISON:  Well, I think we all
21 know that, and we can extend the deposition if we
22 have to go through the history of the Building

**21**

1 Performance Study, but I'll note your objection.
2 BY MR. HARRISON:
3　　　Q　Did you acquire an understanding in
4 your review of the record, Mr. Bridges, as to how FEMA
5 was indexing their Building Performance Study records?
6　　　　　MR. TEPE: Same objection, lacks
7 foundation. You're assuming facts not in
8 evidence.
9　　　　　MR. HARRISON: I understand your
10 objection. Are you asking the witness not to
11 answer?
12　　　　　MR. TEPE: No, I'm objecting to
13 your question. I think you should establish how
14 the --
15　　　　　MR. HARRISON: Okay, you want to
16 start, Mr. Tepe?
17　　　　　MR. TEPE: Yes. My objection is to
18 the foundation of the question. I think counsel
19 needs to establish foundations for his question so
20 he doesn't mislead the witness.
21　　　　　MR. HARRISON: Well, we're not
22 misleading anyone. So --

**22**

1　　　　　MR. TEPE: You're assuming facts
2 that have not been -- you're assuming facts that
3 have not been established in your example.
4　　　　　MR. HARRISON: Well, I don't want
5 to argue this with you, I just want to make a
6 record for the court reporter of your objection.
7　　　　So, Ms. Herrmann, my part of that
8 discussion that you may have missed was that I
9 understand Mr. Tepe's objection, it's on the
10 record, he doesn't need to state it more than
11 once. And I understand he's not instructing the
12 witness not to answer.
13　　　　So for the record, I did ask the
14 witness whether, in his review of the case file,
15 he came to understand how FEMA was indexing
16 Building Performance Study records. His answer
17 was yes to that.
18　　　　And so I'm asking him how FEMA was
19 indexing those records, in his understanding, and
20 we'll let him give his answer. And if it's not
21 responsive to the question, we'll deal with that
22 when it comes, but let's see what the answer is

**23**

1 first.
2 BY MR. HARRISON:
3　　　Q　So, Mr. Bridges, to your understanding
4 from reviewing the records, how was FEMA indexing the
5 Building Performance Study records?
6　　　　　MR. TEPE: Same objection to
7 foundation.
8　　　　　MR. HARRISON: You can have a
9 standing objection to that question, I just would
10 like to eventually get an answer.
11 BY MR. HARRISON:
12　　　Q　Do you recall the question,
13 Mr. Bridges?
**14　　　A　Yes.**
15　　　Q　Okay.
**16　　　A　From review of the records I did, it**
**17 was clear that the records in question were maintained**
**18 by this contracting company called Greenburg and**
**19 O'Mara, we say G&O for short, so they were the ones**
**20 who were maintaining the records. So I don't have**
**21 knowledge of how contractors maintain their records,**
**22 but, from my understanding of the review, that was the**

**24**

**1 group that was maintaining the records that were**
**2 responsive to the request.**
3　　　Q　And I think you may be referring to the
4 contractor named Greenhorne and O'Mara?
**5　　　A　Yes.**
6　　　Q　All right, thank you. In your review
7 of the records, did you also notice that there were
8 other contractors working for FEMA on the Building
9 Performance Study including one called Gilsanz Murray
10 and Steficek?
**11　　　A　To my knowledge, there were other**
**12 contractors involved, but I can't recall at the time**
**13 to who those specific ones were.**
14　　　Q　Thank you. Now, when I started this
15 question, as counsel pointed out, it was compound
16 because I asked you about indexing, tracking, filing,
17 and organizing, all in one question. We just dealt
18 with the indexing part.
19　　　　Would your answer be the same if I
20 asked you how FEMA was tracking Building Performance
21 Study records, meaning would you continue to say that
22 your understanding is that Greenhorne and O'Mara was

25

1 handling the tracking of those records?

2     MR. TEPE: Objection to form. You

3 can answer.

4     MR. HARRISON: Mr. Bridges -- go

5 ahead, Mr. Tepe, and state your objection.

6     MR. TEPE: I just object to the

7 form. You can answer.

8     MR. HARRISON: Thank you.

9 BY MR. HARRISON:

10    Q  Proceed, Mr. Bridges.

11    **A  I'm sorry, could you repeat the**

12 **question?**

13    Q  Yes. What was your understanding of

14 how FEMA or its contractors were tracking Building

15 Performance Study records?

16     MR. TEPE: Same objection.

17 BY MR. HARRISON:

18    Q  You may answer.

19    **A  All right. For this particular**

20 **request, it would be similar to my previous answer**

21 **where that was with the contractors, so I wouldn't**

22 **know how they particularly did it for them.**

26

1    Q  Thank you. So the third part of that

2 question, which I will ask you separately, is do you

3 know from your review of the records how FEMA was

4 filing Building Performance Study records?

5     MR. TEPE: Same objection, lacks

6 foundation. Again, you can answer. Unless I tell

7 you not to answer, I'll provide you instruction,

8 Mr. Bridges, you can answer once I'm done with my

9 objection.

10     THE WITNESS: Sure. Yes, and my

11 answer would be similar to my previous answer;

12 that also was with the contractors and I couldn't

13 speak to how they did it.

14 BY MR. HARRISON:

15    Q  In your review of the case records, did

16 you notice that there was a project manager for FEMA

17 for the Building Performance Study whose name was Paul

18 Tertell?

19    **A  Yes, he was involved in the search for**

20 **any responsive records, yes.**

21    Q  Okay. Did you understand he was the

22 Building Performance Study project manager for FEMA?

27

1    **A  Yes.**

2    Q  All right. Could you tell from the

3 records you reviewed whether Paul Tertell received any

4 emails regarding the Building Performance Study?

5    **A  From the records -- from the records I**

6 **reviewed, it was clear -- it was -- I was under the**

7 **impression and I believe that there was no reason to**

8 **believe any of the emails were even responsive, so I**

9 **didn't see any indication that they were collected but**

10 **I also -- but from my review, it was clear that they**

11 **weren't responsive to the request so it wouldn't be**

12 **something that would be considered.**

13    Q  So you're saying it was clear to you

14 that Mr. Tertell received emails but you didn't think,

15 from your review, those emails would have been

16 responsive to Mr. Cole's request?

17     MR. TEPE: Objection to form.

18 BY MR. HARRISON:

19    Q  You may answer.

20    **A  I believe he received emails related to**

21 **his work on the study, but from my review of the**

22 **request, those were not responsive to the request.**

28

1    Q  Yes. Do you think any of Mr. Tertell's

2 emails that you reviewed or became aware of would have

3 been helpful in a search for records responsive to

4 Mr. Cole's request?

5    **A  No, I don't.**

6     MR. TEPE: Objection to form.

7     THE WITNESS: Oh, I'm sorry.

8     MR. TEPE: No, go ahead.

9     THE WITNESS: Okay. No, I don't.

10 BY MR. HARRISON:

11    Q  You're fine. So did you review --

12 well, let me just ask you, did you have access to

13 Mr. Tertell's email archive in your preparation work

14 on this case?

15    **A  No, I did not.**

16    Q  Do you know whether Mr. Tertell's

17 emails are still available to be reviewed at FEMA

18 today?

19    **A  Due to the disposition schedule, it's a**

20 **possibility that they may not be.**

21    Q  Did you determine that either way in

22 your inquiries?

---

29

1       A    In my inquiries through reviewing the
2  case, is that what you're referring to?
3       Q    Well, any inquiries you have done
4  basically in your life, have you ever come to know
5  whether Mr. Tertell's emails still exist or not?
6       A    No, I haven't -- I haven't looked into
7  the matter as to whether or not they're available or
8  not, but generally based on the timeline of this and
9  our disposition schedule, they are more than likely
10 not available.  Sometimes they're kept, depending on
11 the situation and employee, but typically they
12 wouldn't -- they usually are destroyed by this time.
13      Q    Are you still there, Mr. Bridges?
14      A    Yes.  I'm sorry, can you hear me?
15           MR. TEPE:  Mick, you're muted.  You
16 dropped briefly, now you're muted.
17           MR. HARRISON:  So you missed my
18 joke there, that's probably good.
19 BY MR. HARRISON:
20      Q    So I think we had probably a
21 Mr. Jackson Schueler related power reboot.  And,
22 Mr. Bridges, are you still able to hear me?

---

30

1       A    Yes, I can hear you.
2       Q    Okay, so sorry for that interruption
3  and glad that it was very temporary.
4            So in terms of the emails at FEMA, you
5  were describing disposition schedules and that
6  Mr. Tertell's emails, given the passage of time, may
7  not have been maintained or retained under those
8  schedules, am I hearing you correctly?
9       A    Yes, that's correct.
10      Q    But I also take it you did not confirm
11 with certainty whether Mr. Tertell's emails had been
12 retained?
13      A    No, I have not looked into whether or
14 not they're still available.
15      Q    Okay.  Did you make any effort to
16 determine if any of Mr. Tertell's emails that he
17 received relating to the Building Performance Study
18 had attachments that may have been in the categories
19 requested by Mr. Cole?
20      A    Just to make sure I heard you, did you
21 mean the Agency at the time or did I do it myself?
22      Q    That's a good question for

---

31

1  clarification, so let's take one part of it.  In your
2  work yourself in reviewing records on Mr. Cole's case,
3  did you make any determination whether any of
4  Mr. Tertell's emails had attachments that would have
5  been responsive to Mr. Cole's FOIA request?
6       A    No, I did not.
7       Q    All right.  Do you know from reviewing
8  the record of FEMA's work of Mr. Cole's FOIA request
9  whether anyone at FEMA reviewed Mr. Tertell's emails
10 to see if any of his Building Performance Study
11 related emails had attachments that would have been
12 responsive to Mr. Cole's FOIA request?
13      A    No, they did not.
14      Q    Did you have access in your review of
15 the record to Mr. Paul Tertell's computer hard drive
16 that he would have had and worked with during the time
17 he worked on the Building Performance Study?
18      A    No, I did not.
19      Q    Could you tell from reviewing the
20 records on Mr. Cole's case whether any FEMA staff in
21 doing the search for responsive records for Mr. Cole's
22 request had examined Mr. Tertell's hard drive?

---

32

1       A    From what I saw, there was no
2  indication that it was searched.
3       Q    And have you come to know since you've
4  been at FEMA whether FEMA maintains any backup data
5  storage systems, whether it's an electronic backup or
6  hard drives on personal computers or whether it's a
7  backup for email systems, is there any sort of backup
8  or archive at FEMA for records?
9            MR. TEPE:  Objection, form, vague,
10 and compound.
11 BY MR. HARRISON:
12      Q    You may answer.
13      A    It's really situational, from my
14 understanding but, again, that falls more under the
15 responsibility of the records program, the Records
16 Management Program, so I really can't really speak to
17 anything specifically.
18      Q    Okay.  As a FOIA person for an agency,
19 if you're going to ensure that your agency responds
20 fully to a FOIA request and does a diligent search for
21 responsive records, would it not be relevant to your
22 task to know what backup records and backup systems

33

1  existed?
2          MR. TEPE:  Objection to form.
3          THE WITNESS:  That's really more
4  on -- that's really more on a situational basis;
5  we base it off of the need -- we have to have a
6  reason to conduct a search like that or to look
7  into issues like that.  What we do -- so it really
8  depends on the circumstances of that particular
9  request, and it's not necessarily something we
10  would just do categorically no matter what the
11  request was.
12  BY MR. HARRISON:
13      Q    And the something you're referring to
14  that you either would or wouldn't do depending on the
15  request, in other words wouldn't do categorically, I
16  take it you're referring to a search of Agency
17  electronic backup storage?
18      **A    Yes.**
19      Q    Okay.  Now, in this particular case,
20  you have indicated that Mr. Tertell's emails may not
21  have been retained, you did not ascertain that with
22  certainty but may not have been retained, given the

34

1  passage of time; do you know what the Agency
2  disposition schedule or policy would have been for
3  Mr. Tertell's emails?
4      **A    I don't have the -- I don't know the**
5  **specific section of the records disposition that his**
6  **emails may fall under, but general emails -- generally**
7  **emails are kept for six years.**
8      Q    Okay.  Are you familiar with any Agency
9  records retention policies, whether based in a statute
10  or otherwise, that would indicate that records for a
11  study or investigation like the Building Performance
12  Study would be considered permanent records?
13          MR. TEPE:  Objection, form,
14  foundation, scope.
15          THE WITNESS:  I would say when it
16  comes -- just to clarify, when you say permanent
17  records, do you mean permanent records that the
18  National Archives assumes ownership of?
19  BY MR. HARRISON:
20      Q    That's a good clarifying question as
21  well, sir.  To start for the question I just asked
22  you, let's use the definition of permanent to mean the

35

1  Agency itself should maintain the record in
2  perpetuity.
3          MR. TEPE:  Objection to form.
4          THE WITNESS:  Again, this is more
5  under the Records Management, Records Management
6  program, but to my -- to my knowledge, every
7  Agency record under FEMA has some type of
8  destruction date; some are longer than others,
9  some are shorter than others.
10          But if something is being
11  maintained for permanent storage, then typically
12  National Archives would assume the ownership of
13  that, and it's under their discretion to determine
14  if something is considered permanent.
15  BY MR. HARRISON:
16      Q    And do you know whether any of FEMA's
17  World Trade Center records, whether or not they were
18  Building Performance Study related, were transferred
19  to the National Archives at some point in time?
20          MR. TEPE:  Objection, form, outside
21  the scope.
22          THE WITNESS:  To my knowledge, they

36

1  were transferred to NIST and not to National
2  Archives.
3  BY MR. HARRISON:
4      Q    Well, let me be clear.  You did review
5  Mr. Cole's FOIA case record, correct?
6      **A    Yes.**
7      Q    And did you review in it a letter
8  written from FEMA to Mr. Cole regarding Mr. Cole's
9  questions regarding the status of his FOIA request, in
10  which an Agency representative pointed out to Mr. Cole
11  that 490,000 pages of World Trade Center records were
12  transferred to the National Archives and had not been
13  searched for records responsive to Mr. Cole's request;
14  do you remember reviewing that?
15      **A    Yes, I'm aware of that.**
16      Q    Okay.  So at the moment, and it's sort
17  of a subtle thing to pick up on, at least the first
18  time around, when I asked the question that I
19  intentionally used the term World Trade Center instead
20  of Building Performance Study, so I want to point that
21  out to you as I ask you the question again.  Are you
22  aware that FEMA transferred World Trade Center records

37

1 to the National Archives?
2     **A  I'm aware —**
3     MR. TEPE: Objection, form, scope.
4     THE WITNESS: I'm aware that
5 specifically Region 2 of the Agency transferred
6 the records in question; those records were all
7 created and all maintained by Region 2 of FEMA.
8 And those records were not responsive, even though
9 they relate to the World Trade Center, they are
10 not responsive to this particular request.
11 BY MR. HARRISON:
12     Q  And did you make that determination
13 yourself by reviewing those records?
14     **A  I didn't make the determination by**
15 **reviewing the records myself. I did review the**
16 **search -- the document and search records that the**
17 **staff at the time collected, and just my general**
18 **understanding of records maintained by the three**
19 **offices involved.**
20     Q  Did you see anything in the records you
21 reviewed on the Cole FOIA case that indicated that
22 anyone from FEMA had actually looked at the 490,000

38

1 pages of World Trade Center records transferred to the
2 National Archives to determine if they contained any
3 records responsive to Mr. Cole's request?
4     **A  No, because -- we didn't because it was**
5 **already established that the records in question, that**
6 **all of the records in question that would be**
7 **responsive to the request were the records that were**
8 **transferred over to NIST.**
9     Q  Now, I realize you weren't there with
10 the Agency at the time. Is it your understanding from
11 reviewing the records in the Cole FOIA case that that
12 position the Agency has taken, that they transferred
13 all of their records responsive to Mr. Cole's request
14 to NIST, is it your understanding that that Agency
15 position is that, after that transfer, that FEMA
16 maintained no emails, no hard drives, no electronic
17 backup storage of any records that would have been
18 responsive to Mr. Cole's request, that all those
19 things were given to NIST?
20     **A  That is my understanding, yes.**
21     Q  In your years working on FOIA cases,
22 have you ever seen a transfer like that happen?

39

1     MR. TEPE: Objection to form,
2 vague.
3     MR. HARRISON: Well, let me be
4 clear.
5     MR. TEPE: The question was
6 compound anyways, but --
7     MR. HARRISON: Well, I can make it
8 more clear.
9 BY MR. HARRISON:
10     Q  Have you ever had occasion in your work
11 on FOIA cases to see another example where an Agency
12 took the position that, in transferring records to
13 another agency, that it kept no originals, no copies,
14 no electronic backups, no computer hard drives, no
15 emails that would have contained any copies in any
16 form of those records, essentially they would have
17 given up any copy of those records, have you ever seen
18 that happen?
19     MR. TEPE: Objection to form,
20 compound, incomplete hypothetical.
21 BY MR. HARRISON:
22     Q  You may now answer.

40

1     **A  I can say in general, because that is**
2 **something that's really specific to the request, but**
3 **in general there have been instances where another**
4 **agency has assumed ownership of records or records**
5 **have been transferred to another agency who assumed**
6 **ownership of them.**
7     Q  Okay. And in those cases, the agency
8 receiving the records would have become the new owner
9 and would have had the responsibilities under law
10 about records' disposition and maintenance and access,
11 is that correct?
12     MR. TEPE: Objection, calls for a
13 legal conclusion.
14 BY MR. HARRISON:
15     Q  Well, just in your understanding as an
16 agency FOIA official?
17     MR. TEPE: Same objection.
18     THE WITNESS: I can say -- that's
19 really more of a Records Management question. But
20 from a FOIA perspective, once the agency assumes
21 ownership of the records, they have control of the
22 record. And once they have control of the record,

41

1 they're responsible for making any determinations
2 or final determinations on any requests for
3 information.
4            Specific when it comes to how
5 records disposition schedules are maintained,
6 that's really more situational, that's really
7 specific to Records Management programming. But
8 for FOIA, the control of the record is what
9 matters, and once they assume ownership, they also
10 assume control.
11 BY MR. HARRISON:
12      Q   Was it your understanding in Mr. Cole's
13 case regarding the Building Performance Study records
14 that FEMA had, that FEMA turned over Mr. Paul
15 Tertell's hard drive to NIST?
16      **A   They did not turn over his hard drive;**
17 **from what I saw, I didn't see any indication of that.**
18 **The only thing they turned over were the records that**
19 **were responsive to the requests.**
20      Q   And did you see any indication in the
21 records you reviewed that FEMA turned over
22 Mr. Tertell's emails to NIST in the manner that would

42

1 have eliminated his emails from FEMA's records?
2      **A   I didn't see any indication that -- I'm**
3 **sorry.**
4            MR. TEPE:  No, go ahead.  I object
5 to form.
6            THE WITNESS:  I didn't see any
7 indication that that occurred.
8            MR. HARRISON:  Mr. Tepe, did you
9 want to state an objection?
10           MR. TEPE:  I was just objecting to
11 form.
12           MR. HARRISON:  Okay.
13 BY MR. HARRISON:
14      Q   And thank you, Mr. Bridges.  Was it --
15 well, is it your understanding from reviewing the case
16 file in Mr. Cole's FOIA case that FEMA is taking the
17 position that the transfer of all of their Building
18 Performance Study records occurred in a single
19 installment in the May 2002 time period?
20           MR. TEPE:  Objection to form, lacks
21 foundation.
22           THE WITNESS:  From my understanding

43

1 of what I read from the records, that is what
2 occurred.
3 BY MR. HARRISON:
4      Q   Could you determine from your review of
5 the records whether any FEMA contractor such as
6 Greenhorne and O'Mara or Gilsanz Murray Steficek made
7 any additional transfers of Building Performance Study
8 records to NIST at times other than the May 2002 time
9 period?
10     **A   From my understanding, it was just that**
11 **one occurrence in May.**
12     Q   Now, I believe FEMA has taken the
13 position that when it did the initial search for
14 responsive records regarding Mr. Cole's request, that
15 FEMA searched three FEMA locations, is that your
16 understanding?
17     **A   Yes, it is.**
18     Q   And do you recall which three locations
19 FEMA searched?
20     **A   FEMA Region 2, our Office of External**
21 **Affairs, and the Mitigation Branch of our Flood**
22 **Insurance Mitigation Administration.**

44

1      Q   All right.  And that latter office we
2 sometimes shorthand as FIMA?
3      **A   FIMA or in this case Mitigation, the**
4 **specific part, yes.**
5      Q   Or Mitigation?
6      **A   Yes.**
7      Q   All right.  Now, the Mitigation office
8 was in headquarters?
9      **A   Yes, it is.**
10     Q   And the Region office is in New York?
11     **A   Yes, for Region 2, yes.**
12     Q   And the External Affairs Office, where
13 is that located?
14     **A   That is also in FEMA headquarters in**
15 **D.C.**
16     Q   Okay.  Could you tell from your review
17 of the records whether, in addition to those three
18 locations, whether there was any search of the
19 Greenhorne and O'Mara office records?
20     **A   No, there was not, from what I saw.**
21     Q   Did you determine from your review of
22 the records whether there was any search of the

45

1 Gilsanz Murray Steficek offices for responsive
2 records?
3     **A**   **I don't recall seeing any indication**
4 **that they were searched.**
5     Q   Do you know which of the three FEMA
6 entities you mentioned, the FEMA headquarters External
7 Affairs, the Mitigation Office at headquarters, or the
8 Region 2 office in New York, had any involvement in
9 the Building Performance Study for FEMA?
10     MR. TEPE: Objection to form,
11 compound. If you're not sure, you can have him
12 ask the question again.
13     THE WITNESS: From my
14 understanding -- could you repeat it just one more
15 time, if you don't mind?
16 BY MR. HARRISON:
17     Q   Yes. The three FEMA offices you
18 indicated the records had been searched, the External
19 Affairs at the Headquarters, the Mitigation at
20 headquarters, and the Region 2 in New York, could you
21 determine from your review of the records which of
22 those offices had involvement in FEMA's Building

46

1 Performance Study?
2     **A**   **Based on --**
3     MR. TEPE: Objection to form.
4     THE WITNESS: Based on the search
5 that was conducted, the Mitigation branch was
6 involved in creating the study.
7 BY MR. HARRISON:
8     Q   Okay. Do you know anything about
9 involvement of the other two offices in the Building
10 Performance Study?
11     **A**   **We did a search of the other two**
12 **offices; it was established that Region 2 was not**
13 **involved in creating the study; Mitigation was. The**
14 **External Affairs Office did have responsive records**
15 **but those were the photographs, and we didn't have to**
16 **provide those because they were already available**
17 **online and we provided that link to the requester.**
18     Q   Now, your statement that Region 2 was
19 not involved in the Building Performance Study, is
20 that from your review of the case record or is that
21 your own determination?
22     **A**   **That was based off of my review of the**

47

1 case records.
2     Q   Have you ever actually reviewed the
3 Building Performance Study report?
4     **A**   **Not this particular one. Not this**
5 **particular one in question but I have, in processing**
6 **requests, we have reviewed other types of reports**
7 **created by the Mitigation Branch.**
8     Q   Understood. So I take it you wouldn't
9 know whether Region 2's name is on the Building
10 Performance Study report?
11     **A**   **Not on this one. Just from my general**
12 **knowledge of how FEMA's organized, that would be**
13 **something that would be under the purview of the**
14 **Mitigation branch. So it wouldn't be something that**
15 **Region 2 would take an active part in creating.**
16     Q   So let me be clear about my question.
17 Mr. Bridges, we have the study and the cover does say,
18 just FYI, has Region 2 on the cover of the study. My
19 question to you is whether you were aware that the
20 study report has Region 2 on the cover?
21     **A**   **It has Region 2 on the cover, yes.**
22     Q   Okay. Could you tell from reviewing

48

1 the case records for Mr. Cole's request whether
2 Paul Tertell was involved in the FEMA search for
3 responsive records?
4     **A**   **Yes, he was.**
5     Q   And could you tell what was the nature
6 of his involvement in that search?
7     **A**   **He seemed to be the staff member in the**
8 **Mitigation branch that was on this particular study,**
9 **and he seemed to be the one who had an active part in**
10 **creating it.**
11     Q   Okay. Did he do something to help
12 locate records responsive to Mr. Cole's request, to
13 your knowledge?
14     **A**   **He was consulted and asked to identify**
15 **any known locations that he believed -- that he's**
16 **aware of records responsive to the request existed.**
17     Q   Did you know who asked him that request
18 as part of the FEMA search?
19     **A**   **That office -- that came from our**
20 **office; we filtered that question through FIMA's main**
21 **point of contact and eventually to the Mitigation**
22 **branch.**

49

1    Q   Do you know what Mr. Tertell's answer
2  to that question was?
3    **A   Not the specific verbiage, but during**
4  **the search of the Mitigation branch was when we**
5  **discovered that the records were transferred.**
6    Q   Now, I want you to think carefully
7  about this, Mr. Bridges, because it's kind of key to
8  the matter we're discussing.  And we were given some
9  documents by the Agency in this case in discovery,
10  which are helpful in many ways but they didn't seem to
11  answer this particular question with clarity, and I'm
12  hoping you might answer it for me from your review of
13  the records, I don't know if you can.
14    The question was what is the first
15  instance in FEMA that told the FEMA FOIA office that
16  responsive records for Mr. Cole's request had all been
17  transferred to NIST; do you know who it was in the
18  first instance who took that position?
19    **A   Mr. Tertell said it, I'm not sure in**
20  **what order he conveyed it as far as who was first.**
21  **But it was -- it's definitely clear that the**
22  **Mitigation branch was the group in the Agency who told**

50

1  us about the transfer.
2    Q   Yeah, I'm just looking for a name of
3  who was asserting that they knew that that transfer
4  had been made to NIST and that FEMA had retained
5  nothing in terms of copies of those records; do you
6  think that was Mr. Tertell, or do you think he was
7  just conveying something told to him, from your review
8  of the records?
9    **A   I don't recall the specific order as**
10  **far as someone else, you know, also confirmed what was**
11  **said by Mr. Tertell.  But what was provided to us is**
12  **considered the official response from the branch**
13  **itself, so that's why I'm saying the Mitigation branch**
14  **is the group in the agency that told us about the**
15  **transfer.**
16    Q   Now, do you recall that one of the
17  items that was transferred or indicated had been
18  transferred was something called an FTP site backup,
19  does that ring a bell?
20    MR. TEPE:  Objection, form.
21    THE WITNESS:  I don't recall if
22  that's what it's definitely called, but I believe

51

1  there was something related to a backup that was
2  included in that transfer but I'm not sure on that
3  part.
4  BY MR. HARRISON:
5    Q   Okay.  Did you have occasion to review
6  in your preparation regarding this case a memorandum
7  of June 11, 2002 from Terri McAllister to Paul Tertell
8  and Eric Letvin, subject transfer of WTC data from
9  FEMA to NIST which states, "On Wednesday, May 29,
10  2002, the following materials were delivered to NIST
11  from Greenhorne and O'Mara," and it goes on; did you
12  review that document?
13    **A   I reviewed the document and, to my**
14  **mind, I can't recall every single item that was listed**
15  **to say specifically, but I remember seeing something**
16  **about a backup, I just don't know if it was the FTP**
17  **backup, that's not what I can recall right now.**
18    Q   I understand.  There is, I'll just
19  attempt to refresh your memory -- I did by the way,
20  post the Agency's discovery responses to the website
21  of Planet Depos as exhibits.  And on one of those
22  documents, which I may be able to tell you, the NIST

52

1  Production of Documents document, which was not the
2  FEMA production but from NIST, it does have a clear
3  copy of this memo.
4    And, just for the record, that memo can
5  be found in NIST document production with a bates
6  stamp of COLE-15CB1991-NIST-0001 and 0002.  And I'll
7  just represent, Mr. Bridges, that the very last item
8  on page two under CDs on that index or inventory, and
9  I'll quote, "Item 4, backup of FTP site for World
10  Trade Center BPS," do you know what that's referring
11  to?
12    MR. TEPE:  Again, you're asking a
13  question about a document that's not before the
14  witness.
15    MR. HARRISON:  Well, I think it's
16  on the screen at the moment.
17    MR. TEPE:  Well --
18    MR. HARRISON:  Do you see it on the
19  screen now?
20    MR. TEPE:  All right.
21    THE WITNESS:  Yes, I do.
22

53

1 BY MR. HARRISON:

2     Q   Okay. If you go down to page two there

3 at the bottom, you see, "backup of FTP site for WTC

4 BPS," it says what I just said. And my question to

5 you at the moment isn't really about this document,

6 it's about whether you know what's being referenced

7 there as, "backup of FTP site for World Trade Center

8 BPS," do you know what's being referenced there?

9       MR. TEPE: I also note that this

10 witness has not been designated on the delivery,

11 the actual records delivered from, I think that

12 was topic number 18. So I think this question

13 might be more, you know, in Mr. Letvin's domain.

14       MR. HARRISON: No, I appreciate

15 that, we may take you up on that. But I'm really

16 trying to got at this witness's understanding of

17 the nature of the search, and what was done and

18 wasn't done, and what might have been done.

19 BY MR. HARRISON:

20     Q   And the reason I'm asking, Mr. Bridges,

21 about this particular item, my understanding of what

22 this is referring to is the FTP is the final transfer

54

1 protocol website where Billing Performance Study

2 documents are being posted, and I'm trying to

3 determine whether you have that same understanding?

4       MR. TEPE: Well, I'll object to

5 lack of foundation, and also that he's not

6 designated on this.

7       MR. HARRISON: Well, I'm trying to

8 lay a foundation for another question which is,

9 you know, what happened to that website, what

10 happened to those files, were they searched, were

11 they available to FEMA to search, but I'm trying

12 to get there one step at a time.

13 BY MR. HARRISON:

14     Q   Do you have an understanding of this

15 FTP site backup and what it is or what it was,

16 Mr. Bridges?

17     **A   I do not have a knowledge of what**

18 **specifically is on the FTP site. And a FTP site can**

19 **hold a number of files, so I'm not sure what**

20 **specifically was on that backup. But those were the**

21 **files that were in the possession of the contractor at**

22 **the time, so I really couldn't speak to those specific**

55

1 **ones. But, in general, an FTP site can hold a lot of**

2 **files, so I think you would probably have to go into**

3 **one to really know what was in there.**

4     Q   Are you speaking of -- are you

5 referring to Greenhorne and O'Mara when you say

6 contractor?

7     **A   Yes, I am.**

8     Q   And was it your understanding from

9 reviewing the file that Greenhorne and O'Mara was a

10 prime contractor for FEMA in doing the Building

11 Performance Study?

12       MR. TEPE: Objection to form.

13       THE WITNESS: It's my understanding

14 that they were in possession of the records that

15 were responsive to the request.

16 BY MR. HARRISON:

17     Q   Did you not come to an understanding

18 about their role on the Building Performance Study for

19 FEMA?

20       MR. TEPE: Objection, outside the

21 scope.

22       THE WITNESS: From my understanding

56

1 of reading the records, they were contracted to

2 prepare the what would be the actual report

3 itself.

4 BY MR. HARRISON:

5     Q   Okay. And from your review of the

6 records, could you determine whether Mr. Paul Tertell

7 at FEMA would have had access to this FTP site?

8     **A   I didn't --**

9       MR. TEPE: Objection to form.

10       THE WITNESS: I didn't see any

11 indication or there wasn't anything that

12 referenced, from what I saw, what he had access to

13 as far as the contract records or not.

14 BY MR. HARRISON:

15     Q   Okay. You couldn't tell from the

16 records you reviewed what access he would have had to

17 either the FTP site or other Greenhorne and O'Mara

18 records?

19     **A   I didn't see any reference in the files**

20 **that we had that would speak to that, no.**

21     Q   Okay. So in your review of the

22 records, when this transfer in May 2020 occurred from

57

1  FEMA to NIST of Building Performance Study records,
2  did you see any indication that the website itself was
3  either taken off line or destroyed?
4        MR. TEPE: I object to form,
5  foundation, scope.
6        THE WITNESS: How the -- I really
7  don't have any knowledge of how the contractors
8  maintain their own files, no.
9  BY MR. HARRISON:
10       Q   You're assuming that FEMA had no
11  control over the website, is that your assumption?
12       MR. TEPE: Objection to form,
13  foundation, scope. It's also outside, yeah, I
14  mean it's outside the topics that he's designated
15  for.
16       MR. HARRISON: Well, we're leading
17  to your search questions in this.
18  BY MR. HARRISON:
19       Q   If FEMA had control of the site or
20  access to the site, then it would have been available
21  to FEMA to search. So do you recall the question,
22  Mr. Bridges?

58

1        A   I'm sorry, could you repeat it?
2        Q   So, I believe -- well, actually, I
3  don't know.
4        MR. HARRISON: Ms. Court Reporter,
5  could you repeat that one question back?
6        (Whereupon, the pertinent part of the
7  record was read as follows:
8        "Answer: I really don't have any
9  knowledge of how the contractors maintain their own
10  files, no.
11       "Question: You're assuming that FEMA
12  had no control over the website, is that your
13  assumption?")
14  BY MR. HARRISON:
15       Q   Okay. So did you have an
16  understanding, Mr. Bridges, from your review of the
17  records whether FEMA had some control over this FTP
18  website?
19       MR. TEPE: Objection, foundation,
20  scope.
21       THE WITNESS: From what I read, I
22  see no indication that FEMA did.

59

1  BY MR. HARRISON:
2        Q   All right. Did you see any indication
3  in what you reviewed that FEMA had searched the
4  website for records responsive to Mr. Cole's request?
5        A   I didn't see -- I didn't. I didn't see
6  where they conducted a search, no.
7        Q   Now, is it your understanding from
8  reviewing the case records that during the processing
9  of Mr. Cole's FOIA request, that at some point FEMA
10  transferred the request to NIST for processing?
11       A   I'm sorry, could you repeat that one
12  more time, I'm sorry?
13       Q   That's okay, sir. Was it your
14  understanding from reviewing the case record that at
15  some point, FEMA transferred the FOIA request to NIST
16  to be responded to?
17       A   From my understanding, that happened
18  nine years before the actual request by Mr. Cole was
19  made.
20       Q   Well, let me make a distinction for
21  you. My question is about not transferring Building
22  Performance Study records, which I think is what

60

1  you're speaking to and I understand that part. My
2  question is about transferring a FOIA request for
3  processing from the agency that received it to another
4  agency that may have the ability to respond to it.
5        A   Oh, I'm sorry.
6        Q   And all I'm asking --
7        A   Yes.
8        Q   That's okay.
9        A   I'm sorry, yes, that did occur. Yes,
10  they did refer the request to NIST.
11       Q   Okay. And at some point, did NIST then
12  respond and provide what NIST considered to be
13  responsive records back to FEMA?
14       A   As part of a consultation, yes, they
15  did.
16       Q   Okay. And did you review, in your
17  preparation and your review of the case, did you
18  review the records that NIST returned to FEMA?
19       A   I didn't review the actual records that
20  they provided in response to the consultation, but I
21  did review the analysis done by the staff at the time
22  before they gave it back to the Agency.

61

1    Q    Okay.  Did you make any determination
2  in your review whether the materials that NIST
3  returned to FEMA as responsive to Mr. Cole's request
4  included either the FTP site backup or any files from
5  the FTP site backup?
6          MR. TEPE:  Objection, outside the
7  scope.
8          THE WITNESS:  From my review of the
9  records, I didn't see -- I can't recall what
10 specific records were provided during the
11 consultation.
12 BY MR. HARRISON:
13   Q    Okay.  Now, from your review of the
14 case, once NIST returned that set of records to FEMA,
15 whatever that set included, did FEMA do any additional
16 search for responsive records after receiving those
17 records from NIST?
18   **A    No, that wouldn't have been necessary.**
19   Q    So your understanding is the FEMA
20 search ended with the return of the records from NIST?
21         MR. TEPE:  Objection, form.
22         THE WITNESS:  Are you referring to

62

1  the records that they sent over to us during the
2  consultation, are those the records you're
3  referring to?
4  BY MR. HARRISON:
5    Q    Yes, I think we're talking about the
6  same set of records.
7          MR. HARRISON:  Mr. Tepe, did you
8  want to interject something?
9          MR. TEPE:  I just wanted to object
10 to form, because I thought there was some lack of
11 clarity there but --
12         MR. HARRISON:  I understand.  So
13 there may be some lack of clarity there.
14 BY MR. HARRISON:
15   Q    So I want to be clear, Mr. Bridges,
16 that you and I are talking about the same thing.  When
17 you're talking about the records NIST returned in the
18 consultation, are you referring to the approximately
19 3,900-some pages that NIST sent back to FEMA,
20 indicating that those records may be responsive to
21 Mr. Cole's request and that FEMA should make that
22 determination, are we talking about the same set of

63

1  records?
2    **A    Those are the records --**
3          MR. TEPE:  Objection to form.
4          THE WITNESS:  Those are the records
5  I'm referring to.  And to answer the question,
6  it's a common practice for agencies to have
7  records responsive to a request that happen to
8  have equity from another agency.  So in this case,
9  NIST received the request for the records in
10 question because we transferred the request over
11 to them; upon receipt of that request, they are
12 the agency that's obligated to do the search for
13 responsive records for anything in their
14 possession, which they did, they located these
15 records, and FEMA's equity was involved.
16         So they sent the records over to us
17 to review in order to determine if there is any
18 information from our perspective that we felt
19 would not be appropriate for release; we make our
20 recommendation, and then they return it back to
21 the Agency.
22         NIST, who is the agency processing

64

1  the request, is ultimately responsible for any
2  final determinations or any searches conducted in
3  response to that request, so that's why FEMA did
4  not have to do one.
5  BY MR. HARRISON:
6    Q    So I think I understand your answer and
7  I want to be clear on this point for the record, but I
8  take your answer to be from your review of the case
9  record that there was no additional FEMA search for
10 responsive records after the point in time when NIST
11 returned that set of 3900 or so pages of records to
12 FEMA, is that your understanding?
13   **A    My understanding -- yes, the standard**
14 **practice is that the consulting agency is not required**
15 **to conduct its own search in response to a request for**
16 **consultation because the search for responsive records**
17 **was done by the originating agency; in this case, it**
18 **was NIST.**
19         MR. TEPE:  Can we take a, just
20 whenever is convenient Mick, we've been going for
21 about 75 minutes, might be time for a break.
22         MR. HARRISON:  Sure, time for a

65

1  break?  We can do that in just a minute.  I just
2  had another related question I was hoping to get
3  in before I lose it.
4            MR. TEPE:  Sure.
5  BY MR. HARRISON:
6       Q    So at some point in time, I take it you
7  understand that neither NIST or FEMA produced any
8  records to Mr. Cole until Mr. Cole decided to bring
9  this particular lawsuit in 2015, was that your
10 conclusion from reviewing the record?
11           MR. TEPE:  Objection, outside the
12 scope.
13           THE WITNESS:  I do believe that,
14 from what I saw, that -- and I'm not sure because
15 I don't work at NIST and I can't really testify,
16 but I saw indications that an interim release of
17 records was provided, at the very least.
18 BY MR. HARRISON:
19      Q    I think you're correct about that.  I
20 think there were two such interim releases by NIST, so
21 let me refine my question.  The 3900 or so pages of
22 records that NIST returned to FEMA, is it your

66

1  understanding that none of those records were produced
2  to Mr. Cole until after this lawsuit was commenced?
3            MR. TEPE:  Objection, outside the
4  scope.
5            THE WITNESS:  That's the part that
6  I can't speak to because, again, that was done in
7  consultation.  So our only role in that is to
8  provide recommendations based on our perspective,
9  and then we return those records back to the
10 agency, in this case NIST, and, you know, how the
11 records are then ultimately released would be on
12 them.
13 BY MR. HARRISON:
14      Q    Is it your review of the case record --
15 based on your review of the case record, is it your
16 conclusion that when the back-and-forth between FEMA
17 and NIST eventually ended, that the legal
18 responsibility, the ball, if you will, was in NIST's
19 court to respond to Mr. Cole rather than it being
20 FEMA's responsibility to respond?
21           MR. TEPE:  Objection.
22           THE WITNESS:  Yes.

67

1            MR. TEPE:  Objection to form, calls
2  for a legal conclusion, outside the scope of the
3  deposition.  Go ahead.
4            THE WITNESS:  FEMA would not
5  respond to or make a final determination on a
6  request that was not received by us so, no, we
7  didn't.  Whenever -- however NIST did it, I can't
8  speak to that.
9  BY MR. HARRISON:
10      Q    So putting aside whose responsibility
11 it was, which agency's, which is a legal question, is
12 it your understanding that whether or not FEMA had a
13 responsibility to do so, that it just, as a matter of
14 fact, FEMA did not release any of those 3,900 pages of
15 records that it had received from NIST to Mr. Cole
16 until after this litigation commenced?
17           MR. TEPE:  Objection to form,
18 outside the scope.  The releases after the
19 litigation commenced is not any of the topics on
20 the deposition notice.
21           MR. HARRISON:  I have to disagree
22 with you on that, you may be able to tell why I

68

1  say that in a minute from my next question.
2  BY MR. HARRISON:
3       Q    You may answer, Mr. Bridges.
4       A    **To my -- to my knowledge, FEMA did not**
5  **release any records in relation to this consultation.**
6       Q    Okay.  Now, after the litigation
7  commenced, could you tell from the record you reviewed
8  that Mr. Cole was given a set of records by at least
9  the Agency counsel either on behalf of FEMA or NIST or
10 both, and that Mr. Cole identified certain records he
11 felt existed and were responsive that were missing
12 from the set of records he was provided; could you
13 tell that from the record that you reviewed?
14           MR. TEPE:  Objection, outside the
15 scope.  Outside the scope of even the authorized
16 discovery, the adequacy of the search.  This
17 witness hasn't been designated to talk about, you
18 know, releases after the litigation commenced.
19           MR. HARRISON:  Well, I'm just
20 laying the foundation for my question, which is
21 about whether there was a subsequent search by
22 FEMA for responsive records after the litigation

69

1  commenced, I haven't asked that yet but I'm about
2  to.
3  BY MR. HARRISON:
4      Q   So could you tell from reviewing the
5  record that Mr. Cole had identified certain records
6  that were missing from what he was provided?
7      **A   I did see indication that he was not**
8  **satisfied with the search because of what he felt to**
9  **be missing records.**
10     Q   And in your review of the record
11 provided to you to review for preparing for this
12 deposition, could you determine whether FEMA conducted
13 any additional search for responsive records after
14 Mr. Cole had brought his lawsuit?
15         MR. TEPE:  Objection to form.
16         THE WITNESS:  From my review, I
17 don't see where FEMA did do that.
18         MR. HARRISON:  Okay, let's take a
19 ten-minute break, Mr. Tepe, is that sufficient?
20         MR. TEPE:  Yeah, that's fine.
21         Maybe, Jackson, just throw the
22 Government people into a breakout room.

70

1          TECHNICIAN:  Okay, stand by.
2          MR. HARRISON:  Thank you.  Back in
3  ten minutes, folks.
4          (Whereupon, a short recess was taken.)
5          MR. HARRISON:  So we're back from
6  the break, and we'll resume our questions, I have
7  a few more for the witness.  If you'll bear with
8  me, I'm selecting them from a longer list, some of
9  which we have covered and some of which will not
10 apply to Mr. Bridges, and then we'll take a lunch
11 break after Mr. Bridges.
12         And we'll note that before we close the
13 deposition for Mr. Bridges, I will have marked the
14 five discovery response documents as exhibits which
15 will carry with the deposition, just as a heads up.
16         MR. TEPE:  I'm sorry, where are
17 these documents?  What documents are you talking
18 about?
19         MR. HARRISON:  They have been
20 uploaded to Planet Depo's website for exhibits,
21 you should be able to download them with the link
22 that's been provided.  But you have them,

71

1  Mr. Tepe, you may want to check my versions but
2  they should be your versions; these are the two
3  documents productions, one from FEMA and one from
4  NIST.  The NIST responses combined responses to
5  interrogatories and document requests, and then
6  the FEMA separate responses to interrogatories and
7  document requests, so five documents total.
8          MR. TEPE:  Okay.  And so you're
9  saying that you want them to be exhibits?
10         MR. HARRISON:  I do, and I'll mark
11 them at the end of Mr. Bridge's deposition.
12         MR. TEPE:  Okay.  I'm trying to get
13 access to the share file site.
14         MR. HARRISON:  Would you rather me
15 email them to you?
16         MR. TEPE:  Well, no, I mean, you
17 know, we try and replicate as much as possible as
18 if we were all in, you know, one room and so I
19 think --
20         REPORTER:  I think the Tech has put
21 them in the chat for you, Mr. Tepe.
22         MR. TEPE:  Yeah, I keep on getting

72

1  a website that is asking for a --
2          TECHNICIAN:  I'll drop all the
3  files in the chat.
4          MR. TEPE:  Yeah, that would be --
5          MR. HARRISON:  Thank you for that.
6          MR. TEPE:  -- yeah, would be the
7  easiest, thank you.
8  BY MR. HARRISON:
9      Q   So, Mr. Bridges, do you know from your
10 review of the case file who at FEMA was the person who
11 decided what steps would be taken and would not be
12 taken in the search for records responsive to
13 Mr. Cole's request?
14         MR. TEPE:  Objection, vague.
15 BY MR. HARRISON:
16     Q   Is that ambiguous to you, Mr. Bridges?
17     **A   If you're -- are you saying which group**
18 **is responsible for making a determination of which**
19 **offices should be searched, is that the question?**
20     Q   That is part of it.  So I'm looking for
21 a person's name, not for an office.  What person
22 decided what steps would be taken in conducting the

73

1  search?
2  **A   I don't have the full name of the**
3  **person, but it would have been the Branch Chief at the**
4  **time, her first name is Connie and I don't remember**
5  **her last name, or Eric Neuschaffer at the time.  It**
6  **was the Branch Chief for the FOIA FEMA office is the**
7  **person who is ultimately responsible, and that's who**
8  **the people were dealing with Mr. Cole.**
9  Q   Okay, I think we have those names.  One
10  of them is Charlene Myrthil, she's not who you're
11  thinking of, by any chance?  Charlene Myrthil, I'll
12  actually spell it for you, I hope, if you'll bear with
13  me.  C-h-a-r-l-e-n-e Myrthil, M-y-r-t-h-i-l.
14  MR. TEPE: I object to the form.
15  THE WITNESS:  She worked in the
16  Disclosure branch at the time, so she would have
17  been involved in identifying the responsive
18  offices.
19  MR. TEPE:  Objection to form.
20  BY MR. HARRISON:
21  Q   Okay --
22  MR. TEPE: Sorry, I just want to

74

1  make sure that was there.
2  MR. HARRISON:  No problem.
3  BY MR. HARRISON:
4  Q   Do you know, Mr. Bridges, were there
5  any Subject Matter Experts, which we sometimes
6  abbreviate SME, were involved in FEMA's search for
7  records responsive to Mr. Cole's request?
8  **A   I'm sorry, there were two people**
9  **talking at a time, could you repeat the question?**
10  Q   Yes.  I may have been talking to
11  myself, I'm not sure how I did that.  So were there
12  any Subject Matter Experts involved in FEMA's search
13  for records responsive to Mr. Cole's request?
14  **A   Yes, there were.**
15  Q   Do you recall from your review of the
16  record who those Subject Matter Experts or SMEs were?
17  **A   One of them was Mr. Tertell from**
18  **Mitigation.  I don't remember the names for the**
19  **Region 2 and External Affairs Subject Matter Experts**
20  **at the time, but they each have their own offices as**
21  **well and they would have been consulted.**
22  Q   Okay.  Do you recall seeing any

75

1  communication from Mr. Tertell specifically where he
2  explicitly represented to the FOIA office that he had
3  not retained himself on his computer or emails any
4  Building Performance Study records?
5  **A   No.  He did identify all of the records**
6  **that were responsive, and his emails wasn't -- his**
7  **emails wasn't identified as part of the stuff that was**
8  **transferred over to NIST.**
9  Q   But in terms of my question, you do not
10  recall seeing any communication from him of the nature
11  I described?
12  **A   Not in the nature you described, no.**
13  Q   Could you tell from your review of the
14  record whether paper files at FEMA had been searched
15  for responsive records?
16  **A   Not from what I reviewed, no.**
17  Q   So are you saying you could not
18  determine or that it looked like paper files were not
19  searched?
20  **A   I saw no indication that paper files**
21  **were searched.**
22  Q   Thank you.  Could you tell from your

76

1  review of the case record or your own knowledge
2  whether at the time of the Building Performance Study
3  in 2002 through Mr. Cole's request in 2011 whether
4  there was a policy in FEMA to preserve hard copy or
5  paper versions of important emails?
6  MR. TEPE: Objection to form,
7  vague, compound.
8  THE WITNESS:  When you're saying
9  retention on the emails, are you speaking in
10  relation to this particular request or just in
11  general?
12  BY MR. HARRISON:
13  Q   At the moment, about a policy that
14  would be generally applicable within FEMA?
15  MR. TEPE:  Also object, outside the
16  scope.
17  THE WITNESS:  I'm not aware of a
18  policy that would exist, because the authority for
19  retention would be our disposition schedule so
20  that would be what would serve as the authority
21  for how long any type of email would be
22  maintained.

**77**

1  BY MR. HARRISON:
2      Q   So to be clear, Mr. Bridges, at the
3  moment I'm not asking about time periods for retention
4  but forms or formats of retention.  And my question,
5  putting aside time periods, is whether there was a
6  FEMA policy to have key emails preserved in paper or
7  hard copy form?
8          MR. TEPE:  Objection to form,
9  foundation, outside the scope.
10         THE WITNESS:  To clarify what I
11 meant, in the records, the disposition schedule
12 would spell out the format in addition to how long
13 the records would be maintained.  So it would also
14 state the type of format the records should be
15 preserved in and also how long it would be.
16 BY MR. HARRISON:
17     Q   Thank you.  Bear with me, I'm just
18 screening my questions in hopes of reducing them.
19     So, Mr. Bridges, at some point in this
20 lawsuit, Mr. Neuschaffer gave a Declaration regarding
21 FEMA's search and he -- I'll summarize what I
22 understand he stated about his own conclusion -- he

**78**

1  stated that at some point after the lawsuit was
2  commenced, FEMA's Disclosure Branch conducted another
3  search within Region 2 and consulted with a Subject
4  Matter Expert, and confirmed through that process that
5  the responsive records, the only responsive records
6  that FEMA had were basically the May 2002 documents
7  that FEMA had transferred to NIST and NIST had sent
8  back to FEMA; have you ever reviewed Mr. Neuschaffer's
9  Declaration?
10     **A   Yes, I've seen it.**
11     Q   Okay.  So would you disagree, based on
12 your review of the record, with Mr. Neuschaffer that
13 after the lawsuit was commenced, that another search
14 within Region 2 was conducted?
15         MR. TEPE:  Objection to form.
16         THE WITNESS:  Do I disagree with
17 that?  No, I agree that that's what happened.
18 BY MR. HARRISON:
19     Q   Okay.  Could you tell from your review
20 of the records the nature of that later search after
21 the lawsuit commenced?
22         MR. TEPE:  Isn't any searches of

**79**

1  Region 2 outside the scope of authorized
2  discovery?  I believe that was carved out.
3          MR. HARRISON:  No; that was just
4  about the warehouse that didn't exist that was
5  thought to exist for archived records, not about a
6  search of Region 2 for records that were not
7  archived in a warehouse, no carve-out on that.
8          MR. TEPE:  Well, I don't know if I
9  agree with that, and you haven't pointed us to
10 Neuschaffer's Declaration, you're just sort of
11 characterizing it, so --
12         MR. HARRISON:  Well, I don't have
13 an obligation to show you something that you have,
14 Counsel, which is a filing in the litigation.  The
15 witness didn't require it to answer the question.
16         MR. TEPE:  Well --
17         MR. HARRISON:  He said that he
18 reviewed it and agreed with it, so I'm not sure of
19 the nature of your objection.
20         MR. TEPE:  The nature of my
21 objection is I suppose, you know, foundation.  I
22 mean, you know, a deposition which you want to ask

**80**

1  a witness about something should have a proper
2  foundation.
3          You're not actually -- you know,
4  just because you don't want to show him something
5  doesn't mean that you have established proper
6  foundation for your questions.
7          MR. HARRISON:  Well, you're
8  entitled to maintain that objection and do what
9  you can with it later.  I'm trying to do discovery
10 here, efficiently, and there is nothing outside
11 the scope of allowed discovery in regard to this
12 topic, about FEMA's Branch Chief and Declarant
13 talking about the search that was done after the
14 litigation commenced, so I'm going to continue
15 with those questions to the extent I need to.
16 Your objection is noted.
17         MR. TEPE:  Well, out of
18 professional courtesy, can you tell me a paragraph
19 number of Mr. Neuschaffer's Declaration that
20 you're referencing?
21         MR. HARRISON:  I probably could do
22 that.  It would be Neuschaffer's Declaration,

**81**

1 electronic case file number 23-2, paragraph 37.
2 And I think it may have been referenced in Exhibit
3 4, number 30-8 and 2-4. But the first reference
4 is probably where Mr. Neuschaffer is talking about
5 the second search conducted after the lawsuit was
6 commenced; I don't think that's news to any
7 counsel in the case.
8 BY MR. HARRISON:
9     Q   So my question, Mr. Bridges, is whether
10 you can tell from reviewing the case record the nature
11 of that later search that was conducted by FEMA for
12 responsive records after the lawsuit was commenced?
13         MR. TEPE: I'm going to pause the
14 deposition here because I want to make sure that
15 this is not outside the scope of Court authorized
16 discovery, because the Court was very clear that
17 authorized discovery did not include searches of
18 Region 2 archives, which is what's referenced on
19 paragraph 37. So why don't we just go off the
20 record so that I can consult the Court's ruling?
21         MR. HARRISON: We can go off the
22 record for a moment.

**82**

1         (Whereupon, there was a discussion held
2 off the record.)
3         MR. HARRISON: Can you go back on
4 the record and go back to my last question?
5         (Whereupon, the pertinent part of the
6 record was read as follows:
7         "So my question, Mr. Bridges, is whether
8 you can tell from reviewing the case record the nature
9 of that later search that was conducted by FEMA for
10 responsive records after the lawsuit was commenced?")
11         MR. HARRISON: So do you wish to
12 state an objection, Mr. Tepe, to that?
13         MR. TEPE: Are we going back on the
14 record?
15         MR. HARRISON: Yes, you're on the
16 record.
17         MR. TEPE: So I'm going to object
18 to the form of the question, it lacks foundation
19 for a search.
20 BY MR. HARRISON:
21     Q   So you may answer the question,
22 Mr. Bridges; do you recall it?

**83**

1     A   When you say nature of the search, are
2 you referring to what steps were taken in the search
3 of Region 2 in response to the litigation? Okay --
4     Q   I didn't use -- hang on, I didn't use
5 Region 2 in my question. The question is could you
6 tell from reviewing the record the nature of the
7 search done by FEMA after the litigation commenced?
8 And I would agree with your clarification that I'm
9 asking about the steps taken by FEMA in conducting
10 that later search, if you can tell?
11         MR. TEPE: Objection to form, lacks
12 foundation, outside the scope.
13         THE WITNESS: Are you referring to
14 the Region 2 search? Because that may be a
15 different response. So is it just for Region 2 or
16 for --
17 BY MR. HARRISON:
18     Q   No, okay. So my question is about any
19 search done by FEMA and any office of FEMA after
20 litigation commenced. And if you have noted in the
21 record that you reviewed a search by any component of
22 FEMA after litigation commenced, you're welcome to be

**84**

1 precise in your answer in telling us which office
2 you're speaking of. And I would like to know in your
3 answer, eventually, everything you reviewed from any
4 office that was any additional search done after the
5 litigation commenced.
6         MR. TEPE: I would object to the
7 form of the question.
8         THE WITNESS: There were additional
9 searches done after the litigation, yes.
10 BY MR. HARRISON:
11     Q   And could you determine from your
12 review of the record what steps were taken in those
13 additional searches?
14     **A   There were -- depending on which office**
15 **you're referring to. For Region 2, I can tell that**
16 **there was a consultation done with the Subject Matter**
17 **Experts to identify if there were any documents that**
18 **were responsive to the requests.**
19     Q   All right, and this would --
20     **A   And the consultation --**
21     Q   Sorry.
22     **A   And a consultation would be our office**

85

1 **coordinating with the region to locate who would have**
2 **knowledge of the records or the subject matter, and**
3 **inquiring with them about whether or not the region**
4 **had any records responsive.**
5     Q   All right.  And in your review of those
6 records about that inquiry made after the litigation
7 commenced, do you recall which Subject Matter Expert
8 or Experts were involved?
9     **A   The names of the people don't -- I**
10 **don't recall the names of the people, but Region 2**
11 **definitely was involved in that search.**
12     Q   Okay.  And other than consulting with
13 the Subject Matter Expert, did you notice any other
14 steps taken in that search at that time?
15     **A   No, no, because from what I believe**
16 **from what I saw, I understand that there was no need**
17 **to continue the search beyond that for Region 2.**
18     Q   And in terms of your review of the
19 record for any search done after the litigation
20 commenced by any FEMA office other than Region 2, did
21 you notice anything else in regard to such a post-
22 litigation search by some other FEMA office?

86

1     **A   Mitigation was -- the Mitigation branch**
2 **was searched, from the records I reviewed, in a**
3 **similar fashion to Region 2, which consists of**
4 **consultation with Subject Matter Experts.**
5     Q   Are you saying that the additional
6 search in the Mitigation office was limited to a
7 consultation with a Subject Matter Expert?
8         MR. TEPE:  Objection to form as to
9 time.
10        MR. HARRISON:  We're still talking
11 about post-litigation; I don't think that's
12 ambiguous.
13        THE WITNESS:  There was, based
14 on -- based on from what I reviewed, there was no
15 reason to believe an additional search was located
16 because, again, the only records that anyone
17 identified that were responsive were the ones we
18 transferred.
19 BY MR. HARRISON:
20     Q   So, Mr. Bridges, I'm not asking for
21 anyone's rationale.  I'm asking what steps were taken
22 in the search at the Mitigation office after the

87

1 litigation commenced.  I think you have identified
2 there was a consultation with a Subject Matter Expert,
3 and I'm asking were there any other steps you noticed
4 that had been taken in the additional search after
5 litigation commenced in the Mitigation office?
6     **A   There was no --**
7         MR. TEPE:  Objection.
8         THE WITNESS:  Oh, I'm sorry.
9         MR. TEPE:  Objection.
10        MR. HARRISON:  I'm not asking you
11 that question.
12        MR. TEPE:  Objection to form.
13        MR. HARRISON:  No, that answer is
14 not responsive.
15        MR. TEPE:  I think there's a
16 disconnect, because you're saying, you know --
17        MR. HARRISON:  Counsel, if you want
18 to state an objection, state it; I don't want any
19 coaching of the witness.
20        MR. TEPE:  No, I'm trying to help
21 you, but I'll just object to form.
22        MR. HARRISON:  I don't need any

88

1 help right now.
2         MR. TEPE:  All right.
3         MR. HARRISON:  I appreciate the
4 effort.
5         THE WITNESS:  To answer your --
6 BY MR. HARRISON:
7     Q   Do you remember the question I asked
8 you, Mr. Bridges?
9     **A   Could you repeat it?**
10    Q   Yes, sir, I think I probably should.
11 The question is you testified that there was an
12 additional search after the litigation commenced, both
13 by Region 2 and by the Mitigation office; in Region 2
14 that involved consulting with the Subject Matter
15 Expert, and in the Mitigation office it involved
16 consulting with the Subject Matter Expert, that's my
17 understanding of what you told us thus far.  My
18 pending question is did you notice any other step
19 taken by the Mitigation office in their post-
20 litigation search?
21        MR. TEPE:  Object to the form of
22 the question.

89

1    THE WITNESS:  Outside of them
2  confirming that all the responsive records were
3  already identified, no, there was no other
4  indication that any other search was needed.
5  BY MR. HARRISON:
6    Q    Well, you mean there was no indication
7  that any other search was conducted?
8    **A    The extent of the search was a**
9  **consultation with the Subject Matter Experts who**
10 **confirmed that no additional records were located**
11 **outside of the ones that were already referred over to**
12 **NIST.**
13   Q    And so in terms of my question, your
14 reading of the record is that no additional steps to
15 search were taken at that time by the Mitigation
16 office?
17   MR. TEPE:  Objection to form.  I
18 don't think counsel has established the time
19 period.
20   MR. HARRISON:  The only time period
21 that matters here is any time after the litigation
22 commenced, and that has been established.

90

1    MR. TEPE:  And what date is that?
2    MR. HARRISON:  I don't care what
3  date it is.  I think we know when litigation
4  started.  The litigation date is on the record.
5    MR. TEPE:  I understand, but you're
6  asking questions to an individual.  And I think
7  for sake of clarity of the record, which I assume
8  you're interested in, you would want to make sure
9  that you're asking questions and you're on the
10 same page with the witness.
11   MR. HARRISON:  There's no objection
12 stated there.  If you have an objection that's
13 legally cognizable, state it.
14   MR. TEPE:  Yes, I objected to the
15 form of the question, and I also will object to
16 misleading the witness.
17   MR. HARRISON:  What was the nature
18 of the misleading of the witness?
19   MR. TEPE:  You have not established
20 for the witness the time period that you're
21 referring to, okay?  And that the witness
22 understands what time period you're referring to.

91

1    MR. HARRISON:  You think I misled
2  the witness about the time period?
3    MR. TEPE:  Not intentionally.
4  But --
5    MR. HARRISON:  Okay.
6    MR. TEPE:  -- I think -- I think
7  there's a lack of clarity and lack of foundation
8  in the questions that are being asked, that's the
9  basis for my objection.
10   MR. HARRISON:  So, Counsel, is it
11 your understanding that there was more than one
12 post-litigation search by the Mitigation office?
13   MR. TEPE:  You're you asking me
14 that question?
15   MR. HARRISON:  Well, you're the one
16 saying there's some ambiguity about the time
17 period.  If there was only one post-litigation
18 search, there could be no ambiguity.
19   MR. TEPE:  What I'm trying to
20 establish is an objection on the record that your
21 questions are not clear, you haven't established
22 foundation, they're vague as to time.

92

1    MR. HARRISON:  You say that they
2  are, I don't know why you need to keep stating it.
3    MR. TEPE:  Okay.
4    MR. HARRISON:  So your objection is
5  on the record.
6  BY MR. HARRISON:
7    Q    Mr. Bridges, let me just ask you, did
8  you see any indication in the records you reviewed
9  that there was more than one search by the Mitigation
10 office for responsive records after the litigation
11 commenced other than the one you referenced?
12   **A    I didn't see anything beyond the one I**
13 **referenced.**
14   Q    Okay.  And so are you confused about
15 the time period of the search we're talking about?
16   **A    I'm referring to the one -- I'm**
17 **assuming you're referring to the search that was done**
18 **after the litigation.**
19   Q    Yes, sir, and you're correct.  So you
20 and I are on the same page.  So was there any step
21 taken, just to be clear on this, in the Mitigation
22 office search after the litigation commenced other

**93**

1 than consulting with the Subject Matter Expert?

2     **A  By my definition, that constitutes a**

3 **search, so can I ask what you mean other action you've**

4 **taking beyond that?**

5     Q  I'm asking whether there was any other

6 action taken beyond that type of search?

7     **A  No, there was no need to do anything**

8 **beyond that.**

9     Q  And so your reading of the record is

10 there was nothing done beyond that?

11     **A  There was -- I saw no indication that**

12 **there was anything done beyond that because there was**

13 **no need to.**

14     Q  During your preparation for this

15 deposition, has anyone -- let me restate that. Has it

16 come to your attention that there were transfers of

17 Building Performance Study records to NIST at time

18 periods in addition to the May 2002 transfer that we

19 previously discussed?

20     MR. TEPE: Objection to form.

21     THE WITNESS: When you say

22 transfer -- I'm sorry, can you repeat that?

**94**

1 BY MR. HARRISON:

2     Q  Yes. Has it come to your attention in

3 your preparation for this deposition that there were

4 any transfers of Building Performance Study records to

5 NIST at any time periods other than the May 2002

6 transfer that we have already discussed?

7     MR. TEPE: Objection to form.

8     THE WITNESS: To my knowledge, that

9 was the only transfer that occurred.

10 BY MR. HARRISON:

11     Q  In your review of the case record, did

12 you notice any communications between the FEMA FOIA

13 office and any FEMA contractor?

14     **A  No. From what I saw in the records,**

15 **all communications were with FEMA staff.**

16     Q  And did you see in the records you

17 reviewed any communications between Mr. Paul Tertell

18 and any FEMA contractor that related to FEMA's search

19 for responsive records?

20     **A  No, I didn't see anything.**

21     Q  And in your review of the case record,

22 did you observe any description or identification of

**95**

1 locations where FEMA stored Building Performance Study

2 records?

3     MR. TEPE: Objection, lacks

4 foundation.

5     THE WITNESS: Did they --

6     MR. HARRISON: He said that he

7 reviewed the records.

8 BY MR. HARRISON:

9     Q  Go ahead.

10     MR. TEPE: Yeah, but -- yes, go

11 ahead. Objection, lacks foundation.

12     THE WITNESS: Sorry, could you

13 repeat that again?

14 BY MR. HARRISON:

15     Q  Yes. When you reviewed the case

16 regarding the FOIA search in this case, Mr. Cole's

17 case, did you notice any description or identification

18 of locations where FEMA stored Building Performance

19 Study records?

20     **A  No, I didn't see anything from what I**

21 **reviewed.**

22     Q  In your review of the record for the

**96**

1 FOIA search in this case, did you see any indication

2 of a destruction of any records responsive to

3 Mr. Cole's FOIA request?

4     **A  No, I did not.**

5     Q  Other than the transfer of the records

6 from FEMA to NIST that we have discussed, in your

7 review of this case record did you see any indication

8 that any records responsive to Mr. Cole's request had

9 been removed from FEMA?

10     **A  No. The only records -- all the**

11 **records were transferred to NIST; I didn't see any**

12 **indication of anything otherwise.**

13     Q  In your review of the case record for

14 this FOIA search and FOIA response in Mr. Cole's case,

15 did you see any indication that the FOIA office, your

16 predecessors, had determined that there may have been

17 some either illegal or irregular procedure used in

18 regard to the transfer of the Building Performance

19 Study records to NIST?

20     MR. TEPE: Objection to form.

21     THE WITNESS: No, I saw no

22 indication of that.

97

1 BY MR. HARRISON:
2      Q   In your review of the record in this
3 case, do you recall reviewing a letter to Mr. Cole
4 from a Ms. Charlene Myrthil, Director of Records
5 Management Division at FEMA, where she was referring
6 to the matter in which the transfer of records to NIST
7 had been accomplished?
8      **A   I remember -- I do recall a letter**
9 **where she did speak to that, yes.**
10      Q   So there was a sentence in that letter
11 from Ms. Myrthil which I'm just going to read to you
12 and see if it rings a bell, in other words do you
13 recall reading it, and then I'm going to ask you
14 whether you agree with her statement or not.
15      Her statement is, and I'm quoting,
16 "After a recent review regarding the manner in which
17 the records transfer was handled in 2002, it appears
18 Records Management procedures may not have been
19 properly applied."  Do you recall reading that?
20      MR. TEPE:  Objection to the form of
21 the question.  Objection to asking him questions
22 about a document that is not before him.  You can

98

1 answer.
2      THE WITNESS:  I don't recall the
3 exact language used in the letter, but I do recall
4 her speaking to the transfer, yes.
5 BY MR. HARRISON:
6      Q   And do you recall Ms. Myrthil stating
7 in that letter that the FEMA Records Management
8 Division has concluded perhaps the material should
9 have been loaned to NIST instead of being permanently
10 transferred?
11      MR. TEPE:  Objection to the form of
12 the question, misstates the document.
13      THE WITNESS:  I don't remember -- I
14 don't remember that language, that particular
15 language.  Can you repeat it again?  I just want
16 to make sure.
17 BY MR. HARRISON:
18      Q   Yes, sir, no problem.  "The FEMA
19 Records Management Division has concluded perhaps the
20 material should have been loaned to NIST instead of
21 being permanently transferred."
22      MR. TEPE:  Objection to form.

99

1      THE WITNESS:  I don't recall that
2 statement, but that would fall more under a
3 Records Management responsibility as far as
4 whether or not that transfer should have occurred
5 in the first place.
6 BY MR. HARRISON:
7      Q   Thank you.  I'm assuming, Mr. Bridges,
8 from your testimony, correct me if I'm wrong, that you
9 were not tasked at any time to do any additional
10 search for responsive records in this case yourself?
11      **A   No, I was not.**
12      MR. HARRISON:  Let me ask the court
13 reporter and our technical assistant to assist me
14 in marking five exhibits to this deposition, and I
15 would like them to be exhibits to the deposition
16 to follow with Mr. Letvin.
17      These are the Agency's written
18 discovery responses, and we'll mark them Exhibits
19 1, 2, 3, 4, and 5, very creatively.  And the first
20 one, Exhibit 1, will be the one we referenced
21 previously, and that would be the NIST production
22 of documents will be Exhibit 1.

100

1      And I can tell you, let me just ask
2 Mr. Jackson and the court reporter, are you able
3 to determine from my description which document
4 I'm referring to?
5      TECHNICIAN:  Do you have the file
6 names?
7      MR. HARRISON:  Yeah, but my problem
8 is I have so many files open, it's giving me
9 shortened names.
10      TECHNICIAN:  Okay.
11      MR. HARRISON:  This one starts out
12 0001 NIST-Production.
13      TECHNICIAN:  Yes, got that one.  So
14 Exhibit 1 is marked.  Would you like me to display
15 it on the screen or anything?
16      MR. HARRISON:  No, no, not for the
17 moment.
18      TECHNICIAN:  Okay.
19      MR. HARRISON:  Exhibit 2 is the
20 FEMA document production, the file name starts
21 with COLE-FEMA document.
22      TECHNICIAN:  Is it an email?

101

1       MR. HARRISON:  The first page is an
2  email, topic FOIA 11-558 Transfer Information.
3       TECHNICIAN:  Okay, this is Exhibit
4  2.
5       MR. HARRISON:  Exhibit 2.  Exhibit
6  3 will be the NIST responses to Plaintiff's
7  discovery requests, that file name is 0001 NIST-
8  Response to Cole's Discovery Requests.
9       TECHNICIAN:  I believe I have this
10  one marked.  3?
11       MR. HARRISON:  I can upload that
12  one, let me know when you find it.
13       TECHNICIAN:  I have that one
14  marked.
15       MR. HARRISON:  Okay, Number 3 is
16  marked.  Exhibit 4 will be the FEMA Response to
17  Plaintiff's Request for Production of Documents,
18  that file name is COLE-FEMA Response, that's
19  probably enough.  Well, let me just add two email
20  RPs.
21       TECHNICIAN:  Okay, I have that one
22  marked as 4.

102

1       MR. HARRISON:  Exhibit 4.  And the
2  last one will be Exhibit 5, FEMA's Response to
3  Plaintiff's Interrogatories, and that file name is
4  COLE-FEMA Response to PL Interrogatories.
5       TECHNICIAN:  Okay, I have all five
6  marked.
7       MR. HARRISON:  Thank you.
8       So, Mr. Tepe, if you have any
9  questions for this witness, you're welcome to ask
10  them at this time.
11       MR. TEPE:  Yeah, let me just -- why
12  don't we just take like a ten-minute break so I
13  can collect my questions?
14       MR. HARRISON:  Not a problem.  I
15  assume you won't consult with the witness during
16  that time?
17       MR. TEPE:  I'll ask the witness if
18  he has any questions for me, but you can't stop me
19  from talking to the witness if that's what you're
20  asking.
21       MR. HARRISON:  No, I just don't
22  want you to discuss the questions you're going to

103

1  ask him.
2       MR. TEPE:  Oh, no, no, no, no.
3  Don't worry about that.
4       MR. HARRISON:  Okay.  So did you
5  say ten minutes?
6       MR. TEPE:  Yeah, that's fine.
7       MR. HARRISON:  Okay.  Ms. Court
8  Reporter, we're off the record for ten minutes.
9       (Whereupon, a short recess was taken.)
10  BY MR. TEPE:
11    Q   Mr. Bridges, do you recall some
12  questions about Paul Tertell earlier in the
13  deposition?
14    **A   Yes.**
15    Q   And you were asked about emails that
16  Paul Tertell may have been on?
17    **A   Yes.**
18    Q   Okay.  Was Paul Tertell on email
19  correspondence about the Cole FOIA request?
20    **A   He was involved -- he was involved in
21  the search so he did correspond with our office in
22  relation to that.**

104

1    Q   Okay.  And if Mr. Tertell had
2  responsive records, what would you expect him to have
3  done?
4    **A   Even if they were just --**
5       MR. HARRISON:  I'll object.
6  Mr. Bridges, I just need to interrupt occasionally
7  with an objection myself.  I'll object to that as
8  calling for speculation, but you may answer it.
9       THE WITNESS:  Based on my review
10  and just my general knowledge of how we collect
11  records, even if they were potentially responsive,
12  he would have to provide all of that material to
13  us and then we would, in turn, review it for
14  responsiveness to the request.
15  BY MR. TEPE:
16    Q   So based on your understanding of the
17  FOIA processes at the Agency, if an individual was
18  aware of the FOIA request, you would expect that
19  individual -- and that individual had responsive
20  records, you would expect that individual to say I
21  have responsive records, is that what you're saying?
22    **A   Yes, they would be obligated; they**

105

1 would be obligated to provide those records to our
2 office.
3      Q    And do you know, to your knowledge, did
4 Mr. Tertell state that he had responsive records?
5      A    No, he stated that the only records
6 that were responsive were the ones that were involved
7 in that May 2002 transfer.
8      Q    Okay.  And so did FEMA at the time have
9 a reason to search Mr. Tertell's emails for responsive
10 records?
11          MR. HARRISON:  Objection, calls for
12 speculation; this witness was not with FEMA at
13 that time.  You may want to reword it to ask him
14 regarding his understanding of the proper
15 procedure.
16          MR. TEPE:  I'm going to adjust the
17 question.  Actually, Court Reporter, can you read
18 that back?  I just want to hear it again.
19          (Whereupon, the pertinent part of the
20 record was read as follows:
21          "And so did FEMA at the time have a
22 reason to search Mr. Tertell's emails for responsive

106

1 records?")
2 BY MR. TEPE:
3      Q    Mr. Bridges, based on your review of
4 the record in preparation for today's deposition, are
5 you aware of any reason that FEMA would have had to
6 search Mr. Tertell's emails?
7      A    No, there was nothing in the records
8 that indicated that was necessary to respond to the
9 request.
10      Q    Based on your review of the record in
11 preparation for today's deposition, are you aware of
12 any reason that FEMA should have searched
13 Mr. Tertell's hard copy documents?
14      A    No.  And for a similar reason like the
15 emails, there was no indication that it was needed to
16 respond to the request.
17      Q    Based on your review of the case record
18 and in preparation for today's deposition, are you
19 aware of any reason that FEMA would have had for
20 conducting a search of Mr. Tertell's hard drive?
21      A    No, not from the -- not based off of
22 what the requester was seeking and what we had already

107

1 determined was responsive to the request.
2          MR. TEPE:  I don't think I have any
3 further questions.  We're going to read and sign.
4          MR. HARRISON:  Okay, we're not
5 closing yet.
6          MR. TEPE:  All right.
7 BY MR. HARRISON:
8      Q    So I have a couple followups.  I think,
9 Mr. Bridges, correct me if I'm wrong, that the lady
10 whose name you were not remembering entirely, Connie,
11 might have been Ms. Connie Cook, does that ring a
12 bell?
13      A    Yes.
14      Q    Okay.  And in regard to Mr. Tepe's
15 questions when you were giving your apparent opinion
16 that there was no need for FEMA or the FOIA office of
17 FEMA to review Mr. Tertell's emails to look for
18 responsive records, I believe you indicated that you,
19 yourself, did not review Mr. Tertell's emails, is that
20 correct?
21      A    That is correct.
22          MR. TEPE:  Objection to form.

108

1 BY MR. HARRISON:
2      Q    And is it also correct to say that
3 Mr. Tertell's emails were not in the records you were
4 provided to review?
5      A    I did not see any emails in the records
6 I reviewed.
7      Q    Okay.  And in terms of Mr. Tertell's
8 hard drive, I believe -- and I'm not sure I asked you,
9 but let me just make sure -- that you did not yourself
10 review Mr. Tertell's hard drive?
11      A    I did not review it.
12      Q    All right.  And could you determine in
13 your review of the case record whether Mr. Tertell's
14 hard drive was in the record?
15      A    No, I did not see it in the records;
16 from what I reviewed, it was determined that it wasn't
17 responsive to the request.
18      Q    Okay.  And the determination you're
19 referring to that FEMA made that, in your view, made
20 these inquiries about Tertell's emails and hard drive
21 unnecessary, correct me if I'm wrong, is the
22 determination that FEMA had given all the responsive

109

1  records to NIST in the May 2002 transfer?
2       **A    That is correct.**
3           MR. HARRISON:  I have nothing
4  further.  Counsel, do you have anything further?
5           MR. TEPE:  No.  And just as I said
6  before, we'll read and sign.  We can go off the
7  record and we can talk about lunch and so forth.
8           (Whereupon, there was a discussion held
9  off the record.)
10          MR. TEPE:  It's going to be the
11 same, yes, I mean it's one deposition even if
12 there are multiple witnesses.  You know, we'll
13 take the whatever, the normal electronic
14 transcript.
15          MR. HARRISON:  And, Ms. Herrmann,
16 the Plaintiff would like the electronic transcript
17 as well in a normal timeframe, which I believe is
18 ten days.
19
20
21          _____
22              GREGORY BRIDGES

110

1
2          - - - - -
3          (Whereupon, a luncheon recess was taken.)
4          - - - - -
5          REPORTER:  Will counsel please
6  stipulate that in lieu of formally swearing in the
7  witness, the reporter will instead ask the witness
8  to acknowledge that his testimony will be true
9  under the penalties of perjury, that counsel will
10 not object to the admissibility of the transcript
11 based on proceeding in this way, and that the
12 witness has verified that he is in fact
13 Eric Letvin?
14          MR. HARRISON:  So stipulated.
15          MR. TEPE:  Agreed.
16          REPORTER:  Eric Letvin, do you
17 hereby acknowledge that your testimony will be
18 true under the penalties of perjury?
19          ERIC LETVIN:  I do.
20
21
22

111

1  WHEREUPON:
2              ERIC LETVIN,
3  having first acknowledged that his testimony will be
4  true under the penalties of perjury, thereupon
5  testified upon his oath as follows:
6  BY MR. HARRISON:
7       Q    Hello, Mr. Letvin.  My name is
8  Mick Harrison, I'm an attorney for Plaintiff, David
9  Cole.  As you, I expect, know, we're here for a
10 discovery deposition in a FOIA case, a Freedom of
11 Information Act case, I'll use that shorthand FOIA
12 instead of always saying Freedom of Information Act
13 but I expect you know that abbreviation.  The case is
14 Cole versus Copan, Case Number 15-cv-01991, U.S.
15 District Court for the District of Columbia.
16          Mr. Letvin, have you ever had the
17 pleasure of being deposed before?
18      **A    I have.**
19      Q    All right, so you may know some of
20 this.  I want to remind you that before you answer one
21 of my questions, pause just a moment to see if counsel
22 for the agency, Mr. Tepe, wants to interpose an

112

1  objection, which he's welcome to do.  And if he does
2  start to speak, please allow him finish to before you
3  begin to answer, so be patient in that regard.
4          At the end of Mr. Tepe's objection, he
5  will either invite you to answer the question or
6  instruct you to not answer the question.  If he gives
7  you one of those instructions, you should follow it.
8  If he doesn't say either, I will invite you to answer
9  the question and you will be allowed to answer.  Is
10 that procedure clear to you?
11      **A    Yes, it is.**
12      Q    Very good.  Could you please state your
13 full name?
14      **A    Eric Jerome Letvin.**
15      Q    And what is your current job tile and
16 who is your current employer?
17      **A    My current job title is Acting**
18 **Assistant Administrator for Mitigation.  My employer**
19 **is the Federal Emergency Management Agency.**
20      Q    Could you summarize your employment
21 history briefly for us going back to the time of the
22 FEMA Building Performance Study which I believe was in

113

1  the late 2001/2002 timeframe?

2  **A   Yes.  I was employed by Greenhorne and**

3  **O'Mara from 1994 to I believe 2003 during the time of**

4  **the Building Performance Study.  I then took a**

5  **position at the National Institute of Standards and**

6  **Technology from 2003 to 2000 -- let's see -- I'm**

7  **sorry, no, I took a job at URS, URS consulting firm,**

8  **from 2003 to 2011.  And then from 2011 to 2016, I was**

9  **employed by the National Institute of Standards and**

10 **Technology.  And since 2016, I have been employed by**

11 **FEMA.**

12     Q   Thank you very much.  Your job with URS

13 in the interim there, did it have any relationship to

14 the Building Performance Study or Trade Center studies

15 by NIST?

16        MR. TEPE:  Objection, outside the

17 scope.

18 BY MR. HARRISON:

19     Q   You may answer.

20     **A   No.**

21     Q   Now, you were at Greenhorne and O'Mara

22 during the period that FEMA was contracting with

114

1  Greenhorne and O'Mara to be I guess the primary

2  contractor for preparing the Building Performance

3  Study, is that correct?

4      **A   That is correct.**

5      Q   And what was your role at that time?

6      **A   During the Building Performance Study,**

7  **I was essentially in charge of the prime contract that**

8  **Greenhorne and O'Mara had with FEMA.  So I was the**

9  **program manager for the contract, and I was also the**

10 **project manager, the consultant project manager for**

11 **the Building Performance Study.**

12     Q   All right.  So in those capacities, I

13 take it you would have been familiar with how the data

14 was being collected and brought to Greenhorne and

15 O'Mara for the Building Performance Study?

16        MR. TEPE:  Objection, scope.

17 Unless I tell you, instruct you not to answer, you

18 can testify after I put my objection on.

19        THE WITNESS:  Okay.  Okay, yes, I

20 was familiar with how the data was collected.

21 BY MR. HARRISON:

22     Q   All right.  And was it your

115

1  understanding that in addition to Greenhorne and

2  O'Mara, that FEMA had either contracted with on a paid

3  basis or entered agreements with on a voluntary basis

4  a number of organizations and individuals to help in

5  performing the Building Performance Study which were

6  loosely called the Building Performance Study team?

7         MR. TEPE:  Objection, form.

8  BY MR. HARRISON:

9      Q   You may answer.

10     **A   FEMA did not contract with anybody.**

11 **The Building Performance Study team members, a number**

12 **of them were subcontractors to Greenhorne and O'Mara.**

13     Q   I see.  I appreciate that

14 clarification.  So as an example, I take it Gilsanz

15 Murray Steficek would have been a subcontractor with

16 Greenhorne and O'Mara for the work they did on the

17 Building Performance Study?

18        MR. TEPE:  Objection, scope.

19 BY MR. HARRISON:

20     Q   You may answer.

21     **A   Approximately -- I'm not familiar**

22 **specifically if that firm was under contract or not, I**

116

1  **don't recall.  A number of them were under contract,**

2  **but I don't recall whether that firm was or was not.**

3      Q   Okay.  Are you aware that Gilsanz

4  Murray Steficek actually collected some data relevant

5  to the Building Performance Study?

6      **A   Yes.**

7      Q   Okay.  Are you familiar with the fact

8  that Doctor Gene Corley was considered the lead of the

9  Building Performance Study team?

10        MR. TEPE:  Objection, scope.

11 BY MR. HARRISON:

12     Q   You may answer.

13     **A   Yes.**

14     Q   And is it your understanding that most

15 of the data, at least, if not all of it, collected by

16 the Building Performance Study team members found its

17 way to Greenhorne and O'Mara?

18        MR. TEPE:  Objection, form.

19        THE WITNESS:  Yes.

20 BY MR. HARRISON:

21     Q   And when the records came into

22 Greenhorne and O'Mara where you were working at the

117

1 time for use in the Building Performance Study, can
2 you describe how those records were stored?
3        MR. TEPE:  Objection, scope.
4 BY MR. HARRISON:
5        Q    You may answer.
6        **A    Depends on what they were.  There were**
7 **paper documents which were, you know, stored in**
8 **office.  There were a number of photographs, digital**
9 **copies of videos, and there were a number of VHS tapes**
10 **and so, depending on what that was, whether it was**
11 **stored in a file cabinet or on a server, depended on**
12 **what the data was.**
13        Q    Understood.  Did Greenhorne maintain
14 any sort of inventory or index of the Building
15 Performance Study records it received?
16        MR. TEPE:  Objection, scope.
17 BY MR. HARRISON:
18        Q    You may answer.
19        **A    I don't recall specifically.**
20        Q    Okay.  Do you recall at any time being
21 contacted by the FEMA FOIA office with any inquiry
22 regarding Mr. David Cole's FOIA request?

118

1        MR. TEPE:  Objection, foundation,
2 scope.
3 BY MR. HARRISON:
4        Q    You may answer.
5        **A    Yes, I believe so.  I was contacted by**
6 **the FOIA office, I don't recall whether it was this**
7 **FOIA or a different FOIA.**
8        Q    I understand.  So the FOIA we're
9 talking about in this case, as you may or may not
10 recall -- I'll just ask if this is your understanding
11 of this particular request by Mr. Cole -- is it your
12 understanding that the FOIA request by Mr. Cole for
13 the Building Performance Study data was a request for
14 Building Performance Study data records related to the
15 collapse of the World Trade Center buildings on
16 September 11th, 2001, including video, photos, audio,
17 memos, lab samples, lab results; is that your
18 understanding?
19        MR. TEPE:  Objection, misstates the
20 FOIA request.
21        THE WITNESS:  Could you restate
22 that?

119

1 BY MR. HARRISON:
2        Q    Yes.  Was it your understanding that
3 the scope and nature of Mr. Cole's FOIA request was
4 Building Performance Study data records relating to
5 the collapse of the World Trade Center buildings on
6 September 11, 2001 including video, photos, audio,
7 memoranda, lab samples, I'll leave it there?
8        MR. TEPE:  Objection to form,
9 misstates the FOIA request.
10        THE WITNESS:  Yes, I believe so.
11 BY MR. HARRISON:
12        Q    Okay, thank you.  And were you ever
13 tasked in any capacity, whether in your job with
14 Greenhorne or your job with NIST or with FEMA, to
15 engage in any search for records responsive to
16 Mr. Cole's request?
17        MR. TEPE:  Objection, outside the
18 scope of FEMA, 30(b)(6).
19 BY MR. HARRISON:
20        Q    You may answer.
21        **A    I recall, yes, at NIST -- at FEMA, I**
22 **remember responding to a FOIA; I don't remember**

120

1 **specifically what was being asked of me in my duties**
2 **at FEMA.**
3        Q    Do you recall who contacted you in that
4 regard?
5        **A    I do not, until this case recently.**
6        Q    It was recent in relation to this case?
7        MR. TEPE:  Objection to form.
8        THE WITNESS:  Yeah, so recently,
9 helping to -- helping to, yeah, helping to answer
10 this FOIA for this case, yes.
11 BY MR. HARRISON:
12        Q    Okay.  Might that person who contacted
13 you have been an attorney by the name of Neuschaffer?
14        **A    I don't recall that name, it may have**
15 **been.**
16        Q    Do you recall giving a statement for
17 Mr. Neuschaffer's use in a Declaration he filed in
18 this case?
19        **A    I don't recall, I may have.**
20        Q    Okay.  So in terms of your role at
21 Greenhorne and O'Mara, do you recall participating in
22 a transfer of records on behalf of FEMA in May of 2002

121

1  to NIST regarding the Building Performance Study
2  records?
3      A   Yes.
4      Q   And what was your role in that
5  transfer?
6      A   **My role was to collect all of the data**
7  **that was collected by Greenhorne and O'Mara on behalf**
8  **of the Building Performance Study team and physically**
9  **transfer that data to NIST.**
10     Q   And did you, in your view, accomplish
11 that task of collecting all the Building Performance
12 Study data that had been gathered by the Building
13 Performance Study team?
14     MR. TEPE:  Objection, form.
15 BY MR. HARRISON:
16     Q   You may answer.
17     A   **I was successful in transferring all of**
18 **the data that was collected by Greenhorne and O'Mara**
19 **to NIST on behalf of the team.**
20     Q   Okay.  And did you make an effort at
21 that time to transfer to NIST data collected for the
22 Building Performance Study by Gilsanz Murray Steficek?

122

1      MR. TEPE:  Objection to form.
2      THE WITNESS:  I don't recall if
3  that data was in what was transferred or not; it
4  may have been.
5  BY MR. HARRISON:
6      Q   Now, you changed employers from
7  Greenhorne to NIST at some point, I believe, am I
8  correct?
9      MR. TEPE:  Objection.
10     THE WITNESS:  I worked for URS from
11 2003 to 2011 before I went to NIST.
12 BY MR. HARRISON:
13     Q   Okay.  And so then you were, I take it,
14 at NIST, correct me if I'm wrong, in the time period
15 when NIST would have been processing Mr. Cole's FOIA
16 request at issue that had been transferred to NIST
17 from FEMA, is that correct?
18     A   **I believe so.  I responded to a number**
19 **of FOIA requests while I was at NIST.**
20     Q   Okay.  Well, I may be able to help
21 refresh your memory here a little bit.  If Mr. Jackson
22 Schueler, our tech assistant, could help me show on

123

1  the screen our Exhibit 1, which is NIST Document
2  Production.
3      And the first page showing there,
4  Mr. Letvin, has your name on it, it's dated June 11,
5  2002; can you see that on your screen?
6      A   I can.
7      Q   All right.  And do you recognize that
8  document?
9      A   I do.
10     Q   And what do you understand it to be?
11     A   **It's from Doctor McAllister, confirming**
12 **the receipt of the materials that we delivered to NIST**
13 **it appears on May 29, 2002.**
14     Q   Okay.  Now, you will see a number of
15 items listed there on that page and the page that
16 follows that have headings and numbers; is that list
17 something that you drafted or that Ms. McAllister
18 drafted or that someone else drafted, or do you know?
19     A   **I don't know.  It appears like it was**
20 **drafted from Ms. McAllister since she's on the From**
21 **line.**
22     Q   Understood.  Now, if would you scan

124

1  over that list of items on those two pages, and just
2  take your time, I'm going to ask you whether you
3  recall those items actually being in the set of
4  records that were transferred to NIST on behalf of
5  FEMA by Greenhorne at that time?
6      A   **I mean a lot of them look familiar,**
7  **certainly.  I don't remember every single one of them,**
8  **it was 20 years ago, but that looks like a very**
9  **familiar list of what was collected.**
10     Q   Okay, I understand the memory problem.
11 Is there anything on that list that stands out to you
12 now that you don't believe was actually transferred to
13 NIST?
14     A   **No, not that I recall.**
15     Q   Okay.  So let's -- and, again, if
16 Jackson could help me scroll down to page eight in
17 that document.
18     And I'm going to use my own copy here,
19 if you will bear with me.  Okay.  So you will see an
20 email at the top from Therese McAllister, do you know
21 Therese McAllister?
22     A   I do.

125

1      Q      And did you work with her at NIST?

2      **A      I did.**

3      Q      Okay.  And you will see this is dated

4   during the time period, correct me if I'm wrong, when

5   you had already started work at NIST, is that correct?

6      **A      Yes; it appears it was written very**

7   **soon after I joined NIST.**

8      Q      Okay.  And then below that email from

9   Ms. McAllister, I believe you will see an email from

10  you of the same date, December 28, 2011, do you see

11  that?

12     **A      I do.**

13     Q      And do you recognize that email as one

14  that you had written?

15     **A      Yeah, vaguely.  I, you know, wrote a**

16  **lot of emails but, yeah, I vaguely remember writing**

17  **something like that.**

18     Q      Okay.  So let's start with the question

19  about what Ms. McAllister wrote near the top there.

20  She said, "I see the FOIA request is for data

21  collected by Gene Corley.  As far as I recall, the

22  data transferred to NIST had no designation as to

126

1   source, it was considered FEMA/ASCE team data,

2   however, I will work with Kellie to locate the

3   materials in the collection that were transferred from

4   FEMA to NIST when I return on January 3rd.  It is my

5   expectation that there will be no responsive records."

6   Do you recall Ms. McAllister stating her expectation

7   that there would be no responsive records?

8      **A      I don't recall this, no.**

9      Q      Okay, so I take it you wouldn't know

10  why she made that statement?

11     **A      I could only speculate.  What she wrote**

12  **in there is true, I don't believe we separated data**

13  **collected by a team member at Greenhorne and O'Mara,**

14  **I'm just not sure that's how it was cataloged.  It was**

15  **cataloged by the chapter in the report or whether it**

16  **was a photo or video; I don't recall that we separated**

17  **that data by team member or not, that could be what**

18  **she's referring to.**

19     Q      Okay.  So going down to your email

20  which is below, and it indicates that you had a long

21  conversation with Darla who I believe to be Darla

22  Yonder, and Catherine who I believe to be Catherine

127

1   Fletcher at the FOIA office at NIST, is that correct?

2      **A      That sounds correct.**

3      Q      And you were talking about Mr. Cole's

4   FOIA request, is that correct?

5      **A      It appears so.**

6      Q      Okay.  Do you recall being involved in

7   NIST's response to Mr. Cole's FOIA request?

8      **A      I don't recall specifically whose FOIA**

9   **request it was but, yes, as I stated earlier, I**

10  **remember being involved with a number of FOIA**

11  **requests.**

12     Q      Okay.  And you can see the FOIA request

13  number is listed in the subject line there?

14     **A      I do.**

15     Q      All right.  You say in the second

16  paragraph that Greenhorne and O'Mara, with whom you

17  had previously worked, was the prime contractor for

18  all of the work that was done for FEMA for the FEMA

19  Building Performance Study; would you say that's a

20  correct statement, sitting here today?

21     **A      Yes, it is.**

22     Q      Okay.  And down later in that same

128

1   paragraph, maybe four lines up from the bottom or so,

2   you say, "Doctor Gene Corley was the leader of the

3   FEMA/ASCE team and did collect, create, and have

4   access to photos, videos, audios, file notes,

5   memoranda, and laboratory samples."  Sitting here

6   today, do you believe that to be a correct statement?

7      **A      That is true, he was the leader of the**

8   **consultant Building Performance Study team, yes.**

9      Q      Okay.  So before the transfer was made

10  to NIST from Greenhorne and O'Mara back in the May

11  2002 timeframe when you were there at Greenhorne, did

12  you communicate with Doctor Corley to ensure that you

13  had all of the types of records you list here that he

14  would have gathered, that you had all of the records

15  he had gathered so you could convey those to NIST?

16           MR. TEPE:  Objection.

17           THE WITNESS:  Yes.

18           MR. TEPE:  Objection, outside the

19  scope.

20  BY MR. HARRISON:

21     Q      All right.  Was your answer yes?

22     **A      Yes.**

129

1      Q    And what did Doctor Corley do, if
2  anything, in response to your inquiry or request in
3  that regard?
4          MR. TEPE:  Objection, scope.
5          THE WITNESS:  The request was not
6  only to Doctor Corley but all of the team members.
7  As we were putting together the report, if
8  something -- if a photo or a screen shot or a
9  report was to be referenced in the FEMA study, we
10  needed to have a copy of that to have it properly
11  referenced in the report.
12  BY MR. HARRISON:
13      Q    Okay.  So was it your understanding
14  that Greenhorne had obtained all of Doctor Corley's
15  Building Performance Study data records?
16          MR. TEPE:  Objection, scope.
17          THE WITNESS:  Yes.
18  BY MR. HARRISON:
19      Q    Okay.  And was Gilsanz Murra Steficek a
20  member of this FEMA/ASCE team?
21      A    You used the name of the firm.  I know
22  Ramon Gilsanz was a member of the team, I think you're

130

1  using the title of his firm, but Ramon Gilsanz was a
2  member of the team.
3      Q    I appreciate that distinction.  And did
4  you communicate with Mr. Gilsanz in the same way you
5  did with Doctor Corley to ensure that you had all of
6  the materials he or his firm had collected for the
7  Building Performance Study?
8      A    Yes.
9      Q    And did you do that in writing?
10          MR. TEPE:  Objection, scope.
11          THE WITNESS:  I don't recall.
12  Certainly we did verbally, and I likely sent
13  several emails to all the team members, reminding
14  them that we needed to collect the data.  I likely
15  did, but I don't recall specifically.
16  BY MR. HARRISON:
17      Q    Okay.  And to be clear, these
18  communications you would have done, either verbally or
19  in writing by email or otherwise with the team
20  members, was this for the purpose of making sure that
21  Greenhorne and O'Mara, the company you worked for, had
22  the data to do the study, or was it for the purpose of

131

1  collecting materials to relate to NIST so that NIST
2  could use that for the NIST study?
3          MR. TEPE:  Objection to form.
4          THE WITNESS:  It was more to be
5  complete, to make sure we had all -- at the time
6  when we were writing the report, I don't believe
7  NIST had even received money to do a further
8  onsite study.  So we wanted to be complete like we
9  always are with every post-disaster report to
10  collect all of the data and have it properly
11  referenced in the report.
12  BY MR. HARRISON:
13      Q    Okay.  Are you aware of any transfers
14  of Building Performance Study data records to NIST
15  from any team member for the Building Performance
16  Study that occurred after you had done your transfer
17  in May of 2002?
18      A    That's a difficult question to answer.
19  So the Building Performance Study was the work that
20  FEMA had -- FEMA had completed, and that ended with
21  the completion of the report that was published.
22          NIST then received funding from

132

1  Congress to continue the World Trade Center
2  investigation, and I can't tell you what happened
3  after NIST started their own study with their funding.
4  The FEMA Building Performance Study ended when the
5  report was -- shortly before the report was produced.
6      Q    Okay.  So the transfer that you were
7  involved in in May 2002 records to NIST, you
8  understood at that time, did you not, that this was a
9  transfer of Building Performance Study records from
10  FEMA to NIST to help NIST do a NIST study?
11          MR. TEPE:  Objection to form.
12          THE WITNESS:  I mean at that point
13  in time, FEMA's effort was over.  NIST had
14  received money from Congress to continue the
15  investigation, and so they were the, under the
16  National Construction Safety Team Act, they were
17  the lead investigative agency and we transferred
18  all of our data that we collected over to NIST for
19  their use.
20  BY MR. HARRISON:
21      Q    Okay.  So are you saying you just
22  didn't know at that time what that use would be?

133

1    MR. TEPE: Objection to form.
2    THE WITNESS: I mean I know that
3 NIST received money and there was -- by law, there
4 was direction to NIST on what they were to do with
5 that, but in terms of what NIST -- I don't recall.
6 NIST had to create a project plan in their study
7 and, you know, I didn't know at that time what
8 NIST was going to -- what the details of their
9 study was going to be.
10 BY MR. HARRISON:
11    Q    Okay. Do you know Mr. Paul Tertell?
12    **A    I do.**
13    Q    And was Mr. Tertell involved in working
14 with you at the time you were at Greenhorne in regard
15 to the Building Performance Study?
16    **A    Yes.**
17    Q    And what was Mr. Tertell's role in
18 regard to the Building Performance Study, if you know?
19    **A    He was the FEMA, I'm not sure of the**
20 **exact title, but he was essentially the FEMA project**
21 **manager of the Building Performance Study.**
22    Q    Okay. And did Mr. Tertell have any

134

1 role in this decision to transfer this set of records
2 from Greenhorne to NIST in May of 2002?
3    MR. TEPE: Objection, foundation.
4    THE WITNESS: Yeah, he did.
5 BY MR. HARRISON:
6    Q    Okay. And what role did he have in
7 that regard?
8    MR. TEPE: Objection, foundation.
9    THE WITNESS: Paul met me up at
10 NIST, he was physically present when we turned
11 over the data to NIST.
12 BY MR. HARRISON:
13    Q    Okay. And did you understand that you
14 were conveying those records to NIST regarding the
15 Building Performance Study on behalf of FEMA with
16 Mr. Tertell's approval?
17    **A    Yes.**
18    Q    Now, you indicate in this email we were
19 looking at on the document on your screen, it's going
20 to be now the third paragraph, it begins, "As the FEMA
21 Building Performance Study was winding down --" do you
22 see that?

135

1    **A    Yes.**
2    Q    It says "-- and the NIST study was
3 getting under way --" so I take it -- oh, nevermind,
4 "-- in June or so of 2002, I created an inventory of
5 all of the materials that FEMA/Greenhorne and O'Mara
6 had collected during the course of the Building
7 Performance Study." Do you recall creating such an
8 inventory?
9    **A    I believe so, yes.**
10    Q    Okay. And what form did that take, was
11 it handwritten, typed, typed on a computer, email?
12    **A    I don't recall.**
13    Q    Okay, do you recall how long it was?
14    **A    Maybe two, three pages.**
15    Q    Okay. And in that same paragraph you
16 go on to say, "There were approximately three to four
17 boxes of materials --" were you referring to materials
18 that you had collected, that FEMA and Greenhorne and
19 O'Mara had collected during the course of the Building
20 Performance Study?
21    **A    Yes.**
22    Q    Okay. Were you the person who

136

1 physically gathered those documents or records or
2 media and put those in the three to four boxes?
3    **A    I believe so. Doctor McAllister may**
4 **have helped me do that, but -- actually, she was --**
5 **let me correct that. She was already at NIST at the**
6 **time, so I likely did that myself.**
7    Q    Okay. So Ms. McAllister had worked at
8 Greenhorne with you for a time and then moved to NIST?
9    **A    That is correct. I don't recall**
10 **specifically when, I think it was sometime early in**
11 **2002.**
12    Q    Okay. Now, did you make any effort at
13 the time of transferring the records to NIST on Paul
14 Tertell's direction or at least approval in May of
15 2002, did you make any effort to ensure that
16 everything in your three to four boxes of materials
17 were in the set that you were conveying to NIST?
18    **A    Yes; I made sure whatever we had**
19 **physically, digitally, that that was the comprehensive**
20 **list of everything that Greenhorne and O'Mara had**
21 **collected.**
22    Q    Okay. And during the time you did your

137

1 inventory and collected your three to four boxes of
2 materials, were you aware at that time that the FEMA/
3 ASCE Building Performance Study team had made use of
4 what's called an FTP website?
5       MR. TEPE: Objection, foundation,
6 scope.
7       THE WITNESS: I don't know what
8 that is, no.
9 BY MR. HARRISON:
10    Q  Okay, let me take you back to the first
11 page of this document we're looking at, exhibit, if
12 our technical assistant could help us go to the first
13 page. There you go.
14      And now scrolling down, I believe it's
15 probably on the bottom of the second page, if we could
16 go there. Okay, item number four under CDs, do you
17 see that listed?
18    A  Yes.
19    Q  And do you see it says there, "Backup
20 of FTP site for WTC BPS"?
21    A  Yes.
22    Q  Do you understand what that's referring

138

1 to?
2    **A  Yes. This is back, you know, 2001**
3 **technology, it was very difficult to transfer large**
4 **files, videos. Yeah, now I recall. So at the time, a**
5 **common way to do that, like we have Dropbox today, was**
6 **an FTP transfer, so it's likely we may have set one up**
7 **to transfer larger files to Greenhorne and O'Mara.**
8    Q  Okay. So Greenhorne would have access
9 to that website and so would at least some of the BPS
10 team members?
11      MR. TEPE: Objection, foundation.
12      THE WITNESS: I don't recall
13 specifically. Perhaps Greenhorne may have set it
14 up, I don't know who had access to it on the other
15 side, if it was open or not.
16 BY MR. HARRISON:
17    Q  Okay. So looking at this inventory and
18 this last item under CDs, do you recall that in the
19 material you conveyed with Mr. Paul Tertell's
20 blessings and in his presence in May 2002 to NIST,
21 physically conveyed, that that material included a CD
22 or perhaps a DVD but an electronic disc of some kind

139

1 that actually had the material that had been placed on
2 the FTP site on the CD?
3      MR. TEPE: Objection to form.
4      THE WITNESS: I don't recall
5 specifically. There were many CDs and DVDs that
6 we burned, which was very common back then for
7 transferring files.
8 BY MR. HARRISON:
9    Q  Okay. Is it your understanding that a
10 reference to a backup of an FTP site would basically
11 mean a copy of it?
12      MR. TEPE: Objection to form.
13      THE WITNESS: I suppose, yes.
14 BY MR. HARRISON:
15    Q  Okay. And was there a CD or other
16 storage device with a copy of the FTP site in your
17 three to four boxes of Building Performance Study
18 material that you had compiled?
19    **A  I don't recall each item specifically.**
20 **If it's on the list, I'm very confident that it was**
21 **included.**
22    Q  Is it your expectation then that the

140

1 items listed on pages one and two of the Exhibit 1
2 we're looking at, this inventory that has
3 Ms. McAllister's name at the top, is it your
4 expectation that those items would also be expected to
5 be found in the three to four boxes of material you
6 had collected?
7    A  Yes.
8    Q  Okay. Can you tell us what happened
9 with your three to four boxes of materials?
10    **A  After they were -- after NIST took**
11 **possession?**
12    Q  Well, I'm asking you first, you know,
13 did NIST take possession? I mean just basically walk
14 us through what happened with them first.
15    **A  I remember being in a conference room**
16 **and we literally, Paul Tertell and I, pushed the boxes**
17 **across the table, and NIST took physical possession of**
18 **those boxes. When I left the NIST campus that day, I**
19 **did not have any materials on me, nor did Mr. Tertell.**
20    Q  Okay. So the boxes physically pushed
21 across the table to NIST were the three to four boxes
22 you had compiled?

141

1      A    Yes.
2          Q    Okay.  And so you later, some years
3  later, went to work for NIST; when you did go there to
4  work for NIST, did you come across the materials that
5  you had put in your three to four boxes that had been
6  given to NIST in 2002?
7          MR. TEPE: Objection, vague.
8  BY MR. HARRISON:
9      Q    Go ahead.
10     A    Yeah, there was, some years later, NIST
11 had a library, I don't recall, in a room where many of
12 these materials existed, there was a digital library,
13 there was a library that had building plans.  I don't
14 recall specifically but, yes, a lot of these materials
15 were collected by NIST and placed in various places
16 for use by the team that was investigating.  I think
17 at that time, NIST had just completed their
18 investigation but, yes, these materials were, to my
19 knowledge, at NIST.
20     Q    Okay.  And do you know whether the
21 items that you had conveyed in your three to four
22 boxes to NIST in 2002 were eventually entered into the

142

1  NIST computer World Trade Center database?
2          MR. TEPE: Objection, outside the
3  scope of the FEMA 30(b)(6).
4          THE WITNESS: One of the tasks that
5  I did have in NIST was helping put together that
6  World Trade Center database, and that was -- much
7  of the data that was there was collected by NIST,
8  but it also included I know a lot of this, if not
9  all of the data.  It was a digital database so a
10 lot of the documents got scanned.  So, yes, a lot
11 of the data, I would imagine, would end up on the
12 NIST data repository.
13 BY MR. HARRISON:
14     Q    Okay.  If I could get our technical
15 assistance person to help us scroll down to page 19 in
16 that same document.  Page 19, yeah, looks like --
17 yeah, that's it.
18          So that will look similar, Mr. Letvin,
19 because it's that June 11th, 2002, inventory that has
20 Ms. McAllister's name at the top, but you'll see this
21 version has handwriting on it and some checkmarks, do
22 you see that?

143

1      A    I do.
2          Q    Okay.  We've had some testimony about
3  this from Ms. Kellie Beale, who is the person whose
4  handwriting is reflected there, and she was tasked to
5  locate these items in response to Mr. Cole's FOIA
6  request.  And her checkmarks, as I understand it,
7  indicate the items that she located at NIST.
8          So my question to you is, if you would
9  look over those two pages, you will see that virtually
10 every item with the exception of one or two have a
11 checkmark.  And my question to you is would you have
12 expected the items that are checked to have been
13 located, in other words to have been physically
14 present at NIST, just based on your knowledge having
15 worked there and based on what you conveyed to them?
16          MR. TEPE: Objection, outside the
17 scope of the FEMA 30(b)(6).
18          THE WITNESS: Yeah, I'm concerned
19 that you're asking a lot of questions about what
20 happened after I left Greenhorne and O'Mara and
21 that's outside the scope.  This is within the
22 scope of what I did at NIST or what I did or may

144

1  not have done at NIST.
2          So, Sean, I guess help me, am I to
3  be answering these questions?  This is way outside
4  the scope.
5          MR. TEPE: Yeah, no, so just,
6  Mr. Letvin, so you understand, I'm objecting to
7  the -- when I say outside the scope, I'm putting
8  on the record that these are questions and answers
9  that are not within the scope of the FEMA 30(b)(6)
10 and the topic, but I am, you know, allowing
11 counsel to ask, you know, I think reasonably
12 adjacent questions that are within your personal
13 knowledge when it comes to the subject of the
14 collection of these records.
15          So, you know, if there's something
16 outside of that, I'll instruct you, you know, not
17 to answer.  But you would be answering these
18 questions in your personal capacity to the extent
19 you have recollections and so forth.  I hope that
20 helps.
21          THE WITNESS: Okay.  No, I mean
22 make it very clear, I was not part of the NIST

145

1 World Trade Center investigation. When I came to
2 NIST, I helped NIST put a lot of the data that was
3 collected up on the NIST data repository. So it
4 was not my job during the NIST investigation to
5 keep track of these materials; that would have
6 been other people like Kellie Beale.
7         So I really don't -- I really can't
8 answer questions as to what happened with the data
9 after I pushed it across the table to NIST. Other
10 than later on when I, you know, when I worked at
11 NIST, a lot of this data, I helped put on the
12 website.
13 BY MR. HARRISON:
14     Q    Okay. The inventory that you had
15 prepared, there was a note you had made in that email
16 which we were showing you before, if we can go back up
17 to page eight of this document which is where I recall
18 that being.
19         I think you made a suggestion to the
20 folks working on the FOIA request that if they could
21 locate, if someone could find the inventory that you
22 created, it might be a fairly easy exercise to walk

146

1 through and evaluate the time needed to pull
2 everything together. And you'll see that statement by
3 you in the last paragraph of that email from you. Do
4 you know whether your inventory was located by the
5 folks who were dealing with Mr. Cole's FOIA request?
6     A    **Can you scroll down? I can't see the**
7 **last paragraph there.**
8     Q    There you go.
9     A    **Thank you.**
10     Q    You can see in the second sentence
11 there where you see, "If someone can find the
12 inventory".
13     A    **Yeah, I don't recall whether that was**
14 **done or not.**
15     Q    Okay. In your work at NIST, did you
16 come across at any point in time a conveyance of
17 records from Gilsanz Murray Steficek after the May
18 2002 transfer that had Building Performance Study
19 records in it?
20         MR. TEPE: Objection, outside the
21 scope.
22         THE WITNESS: No.

147

1 BY MR. HARRISON:
2     Q    So in your involvement in putting items
3 up on the NIST computer database for the World Trade
4 Center records, do you not recall any items that came
5 from Gilsanz Murray Steficek?
6     A    **I don't recall specifically; there may**
7 **have been.**
8     Q    Okay. The materials that you put in
9 your three to four boxes of Building Performance Study
10 records that were then conveyed to NIST, physically
11 conveyed to NIST, how had you acquired those
12 materials; were they all given to you like hard copy
13 hand delivery, some by mail, some by email, some by
14 maybe the FTP site, electronically transferred; do you
15 recall?
16     A    **Yeah, I imagine some came**
17 **electronically, people physically mailed hard drives**
18 **or CDs. Building plans were FedExed. Materials came**
19 **in through a number of different venues from team**
20 **members to Greenhorne and O'Mara.**
21     Q    Okay. Do you remember whether
22 Mr. Paul Tertell's personal computer that he used as

148

1 project manager on the Building Performance Study was
2 given to you to convey to NIST during this transfer?
3     A    **No; I had no access to any FEMA -- I**
4 **was a contractor so I had no access to any FEMA**
5 **internal IT systems or computers.**
6     Q    Okay. After you had conveyed the three
7 to four boxes of material to NIST for FEMA during your
8 time at Greenhorne, after having done that, did you
9 make any effort to go back into Greenhorne's records,
10 either email or website or other records, maybe
11 thumb drives, CDs, DVDs, floppy discs, whatever they
12 used back then, did you make an effort to go back then
13 and basically delete your original version of the
14 records you had received electronically?
15     A    **I remember being very thorough in**
16 **collecting everything that we collected to put into**
17 **those boxes. I don't recall deleting any files;**
18 **typically, just didn't do that. I don't recall**
19 **deleting -- you know, if we had a thumb drive or a CD,**
20 **we had make sure that went to NIST. If there was some**
21 **remnant on a server or email, that likely remained.**
22     Q    Okay, and that was my question, thank

149

1  you.

2      MR. TEPE:  Mr. Letvin, do you have

3  a conflict at 3:00 o'clock?

4      THE WITNESS:  I do.  I can be a

5  little bit late or I can pick back up at 4:00 or

6  5:00 also if that --

7      MR. HARRISON:  Gentlemen, I may be

8  able to finish by 3:00 o'clock, I don't know about

9  Mr. Tepe having questions for you, if you let me

10  proceed.

11      MR. TEPE:  Go ahead.  I mean,

12  again, like whatever, Mr. Letvin, if he needs to

13  leave then he needs to leave, so I defer to the

14  witness on that, but thank you.

15  BY MR. HARRISON:

16      Q    Okay.  And I'm happy for you to go when

17  you need to go, Mr. Letvin.  During the time when you

18  were at NIST and they were inquiring -- and that

19  included Ms. Therese McAllister inquiring into

20  Mr. Cole's FOIA request and how to respond to it, did

21  you come to know whether Ms. McAllister and the NIST

22  FOIA people were looking at any records beyond those

150

1  that had been given to NIST by FEMA in the May 2002

2  transfer to respond to Mr. Cole, or do you think they

3  limited their inquiries to that particular transfer?

4      MR. TEPE:  I object to form.

5      THE WITNESS:  I don't recall how

6  NIST responded to that FOIA.

7  BY MR. HARRISON:

8      Q    To your knowledge, was there any record

9  that would have been responsive to Mr. Cole's FOIA

10  request that had been destroyed either by Greenhorne

11  or by NIST?

12      A    Not to my knowledge.

13      Q    Do you know whether at any time the

14  computer or computers that you used when you were at

15  Greenhorne were searched by anyone in response to

16  Mr. Cole's FOIA request?

17      MR. TEPE:  Objection to form,

18  foundation, scope.

19      THE WITNESS:  At Greenhorne --

20  BY MR. HARRISON:

21      Q    You may answer.

22      A    **This FOIA request came in after**

151

1  **Greenhorne had completed the study so, no, I don't**

2  **recall any computers being searched.**

3      Q    Okay.  Do you recall the FOIA request

4  does cover the time period when you were working at

5  Greenhorne, you do understand that?

6      MR. TEPE:  Objection to form,

7  outside the scope, foundation.

8  BY MR. HARRISON:

9      Q    Do you understand that, sir?

10      A    **Yes, correct, but I had left Greenhorne**

11  **and O'Mara; I have no idea what happened to my**

12  **computer or the networks or how they were handled**

13  **after I left the firm.**

14      Q    Understood.

15      MR. HARRISON:  So, Mr. Tepe, those

16  are all the questions I have for Mr. Letvin.  I

17  appreciate his time and his schedule challenges.

18      MR. TEPE:  Okay, thank you.

19  BY MR. TEPE:

20      Q    I just have a few questions,

21  Mr. Letvin.  So you understand that the FOIA request

22  that we've been talking about for Mr. Cole was for

152

1  background or raw data used for the FEMA Building

2  Performance Study, including photos, videos,

3  memorandums, et cetera?

4      A    Yes.

5      Q    And am I correct that your testimony is

6  that, to the extent Greenhorne and O'Mara collected

7  those records, all of those records were transferred

8  to NIST in 2002?

9      A    Yes.

10      MR. HARRISON:  Objection, vague.  I

11  don't know whether that question is asking whether

12  copies of any of those were retained at Greenhorne

13  or whether no copies were retained at Greenhorne,

14  that's why I think it's ambiguous.

15      MR. TEPE:  Okay, well, you can ask

16  your own questions.

17  BY MR. TEPE:

18      Q    And so if I understand correctly,

19  Mr. Letvin, to the extent that there was any of the

20  background data that was used to support the Building

21  Performance Study by Greenhorne and O'Mara, either the

22  original or a copy of that background information was



153

1 transferred to NIST in 2002, is that your testimony?

**2  A  Yes.**

3  Q  And to your knowledge, was a separate
4 copy of those records that were transferred to NIST
5 also transferred to FEMA?

**6  A  No.**

7  Q  You looked at the June 11 list or memo
8 of Terri McAllister earlier, correct?

**9  A  Yes.**

10  Q  Right.  Do you have any reason to
11 believe that that index is not a reflection of the
12 materials that were transferred by Greenhorne and
13 O'Mara on behalf of FEMA to NIST?

**14  A  Yes, that list appears to be accurate.**

15  MR. TEPE:  I have nothing else.

16  MR. HARRISON:  I think we're
17 finished, folks.  Thank you, Mr. Letvin, you're
18 excused.

19  MR. TEPE:  And we'll read and sign
20 it again, as I said before.

21  MR. HARRISON:  Plaintiffs would
22 like the electronic transcript within ten days.

154

1  MR. TEPE:  And for my perspective,
2 also electronic transcript but I think I want it
3 in seven days.

4
5
6  _____
7  ERIC LETVIN
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

155

1  C E R T I F I C A T E
2
3  STATE OF MARYLAND  )
4  )
5  WICOMICO COUNTY  )
6
7  I, Pamela C. Herrmann, Registered
8 Professional Reporter and Notary Public, do hereby
9 certify the foregoing deposition of the witnesses
10 GREGORY BRIDGES and ERIC LETVIN were taken before me
11 at the time indicated herein; that said witnesses
12 acknowledged that their testimony was given under the
13 penalties of perjury; that the testimony was
14 stenographically reported by me and thereafter reduced
15 to typewriting under my personal supervision; that I
16 am neither of counsel nor kin to parties in said
17 action nor interested in the outcome thereof.
18 WITNESS my hand this _30_ day of _June_, 2022.
19
20  _____
21  Pamela C. Herrmann
    Registered Professional Reporter
    and Notary Public
22

# EXHIBIT 2

1

```
1        IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF COLUMBIA
3   ---------------------------------------------
4   DAVID COLE,
5               Plaintiff,
6          v.          Case No.:
7   WALTER G. COPAN, in his    1:15-cv-01991-EGS/GMH
8   official capacity as
9   Director of the National
10  Institute of Standards
11  and Technology, et al.,
12              Defendants.
13  ---------------------------------------------
14
15           ZOOM DEPOSITION OF
16           CATHERINE S. FLETCHER
17           10:00 a.m. - 11:55 a.m.
18                June 29, 2022
19
20  Job #454524
21  Pages: 1-75
22  Reported By:  Joseph C. Spontarelli, CCR
```

2

```
1           APPEARANCES OF COUNSEL
2
3   ON BEHALF OF THE PLAINTIFF
4   LAW OFFICE OF MICK HARRISON, ESQUIRE
5   By:  Mick Harrison, Esquire
6   and David Colapinto, Esquire
7   520 South Walnut Street #1147
8   Bloomington, Indiana 47402
9   (812)361-6220
10
11  ON BEHALF OF THE DEFENDANTS
12  OFFICE OF THE UNITED STATES ATTORNEY
13  By:  Sean M. Tepe, Esquire
14  Assistant United States Attorney
15  555 Fourth Street, N.W.
16  Washington, D.C. 20530
17  (202)252-2533
18
19  Also present:
20   Michael Bogomolny, Esquire
21   Paula Rich, Esquire
22   Jackson Schueler, PD Technician
```

3

```
1                INDEX TO WITNESS
2
3   Witness           Examined By    Page
4   Catherine S. Fletcher  Mr. Harrison    5
5                     Mr. Tepe       69
6                     Mr. Harrison    71
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

4

```
1              P R O C E E D I N G S
2
3        THE COURT REPORTER:  Will counsel
4   please stipulate that in lieu of formally
5   swearing in the witness, the reporter will
6   instead ask the witness to acknowledge that
7   their testimony will be true under penalties of
8   perjury, that counsel will not object to the
9   admissibility of the transcript based on
10  proceeding in this way, and that the witness has
11  verified that she is in fact Catherine Fletcher?
12       MR. HARRISON:  I agree.
13       MR. TEPE:  I agree.
14       THE COURT REPORTER: Ms. Fletcher,
15  do you hereby acknowledge that your testimony
16  will be true under the penalties of perjury?
17       CATHERINE S. FLETCHER:  I do.
18
19       CATHERINE S. FLETCHER,
20  having declared to provide truthful testimony,
21  was examined and testified as follows:
22
```

---

5

1  BY MR. HARRISON:
2      Q    Ms. Fletcher, my name is Mick
3  Harrison.  I'm the attorney for the plaintiff
4  David Cole.  My colleague David Colapinto has
5  just joined us and I see that my client, David
6  Cole, who is on as Kawik there without the
7  camera has joined us.
8          I appreciate your assisting us today
9  with your testimony.  I believe you understand
10 you're here for a discovery deposition in a FOIA
11 case.  Is that your understanding?
12     **A    Yes.**
13     Q    The case, for the record, is Cole
14 versus Copan, et al., Case No. 1:15-cv-01991.
15 It is before the U.S. District Court for the
16 District of Columbia.
17         Ms. Fletcher, have you ever been
18 deposed before?
19     **A    No.**
20     Q    I'm sorry to be the one to give you
21 that pleasure for the first time.
22         There are a couple things you should

---

6

1  know.  First of all, if you need a break just
2  let me know and we'll accommodate you.
3          If you need me to repeat a question
4  you should not hesitate to ask me to do that.
5  It's important that you understand what's being
6  asked.  If I do not enunciate adequately or you
7  don't understand what's being asked just let us
8  know and we'll help you by restating or
9  rewording as-needed.
10         There may be objections to some of my
11 questions from counsel for the agency.  If you
12 hear Mr. Tepe start to state an objection please
13 be patient and allow him to do so.  Let him
14 finish his statement.  At the end of his
15 objection he may add an instruction to you
16 either to answer the question or not to answer
17 the question so listen carefully for that.  If
18 he does not give you either instruction at the
19 end of his objection then he's simply stating an
20 objection for the record and I will ask you to
21 go ahead and answer the question which you may
22 do.  If you do get an instruction from your

---

7

1  counsel to not answer a particular question you
2  should obey that instruction and not answer that
3  question and I'll go on to another question and
4  we'll deal with that issue with the Court at a
5  later time.
6          Do you understand that basic
7  procedure?
8      **A    Yes.**
9      Q    Thank you.
10         Could you state for the record your
11 full name Ms. Fletcher?
12     **A    Catherine Seibolt Fletcher.**
13     Q    Who is your current employer?
14     **A    The Department of Commerce-National**
15 **Institute of Standards and Technology.**
16     Q    What is your job title with NIST as
17 we call your agency?
18     **A    Director of Management and**
19 **Organization Office.**
20     Q    Can you summarize for us briefly your
21 employment history with NIST, and if you had
22 different roles at different times what those

---

8

1  were?
2      **A    I was hired as the Director of**
3  **Management and Organization Office and that's**
4  **what I've done since I've been here.**
5      Q    How long have you been with NIST?
6      **A    15 plus years.**
7      Q    Mr. Cole's FOIA request was presented
8  first to FEMA -- a different agency -- the
9  Federal Emergency Management Agency -- and then
10 it was relayed to your agency NIST.  I believe
11 your agency received Mr. Cole's FOIA request as
12 a referral in or about December --
13         MR. TEPE:  Object to form.
14 BY MR. HARRISON:
15     Q    You may answer.
16     **A    I'm sorry.  You keep going in and out**
17 **on my computer.**
18     Q    The audio?
19     **A    Yes.  I heard the first part but then**
20 **you freeze.**
21     Q    Let's hope we fix that.  I'll restate
22 that for you and I'll try to make it shorter.

---

9

1    Do you recall receiving Mr. Cole's
2 request at NIST at some point in time?
3    A    Yes.
4    Q    Do you remember the time period you
5 received his request?
6    A    Yes.  Fiscal 2012.
7    Q    I'm sorry.  That sounds right.
8        Which would have been probably the
9 last part of 2011.
10    A    Yes.
11    Q    Thank you for that clarification.
12        Was it your understanding that this
13 was a FOIA request that Mr. Cole first presented
14 to the agency we call FEMA?
15    A    Yes.
16    Q    Did you understand that the FOIA
17 request from Mr. Cole was asking for background
18 or raw data used for the FEMA 403 building
19 performance study concerning the World Trade
20 Center including photos, videos, audio, field
21 notes, memoranda and laboratory samples?
22    A    Yes.

10

1    Q    How did you become involved, if you
2 did, in responding to Mr. Cole's FOIA request?
3    A    The request came to the FOIA office
4 and we contacted the engineering laboratory that
5 did the study to see if we had the records.
6    Q    When you say we, was that you and
7 some other person or persons?
8    A    Darla Yonder was the management
9 analyst in this office and she handled the World
10 Trade Center requests.
11    Q    I get the impression that you sent
12 Mr. Cole's request to the -- did you say the
13 engineering laboratory or engineering office?
14    A    The engineering laboratory, yes.
15    Q    Was that your decision to send the
16 request to that particular laboratory?
17    A    Yes.
18        MR. TEPE:  Object to form.
19 BY MR. HARRISON:
20    Q    Can you explain your basis for
21 sending the request to the engineering
22 laboratory at NIST?

11

1    A    The engineering laboratory did the
2 study into the World Trade Center collapse.
3    Q    That was your basis for referring the
4 request to them?
5    A    Yes.
6    Q    Was there any other person who took a
7 role in that decision to send Mr. Cole's FOIA
8 request to the engineering laboratory, correct
9 me if I'm wrong, for a search?
10    A    I'm sorry, the first part of your
11 question I did not hear you.  It was muffled.  I
12 don't know if anybody else is having the same
13 problem.
14        MR. TEPE:  I am as well.
15 BY MR. HARRISON:
16    Q    Was there anyone else involved in the
17 decision to send Mr. Cole's request to the
18 engineering laboratory?
19        MR. TEPE:  Objection to form.  Vague.
20 BY MR. HARRISON:
21    Q    Do you understand the question
22 Ms. Fletcher?

12

1    A    I guess.  No.
2    Q    Don't guess.
3    A    I sent it to the engineering
4 laboratory.  They would be the ones that would
5 have records for the World Trade Center
6 collapse.
7    Q    Was anyone else involved in making
8 that decision to refer the request to that
9 laboratory?
10    A    I contacted the laboratory to see if
11 they would have that and they agreed so we sent
12 it to them.
13    Q    Did you task the engineering
14 laboratory with something specific when you sent
15 the request to them?
16    A    We forwarded the request and asked
17 them if they had any questions to let us know.
18    Q    Were you asking the laboratory to
19 search for records responsive to that request?
20    A    Yes.
21    Q    Did the laboratory do so?
22    A    Yes.

13

1    Q    Was any other NIST office or
2  department or laboratory asked to participate in
3  the search for responsive records?
4        MR. TEPE: Objection to form.
5  Compound.
6  BY MR. HARRISON:
7    Q    You may answer if you understand it.
8    A    No.
9    Q    How would you describe the role that
10 you played as NIST processed Mr. Cole's FOIA
11 request?
12   A    I guess I don't understand your
13 question.
14   Q    You referred Mr. Cole's request to
15 the laboratory. Did you have any involvement
16 after that point in time in regard to this
17 request?
18   A    Once we received the record -- I
19 guess I don't understand your question.
20        We sent the FOIA request and asked
21 them to search and if they understood what was
22 being asked.

14

1    Q    After you sent the request to the
2  laboratory to search what did you personally do
3  next in regard to Mr. Cole's requests?
4    A    Waited for them to return the records
5  so we could process them.
6    Q    Did the engineering laboratory return
7  records to you or to your office for processing?
8    A    Yes.
9    Q    I didn't quite catch that answer.
10   A    You froze again, too. Yes.
11   Q    You seem to be going --
12        THE COURT REPORTER: Mick, I'm going
13 off the record. I don't hear him talking.
14
15        (Recess due to technical
16 difficulties.)
17
18 BY MR. HARRISON:
19   Q    When the engineering laboratory was
20 tasked to search for responsive records did they
21 at the laboratory return records to your office
22 for processing?

15

1    A    Yes.
2    Q    What did you do, if anything,
3  regarding the FOIA request at that point in
4  time?
5    A    We reviewed the records that they
6  gave us, and we did rolling releases on records
7  that had already been in the public domain.
8    Q    To make what is probably a long story
9  short and not necessarily the subject of this
10 deposition, is it fair to say that the records
11 that NIST and FEMA eventually determined were
12 releasable to Mr. Cole were not released to
13 Mr. Cole until after this litigation commenced
14 except for what you're describing as the rolling
15 releases?
16        MR. TEPE: Objection to form. You
17 can answer if you understand the question.
18        THE WITNESS: We did the releases as
19 you mentioned, and then returned the request to
20 FEMA. I don't know what they did.
21        MR. TEPE: You don't need to turn the
22 mic on and off after each response. You can

16

1  keep your microphone off mute unless it's
2  automatically doing that.
3        THE WITNESS: I'm good now.
4  BY MR. HARRISON:
5    Q    You understand that there was a body
6  of records that your office determined were
7  responsive to Mr. Cole's request that you
8  returned to FEMA for further processing.
9    A    Correct.
10   Q    Do you understand that your office
11 and NIST did not themselves release that
12 particular set of documents or records to
13 Mr. Cole until after this litigation commenced?
14        MR. TEPE: Objection to form.
15        THE WITNESS: Once we sent the
16 records back I don't know what FEMA released.
17 BY MR. HARRISON:
18   Q    I'm not asking you about FEMA, I'm
19 asking you about NIST.
20        Did NIST release these particular
21 records to Mr. Cole directly prior to this
22 lawsuit?

17

1        MR. TEPE:  Objection.  Unclear as to
2  what these records are.
3        MR. HARRISON:  These are the records
4  we were just talking about.
5  BY MR. HARRISON:
6     Q    Are you unclear Ms. Fletcher on what
7  records we're talking about?
8     A    A bit.
9        We released two responses, and then
10  transferred the FOIA request back to FEMA.
11    Q    Let's be clear.
12        What was the first responses to the
13  records you released?
14    A    I don't have that in front of me.  I
15  know we sent that.
16    Q    Is it your understanding that this
17  was material already in the public record?
18    A    Correct.
19    Q    Do you recall what the second -- I
20  think what you called interim release -- of
21  records to Mr. Cole was?
22    A    Again, I don't have it right in front

18

1  of me.  It was also records that we had already
2  released so they could go out.
3     Q    Did you understand that the set of
4  records beyond those first two releases that
5  NIST sent back to FEMA for processing were
6  records that had not been previously publicly
7  released?
8     A    Not by us.
9     Q    Not by NIST?
10    A    Correct.
11    Q    For that particular set of records,
12  the set of records you just described as not
13  having been released by NIST, did NIST release
14  those records directly to Mr. Cole prior to
15  lawsuit commencing?
16        MR. TEPE:  Objection.  Asked and
17  answered.
18        MR. HARRISON:  I'm sorry.  We've had
19  objections and clarifications.  We haven't had
20  an answer, but we're going to get one.
21        MR. TEPE:  You can answer if you
22  understand the question.

19

1        THE WITNESS:  From what I'm hearing
2  we did two releases when we received the FOIA
3  request.  In the interest of getting rolling
4  releases out as quickly as possible we released
5  what could be released.  Then when we realized
6  the FOIA request we transferred it back -- after
7  speaking to FEMA we transferred it back to them.
8  I don't know what else was released.
9  BY MR. HARRISON:
10    Q    Ms. Fletcher, listen carefully to my
11  question.  I'm not asking you about what FEMA
12  did or didn't do.  I'm asking you about what
13  your agency did.
14        I understand from your testimony so
15  far that you sent this third set of documents --
16  the documents you described as not having been
17  previously made public by NIST -- you sent that
18  to FEMA for further processing.  You made that
19  clear.  I'm not asking you what FEMA did with
20  those documents.
21        What I want to know is whether in
22  addition to sending those documents back to FEMA

20

1  for processing did NIST send those documents
2  directly to Mr. Cole prior to this lawsuit
3  commencing?
4     A    NIST closed our FOIA and transferred
5  it to FEMA.  After we did the transfer and after
6  the two releases we closed our portion of the
7  FOIA and sent a letter saying that we
8  transferred it back.
9     Q    I understand that, but please answer
10  the question as I asked it.
11        Did NIST send these records to Mr.
12  Cole before this lawsuit commenced?
13        MR. TEPE:  Objection to form.
14  BY MR. HARRISON:
15    Q    You may answer.
16    A    I don't understand your question.
17        We sent two rolling releases before
18  the litigation.  We did nothing else after.
19    Q    If you did nothing else after, that
20  means you did not send the set of records that
21  was sent back to FEMA -- NIST did not send those
22  records directly to Mr. Cole until after this

21

1  lawsuit commenced, isn't that correct?
2         MR. TEPE:  Objection to form.
3         First off, it's outside the scope of
4  the deposition and discovery about the adequacy
5  of searches.
6         In the interest of moving on
7  Ms. Fletcher if you understand the question
8  please try and answer.
9         THE WITNESS:  As I understand the
10 question, once we transferred the records back
11 we closed our FOIA request; ergo we would not
12 have done another release to Mr. Cole on that
13 particular FOIA request.
14 BY MR. HARRISON:
15    Q    I think that's responsive.
16    A    Okay.
17    Q    The records that the NIST laboratory
18 provided to your office as responsive, do you
19 know how the NIST laboratory conducted their
20 search to come up with that set of responsive
21 records?
22        MR. TEPE:  I'm going to alert you

22

1  Mick what the engineering laboratory did is
2  being covered by Ms. Beall.  If you have
3  questions about what the engineering laboratory
4  did that's been designated to Ms. Beall.
5         MR. HARRISON:  I appreciate that.  We
6  can address Ms. Beall for that.
7  BY MR. HARRISON:
8     Q    Did you have, Ms. Fletcher, a role in
9  deciding how the NIST laboratory would conduct
10 its search for these responsive records?
11    A    No.
12         We sent it to the organizational unit
13 and the Deputy Director was charged with doing
14 that which Kellie will go over.
15    Q    Ms. Beall knows about that?
16    A    Yes.
17    Q    The Deputy Director at that time
18 would have been?
19    A    Bill Grosshandler.
20    Q    Ms. Fletcher, did you have any role
21 in determining who would be involved for Mr. Cole's
22 searches for responsive records?

23

1  request?
2     A    No.
3     Q    Do you know who made that decision as
4  to who would be involved?
5         MR. TEPE:  Objection to form.
6         THE WITNESS:  I believe Kellie could
7  answer that.
8  BY MR. HARRISON:
9     Q    You're not aware of who made the
10 decision on who should be involved in the
11 search?
12    A    Bill Grosshandler signed the
13 documents, the papers, the cover sheets.
14    Q    Mr. Grosshandler would have been
15 involved.  Do you know whether anyone else was
16 involved in determining who would do the search?
17    A    Again, that would be a Kellie
18 question.
19    Q    I'm going to ask Ms. Beall whatever
20 she knows about this.  If you know someone else
21 was involved in deciding how the search would be
22 done or who would be involved I would like you

24

1  to tell me.
2     A    All FOIA requests for World Trade
3  Center went to the engineering laboratory.  Dr.
4  Grosshandler was in charge of FOIA requests for
5  that.  Kellie Beall was the one who searched and
6  knew who to go to for searches.
7     Q    I appreciate that.
8         To your knowledge no one else outside
9  of the engineering laboratory was involved in
10 deciding who would search?
11    A    Yes.
12    Q    I assume you've been involved in a
13 number of FOIA requests over the years.
14    A    Yes.
15    Q    Is it fair to say that the nature of
16 a search for responsive records is in large part
17 determined by the agency's understanding of what
18 records are being requested?
19         MR. TEPE:  Objection to form.  Calls
20 for a legal conclusion.
21 BY MR. HARRISON:
22    Q    You may answer.

25

1    A    You went out just a little bit.
2 Would you repeat that?  I'm sorry.
3    Q    No problem.  You should ask me when
4 you need it to be repeated.  No apology
5 required.
6         Is it fair to say based on your
7 experience in your job that the nature of a
8 search for responsive records is in large part
9 dependent on the agency's understanding of the
10 nature of the FOIA request?
11        MR. TEPE:  Objection to form.
12        THE WITNESS:  Yes.
13 BY MR. HARRISON:
14    Q    Now, did you have an understanding
15 yourself at the time Mr. Cole's FOIA request was
16 processed by NIST as to the scope of his
17 request?
18    A    It was a different request that's why
19 we made a phone call because it came from FEMA.
20 We made a phone call to see if the engineering
21 laboratory understood the request before we sent
22 it to them for processing.

26

1    Q    Were you involved in that phone call?
2    A    I was.
3    Q    Did you and the engineering
4 laboratory folks reach an understanding as to
5 what the FOIA request was requesting?
6    A    Yes.
7    Q    Can you describe from your memory
8 what you and the engineering laboratory staff,
9 which I take to be Mr. Grosshandler and
10 Ms. Beall or both, you correct me, what
11 understanding you came to as to what was being
12 requested?
13        MR. TEPE:  Objection to form.
14        THE WITNESS:  We spoke to Eric Letvin
15 who was working at NIST at the time.
16 BY MR. HARRISON:
17    Q    Who was involved in that
18 conversation?
19    A    Darla Yonder, my management analyst,
20 Eric Letvin and me.
21    Q    Not Mr. Grosshandler or Ms. Beall?
22    A    No, not at that point.

27

1    Q    Was that conversation intended to
2 reach an understanding or clarification of what
3 Mr. Cole was requesting?
4    A    Yes, I guess.
5    Q    You can just tell me essentially what
6 Mr. Letvin and you discussed if I'm not
7 capturing it precisely.
8    A    We just made a phone call to see if
9 this request -- if we needed to go back for
10 clarification to FEMA.
11    Q    Did you have to go back to get more
12 clarification?
13    A    He said it looked okay so we
14 forwarded it for processing to Dr. Grosshandler.
15    Q    Did you actually show Mr. Letvin the
16 wording of Mr. Cole's FOIA request?
17    A    We did.
18    Q    Do you recall at some point in time
19 that NIST determined that records responsive to
20 Mr. Cole's FOIA request would have included
21 records transferred to NIST by FEMA in May of
22 2002 by a contractor called Greenhorne & O'Mara?

28

1    A    Can you rephrase that?
2    Q    I'll try.  It may help to start with
3 another component of this.
4         Do you recall an inventory that was
5 created either by or for Therese McAllister that
6 attempted to list documents provided to NIST in
7 the time period of May 2002 that came from FEMA?
8    A    Yes, as a result of this FOIA
9 request.
10    Q    Do you know whether the engineering
11 laboratory personnel doing the search considered
12 the documents listed on what I will shorthand as
13 the McAllister inventory which I believe is
14 dated June 11, 2002 -- did they consider those
15 documents responsive to Mr. Cole's request?
16    A    Yes.
17    Q    Do you know whether the engineering
18 laboratory personnel doing the search considered
19 any additional NIST records to be in response to
20 Mr. Cole's FOIA request?
21        MR. TEPE:  Again, Mr. Harrison,
22 questions about what the engineering laboratory

**29**

1 did Ms. Beall has been designated to discuss the
2 search they did.  Ms. Beall has been prepared to
3 testify on that.
4        MR. HARRISON:  I'll try to hold those
5 questions for Ms. Beall with once exception
6 which is if in this particular conversation
7 Ms. Fletcher had with Mr. Letvin this topic was
8 discussed I would just like to ask her whether
9 she knew from Mr. Letvin -- and she may not --
10 whether she knew whether the engineering
11 laboratory considered any records beyond those
12 on the McAllister inventory to be responsive.
13        THE WITNESS:  We asked if that was
14 clarified enough.  They said yes.  We sent it
15 for processing.
16 BY MR. HARRISON:
17    Q     When you received the set of records
18 considered responsive by the engineering
19 laboratory did you question anyone from the
20 laboratory as to how they conducted the search?
**21    A     They fill out a form when they send**
**22 it back to us that Dr. Grosshandler signs.**

**30**

1    Q     Was that form intended to explain how
2 they did the search?
**3    A     Just where they looked for**
**4 everything.**
5    Q     Did you review that form?
**6    A     Of course.**
7    Q     Could you tell from that form whether
8 the engineering laboratory had searched the NIST
9 computer databases for responsive records?
10        MR. TEPE:  Again, questions in this
11 deposition regarding what the engineering
12 laboratory did are best handled by Ms. Beall.
13 She's the one who has been designated on that
14 topic.
15        MR. HARRISON:  Do you think Mr.
16 Tepe -- I'll ask you -- that Ms. Beall is
17 familiar with the form that Ms. Fletcher has
18 identified?
19        MR. TEPE:  I think so.  Ms. Fletcher,
20 what do you think?
21        THE WITNESS:  Yes.  Of course.
22

**31**

1 BY MR. HARRISON:
2    Q     Ms. Fletcher, do you remember the
3 time period in which you would have received the
4 responsive records back from the engineering
5 laboratory?
**6    A     I don't recall the exact date.**
7    Q     After receiving those records I'm
8 assuming -- putting the exact date aside -- this
9 would have been in the 2012 time period.  Does
10 that sound right?
**11    A     Yes, it does.**
12    Q     After receiving those records did you
13 or someone at NIST request any additional
14 searches for responsive records?
**15    A     I don't believe so, no.**
16    Q     Would that be true also for the time
17 period after this lawsuit commenced?
**18    A     I don't understand the question**
**19 because we closed the FOIA before the lawsuit**
**20 started.**
21    Q     I think you're answering it.  I
22 realize you have your own way of describing your

**32**

1 procedures which I don't have a problem with,
2 but it may not be as clear to a judge so let me
3 just clarify.
4        I believe what you're saying is
5 because the request was closed by NIST before
6 the lawsuit commenced that it would not have
7 been NIST's procedure to do another search after
8 the lawsuit commenced, and in fact in this case
9 there was no additional search after the lawsuit
10 commenced; is that correct?
11        MR. TEPE:  Objection to form.
12 Compound.
13 BY MR. HARRISON:
14    Q     You may answer.
**15    A     Yes.**
16    Q     Ms. Fletcher, were you the one
17 responsible for communicating to FEMA regarding
18 this FOIA request?
**19    A     Yes.**
20    Q     I take it from your testimony thus
21 far that when you received the responsive
22 records from the engineering laboratory at NIST

33

1 you sent those records to FEMA, is that correct?

2    **A    Yes.**

3    Q    Was there someone designated to

4 supervise this FOIA search?

5    **A    I don't understand that question.**

6    Q    You've indicate that the engineering

7 laboratory -- Mr. Grosshandler and Ms. Beall,

8 for example, were involved -- was anyone outside

9 of the engineering laboratory in the role of

10 supervising the FOIA search to make sure it

11 complied with FOIA?

12    **A    From the engineering laboratory?**

13    Q    No, from anywhere in NIST that would

14 have had supervisory or oversight authority.

15    **A    Not to my knowledge.**

16    Q    You, yourself, did not play that

17 role?

18    **A    Did I supervise their search?**

19    Q    Yes, ma'am.

20    **A    No.**

21    Q    Did you rely on the engineering

22 laboratory personnel that you've identified to

34

1 decide what steps would be taken in the search,

2 or did you dictate some of those steps?

3         MR. TEPE:  Objection to form.

4         THE WITNESS:  As I had mentioned, we

5 send -- when we process the FOIA request we tell

6 them -- all FOIA requests -- where to look.  We

7 send a search certification and they sign that.

8 That's what Dr. Grosshandler signed.

9 BY MR. HARRISON:

10    Q    When you say you tell staff where to

11 look I'm not sure I understand what kind of

12 instruction that is.  Can you tell me what

13 instruction was given in that regard in this

14 case?

15    **A    The search certification just has**

16 **different places that people can search for**

17 **responsive records.  It's just a template.  It's**

18 **filled out by the office that received it and**

19 **they check where they searched and they may sign**

20 **it.**

21    Q    For example, your template might list

22 e-mail records, hard copy records, file

35

1 cabinets, computer databases, hard drives,

2 places one might look for records.

3    **A    Correct.**

4    Q    Did you rely on the engineering

5 laboratory to determine which of the areas

6 listed on your template would in fact be

7 searched in this case?

8    **A    Yes.**

9    Q    Do you think that you were in a

10 position to know at that time when the search

11 was done for responsive records for Mr. Cole's

12 request whether you, yourself, would have been

13 knowledgeable enough about the records at NIST

14 to have known whether the engineering laboratory

15 failed to look in some area where responsive

16 records would be expected to be found?

17         MR. TEPE:  Objection to form.

18 Speculation.

19         MR. HARRISON:  There's nothing

20 speculative about that.  I'm asking what she

21 knew at the time.

22         MR. TEPE:  Why don't you re-ask it.

36

1 That might help.

2 BY MR. HARRISON:

3    Q    Ms. Fletcher, did you know at the

4 time of Mr. Cole's FOIA request enough about

5 NIST's records and how they were kept that you

6 would have been able to identify whether the

7 engineering laboratory failed to look for

8 responsive records in some location where they

9 would reasonably have been expected to be found?

10         MR. TEPE:  Objection to form.

11         THE WITNESS:  Again, we sent the

12 search certification.  They checked where they

13 searched.  That's where they kept all World

14 Trade Center records.  Kellie will be able to

15 answer that.  I did not do the search myself.  I

16 received the search certification from them with

17 the records.

18 BY MR. HARRISON:

19    Q    My question is about your knowledge

20 Ms. Fletcher.

21         When you got the certification back,

22 which I understand to be your template form, I

37

1  assume the engineering laboratory folks would
2  have checked certain items on that form
3  indicating they had looked in those locations.
4      A    Yes.
5      Q    My question is at that time did you
6  have sufficient knowledge of NIST's records and
7  record keeping systems so that you could have
8  reviewed that form and had the engineering
9  laboratory left off some area which would be
10 expected to have responsive records omitted --
11 being omitted to search -- that you would have
12 identified that omission?  Did you have
13 sufficient knowledge to identify omissions of
14 that kind?
15     MR. TEPE:  Objection to form.
16     THE WITNESS:  I did not have any
17 indication that they didn't search the
18 repository where all the World Trade Center
19 records were kept.
20 BY MR. HARRISON:
21     Q    Are you saying that you did have
22 sufficient knowledge of at least World Trade

38

1  Center records to have made a judgment about the
2  adequacy of the search by reviewing that
3  template form?
4      A    The search certification?
5      Q    Right.
6      A    I had no reason to believe that there
7  was anything that they didn't search.
8      Q    I take it you were familiar with the
9  NIST World Trade Center database at that time.
10     A    To the extent that we had many, many,
11 many FOIA requests for that, yes.  Not like the
12 engineering lab did.  I did not have access to
13 it.
14     Q    When you reviewed the search
15 certification form was it your understanding
16 from reviewing it that the NIST World Trade
17 Center database had been searched?
18     A    Yes.
19     Q    Did you ask the engineering
20 laboratory to use any list or inventory or index
21 in doing their search?
22     A    Again, that's part of the FOIA

39

1  process.  We send it to process and all of that
2  information is in there.  If they have any
3  questions or need clarification they should get
4  back to us.  If there's another office where
5  something should go to they would tell us.
6      Q    Am I understanding your answer
7  correctly to mean that the NIST offices that are
8  tasked to do a search are given instructions on
9  how searches should be done for a FOIA request
10 and that includes use of any inventory or list
11 of records that may be available?
12     A    Yes.  We tell them to do a search for
13 all records or whatever the request is.
14     Q    Does that include any guidance on
15 using inventories or existing lists?
16     A    I don't really understand your
17 question.
18         They know their records.  The
19 instructions are to search anywhere you would
20 have those particular records — if it's media,
21 if it's hard copy, all of that.
22     Q    I appreciate that.

40

1          What I'm trying to get at is if the
2  agency or maybe a sub unit like the laboratory
3  has an existing inventory of records -- maybe a
4  computerized list -- do you give the staff any
5  guidance on using those existing inventories or
6  lists in doing the FOIA search?
7      MR. TEPE:  Objection to form.
8      THE WITNESS:  We give the guidance to
9  every FOIA request that comes in to any
10 laboratory or organizational unit.  They're all
11 different.  We don't get specific.
12 BY MR. HARRISON:
13     Q    Do you know whether there was any
14 instruction or guidance to the engineering
15 laboratory in this case to use the World Trade
16 Center computer database in doing their search?
17     A    I know that's where they did their
18 search from what they said.
19         Yes, the instruction was to look for
20 electronic media, hard copy, anything that has
21 to do with the FOIA request.
22     Q    Did you request the involvement of

41

1 any subject matter expert at any time in regard
2 to this Cole FOIA request?
3        MR. TEPE:  Objection to form.
4        THE WITNESS:  The FOIA request went
5 to the engineering laboratory and they have
6 their experts there.
7 BY MR. HARRISON:
8    Q    Beyond those who may be working in
9 that laboratory you did not request involvement
10 of any other subject matter expert.
11       MR. TEPE:  Objection to form.
12       THE WITNESS:  No.
13 BY MR. HARRISON:
14    Q    When you reviewed the -- I don't
15 remember the exact name again -- your template
16 form -- the verification sheet -- did it
17 indicate to you that any e-mail systems had been
18 searched?
19       MR. TEPE:  Objection to form.
20       Again, questions about the search
21 performed by the engineering laboratory
22 Ms. Beall has been designated on that.

42

1        MR. HARRISON:  We have a person in
2 charge of the FOIA office who received a form
3 describing the nature of the search.  It seems
4 reasonable to ask her what was on it.  I don't
5 know that Ms. Beall reviewed that form.  Maybe
6 she prepared it.  We'll find that out.
7        MR. TEPE:  If there's a form that
8 you're asking the witness about you should
9 probably introduce that as an exhibit.
10       MR. HARRISON:  If you don't mind I'll
11 do this deposition my way.
12       Are you instructing the witness not
13 to answer this question, sir?
14       MR. TEPE:  No.  Did I say that?
15       MR. HARRISON:  No, you did not.  I
16 appreciate it.
17       MR. TEPE:  I just don't understand
18 the question.  If you could re-ask it.
19       MR. HARRISON:  Certainly.
20 BY MR. HARRISON:
21    Q    The verification form that was
22 returned to you from the engineering laboratory,

43

1    I understand your testimony to be that you
2 reviewed that form; is that correct?
3    A    Yes.
4    Q    It had certain areas checked on it
5 that were represented as having been searched,
6 is that correct?
7    A    Yes.
8    Q    Was one of the items checked having
9 to do with e-mails or e-mail systems?
10    A    I don't recall.  I don't have that in
11 front of me.
12    Q    Do you know whether one of the items
13 on that form that was checked had to do with
14 personal computer hard drives?
15    A    I don't recall.
16    Q    Do you know whether one of the items
17 checked on that form was related to electronic
18 storage of records; meaning some kind of a
19 back-up storage system?
20    A    I do not recall.
21    Q    Was there someone at your office that
22 was responsible for ensuring the quality of any

44

1 searches of electronic records, for example, by
2 ensuring proper search terms were used?
3        MR. TEPE:  Objection to form.
4        THE WITNESS:  Can you repeat that?  I
5 don't understand.
6 BY MR. HARRISON:
7    Q    I'm making a distinction between the
8 laboratory that did the search and your office,
9 and I'm asking whether your office may have
10 taken any quality control steps to ensure that
11 certain search terms were used when searches
12 were done by the laboratory of electronic
13 records.
14    A    Not that I recall.
15        We made sure that they checked the
16 different boxes.  They said this is all the
17 information they had on this request.
18    Q    I take it you trusted the accuracy of
19 that verification form.
20    A    I did.
21    Q    At some point you received a set of
22 records considered responsive to Mr. Cole's

45

1  request by the laboratory.  Can you describe how
2  that package of records was provided to you?
3      **A      It was sent to my management analyst**
4  **that was working on it.  She went through the**
5  **records and then brought it to my attention.  We**
6  **worked on doing rolling releases of what were**
7  **already out.**
8      Q      The rolling releases were not part of
9  the package that the laboratory gave you were
10 they?
11     **A      Yes.**
12     Q      So you got that material plus you got
13 the other documents that were eventually sent
14 back to FEMA.  They were all part of the same
15 package you were given, is that correct?
16     **A      To the best of my knowledge.**
17     Q      Your associate who reviewed the
18 package, was she looking at that on a computer
19 as electronic files or hard copy or some other
20 way?
21     **A      When we received it, back then I**
22 **believe they were on disks.  We have since**

46

1  **converted thanks to electronics.**
2      Q      If any person was interviewed as part
3  of the search to help locate responsive records,
4  to your knowledge would those interviews have
5  been done by the engineering laboratory folks or
6  would those interviews have been done by your
7  office?
8          MR. TEPE:  Objection to form and
9  foundation.
10         THE WITNESS:  Can you repeat your
11 question, please?
12 BY MR. HARRISON:
13     Q      Had any interviews been done to help
14 locate responsive records -- to give you a
15 concrete example -- let's say that the
16 McAllister inventory listed photographs or
17 videos -- someone might have decided to talk to
18 Jonathan Barnett or Mr. Steficek to locate those
19 items -- speaking hypothetically -- if any
20 interviews had been done as part of the search
21 to help locate records would those interviews
22 have been done by your office or by the

47

1  engineering laboratory in this case?
2      **A      The engineering laboratory.  They had**
3  **the records.**
4      Q      Is it your understanding as the
5  agency -- I don't want to mischaracterize your
6  role -- I'll call you the person responsible for
7  Freedom Of Information Act requests at NIST --
8  is it your understanding that once your agency
9  closes a request -- such as in this case by
10 referring the matter back to FEMA -- that your
11 agency has no ongoing FOIA obligations regarding
12 that request?  Is that your understanding?
13         MR. TEPE:  Objection.  Outside the
14 scope of the 30(b)(6) deposition.  May also call
15 for a legal conclusion.
16         MR. HARRISON:  I'm just asking for
17 her understanding in that regard.
18 BY MR. HARRISON:
19     Q      You may answer.
20     **A      Yes.**
21     Q      If -- I'm asking your understanding
22 as the FOIA person for NIST -- if you received

48

1  information at any point in time after closing a
2  FOIA request that the records you produced were
3  not a complete set of responsive records but
4  that there were additional responsive records
5  that existed, what would your understanding be
6  about your obligation under FOIA at that point?
7          MR. TEPE:  I'm going to object as
8  outside the scope of the 30(b)(6).  Also object
9  as an incomplete hypothetical.
10         If Ms. Fletcher has views in her own
11 capacity and she understands the question she
12 can answer.
13 BY MR. HARRISON:
14     Q      I'm just asking, Ms. Fletcher, your
15 understanding as the NIST FOIA official what
16 would your position be in a scenario where you
17 received information after closing a search that
18 there were additional responsive records?
19         MR. TEPE:  Same objection.
20         THE WITNESS:  I guess I'm not
21 understanding the question.
22         If additional records came in after

49

1 the request, or they found records that they
2 didn't know beforehand?
3 BY MR. HARRISON:
4    Q    That's a good clarifying question.
5        My question was intended initially to
6 reach the scenario where the records actually
7 had existed at the time of the initial search
8 but had not been located and it later came to
9 the agency's attention that those additional
10 records did exist and could be located.  In that
11 type of scenario what would your position be as
12 the NIST FOIA person after you closed the
13 request?  Would you have any continuing FOIA
14 obligations in that scenario?
15        MR. TEPE:  Objection to form.
16 Incomplete hypothetical.  Your hypothetical
17 doesn't even say if the agency has the records
18 in their possession.
19        MR. HARRISON:  We can add that
20 clarification that these are records that would
21 be in the agency's possession.
22        MR. TEPE:  These questions are

50

1 outside the scope of the 30(b)(6).  This witness
2 is here designated to provide testimony on
3 certain designated topics that are responsive to
4 the authorized scope of discovery which is the
5 adequacy of NIST's search for records responsive
6 to Mr. Cole's FOIA request.  This question
7 doesn't get at that at all.
8 BY MR. HARRISON:
9    Q    Do you recall the question
10 Ms. Fletcher?
11    **A    I do.**
12    Q    What is your answer?
13    **A    Hypothetically if that were to come**
14 **up I would deal with it.  I can't answer the**
15 **question.  Hypothetically if there were records**
16 **and some office came to me and said oops we**
17 **forgot these I would probably reopen.  You can**
18 **certainly do that.**
19    Q    Thank you.
20        Were you the one responsible for
21 sending the package of responsive records that
22 the laboratory gave to your office back to FEMA?

51

1 Was that something that you did?
2    **A    Yes.**
3    Q    When you did that was it your intent
4 to send FEMA the entire package of responsive
5 records that you had been provided?
6        MR. TEPE:  Objection to form.
7        THE WITNESS:  Yes.
8 BY MR. HARRISON:
9    Q    Are you aware of any records that
10 would have been responsive to Mr. Cole's FOIA
11 request, had they been retained by NIST, not
12 having been retained by NIST and therefore could
13 not have been produced to Mr. Cole?
14    **A    No.**
15    Q    I'm not reading something into your
16 answer, but I'll just ask to be clear -- I'm
17 assuming that during your processing of Mr.
18 Cole's FOIA request that you did not see any
19 evidence that responsive records had been
20 destroyed or removed from the agency.
21    **A    No.**
22    Q    During your processing of Mr. Cole's

52

1 FOIA request did you see any evidence or
2 indication that any of NIST's records management
3 or retention policies had been violated in
4 relation to any responsive records?
5    **A    I have no reason to believe that.**
6 **No.**
7    Q    Is it part of your duties to be
8 involved in transfers of NIST records to the
9 National Archives and Records Administration --
10 the agency we call NARA?
11    **A    Yes.  Records management falls under**
12 **my office as well.**
13    Q    Do you know whether any potentially
14 responsive records -- meaning potentially
15 responsive to Mr. Cole's FOIA request -- had
16 been transferred at any point in time by NIST to
17 the national archives?
18    **A    No.**
19    Q    I take that to mean no they were not
20 rather than no I don't know.
21    **A    No, they were not.  I'm sorry.**
22    Q    Thank you.  You're fine.

---

53

1    When you and your colleague, who I
2 took to be Darla Yonder, received the package of
3 responsive records back from the engineering
4 laboratory do you know whether Ms. Yonder or did
5 you review that package and compare it, for
6 example, to the McAllister inventory as a
7 quality control check for completeness?
**8    A    We reviewed what they sent us.**
**9    Again, we relied on their search certification.**
10    Q    I take that answer to be no, we
11 didn't do the comparison to the McAllister
12 inventory for quality review; is that correct?
**13    A    We did look to see what they sent us.**
**14 I don't know that we looked to say one-on-one.**
**15 I know the engineering laboratory did that. We**
**16 looked over the records once we got them.**
**17 That's when we transferred them.**
18    Q    Are you saying you did not use the
19 McAllister inventory to sort of check for
20 completeness, or that you just don't remember if
21 you did?
22    MR. TEPE:  Are you asking

---

54

1 Ms. Fletcher in her personal capacity?
2    I think potentially what you're
3 asking for better goes to Ms. Beall and her
4 testimony.
5    Are you asking Ms. Fletcher if she
6 personally redid the work of folks in the
7 engineering laboratory?
8    MR. HARRISON:  I'm not asking your
9 question, I'm asking my question.  My question
10 has to do with the different roles between Ms.
11 Fletcher's office and Ms. Beall's role.
12 BY MR. HARRISON:
13    Q    Correct me if I'm wrong Ms. Fletcher,
14 I'm assuming Ms. Beall works in the engineering
15 laboratory and does not work for you; is that
16 correct?
**17    A    Yes.**
18    Q    I'm asking a quality control and
19 review question that goes to the FOIA office as
20 to whether they quality reviewed the work of the
21 engineering laboratory that did the search.
22 Ms. Beall cannot answer that question so I'm

---

55

1 going to ask it of Mr. Fletcher.
2    Ms. Fletcher, are you saying you did
3 not use the McAllister inventory as a
4 completeness check on what the laboratory
5 produced to you or you just don't remember if
6 you did?
**7    A    I don't recall exactly what we did.**
**8    Yes, we looked at everything that was given to**
**9    us, how it was given to us.**
**10    If you look at the McAllister**
**11 inventory -- some say just CDs and videos -- it**
**12 doesn't name everything individually.  Yes, we**
**13 did it to the best of our capabilities on that.**
**14 We were told we were given a complete copy of**
**15 everything that was responsive to the request.**
16    Q    Do you know sitting here today
17 whether the CDs that were referenced as CDs on
18 the McAllister inventory were actually included
19 in the responsive records that the laboratory
20 produced to you?
**21    A    Yes.**
22    Q    That was a yes?

---

56

**1    A    To the best of my knowledge, yes.**
2    Q    Listen carefully to this question
3 Ms. Fletcher.  It requires a certain level of
4 precision which I will do my best to insert into
5 it.  If you don't understand it please ask me to
6 reword or repeat.
7    Let me give you a prelude and your
8 counsel a prelude to this question.  It's going
9 to make the distinction between the records that
10 NIST received from FEMA in May 2002 by way of
11 Greenhorne & O'Mara that were listed or intended
12 to be listed in the McAllister inventory so
13 keep that one set of records in mind for this
14 question.
15    Then I'm going to make a distinction
16 between potentially a larger set of records that
17 NIST acquired still related to the FEMA building
18 performance study, some of which may have come a
19 different route to NIST; meaning not through the
20 May 2002 Greenhorne & O'Mara transfer.
21    Do you understand that basic
22 distinction without me asking you a question

57

1  yet?
2       MR. TEPE:  I'm going to say that this
3  question is in Ms. Beall's bucket.
4       MR. HARRISON:  Let me just examine it
5  and see if I agree with you on the bucket.  I do
6  for the detail I was going to ask.  I'll reserve
7  that one for Ms. Beall.
8  BY MR. HARRISON:
9       Q    Let me ask a more general question --
10 in your understanding as the FOIA officer when
11 you were returning to FEMA the records that were
12 provided to you as responsive was it your
13 understanding that you were providing to FEMA
14 all of NIST's building performance study records
15 or simply all of NIST's records provided by
16 Greenhorne & O'Mara in May of 2002 or something
17 different?
18      MR. TEPE:  Objection to form.
19      THE WITNESS:  I believe we sent them
20 back what they sent to us.  We returned their
21 records.
22

58

1  BY MR. HARRISON:
2       Q    Your understanding was all of FEMA's
3  records regarding the building performance study
4  given to NIST it was your understanding and I
5  take it your intention to return those to FEMA.
6       A    Correct.
7       Q    Ms. Fletcher, we received a document
8  by way of agency counsel -- I'm not going to
9  take the time to show it to you at the moment --
10 counsel will correct me if he thinks I'm
11 mischaracterizing it -- where someone in NIST I
12 believe at the time -- I think it was Eric
13 Letvin -- let me just ask you -- do you know
14 Eric Letvin?
15      A    I do, yes.
16      Q    Did he work for NIST for a period of
17 time?
18      A    Yes.
19      Q    Is he currently with NIST?
20      A    No.
21      Q    Do you understand he's currently with
22 FEMA?

59

1       A    I understand that, yes.
2       Q    I don't know if you were in this
3  chain of communication so that's why I'm asking
4  you -- were you informed at any point in time
5  that Mr. Letvin or Ms. Beall interpreted the
6  FOIA request to be limited to only those files
7  transferred to NIST from FEMA?
8       MR. TEPE:  Objection to form.
9       Do you understand the question?
10      THE WITNESS:  I don't understand it.
11      MR. HARRISON:  Pardon me.  I missed
12 what counsel said.
13      MR. TEPE:  I objected to form, and it
14 looks like Ms. Fletcher is not understanding the
15 question.
16 BY MR. HARRISON:
17      Q    Would you like it repeated
18 Ms. Fletcher?
19      A    Yes, please.
20      Q    The question is were you in the loop
21 on any communication from Mr. Letvin or
22 Ms. Beall indicating their understanding of the

60

1  limits of the Cole FOIA request in terms of
2  NIST's responsibilities, and that their
3  understanding was that NIST would not need to
4  perform any search beyond what was necessary to
5  locate files transferred to NIST by FEMA?
6       MR. TEPE:  Objection to form.
7       THE WITNESS:  I believe when we had
8  the initial phone call we asked if Eric
9  understood this request or did we need to go
10 back for clarification.  He said no, he
11 understood it.  He'd send it to the engineering
12 laboratory to process and then we received the
13 records.
14 BY MR. HARRISON:
15      Q    Was it your understanding at that
16 time that Mr. Letvin's understanding for the
17 purpose of the engineering laboratory search was
18 that they would only search for records that had
19 been transferred to NIST by FEMA?
20      MR. TEPE:  Objection.
21      Again, any questions about the
22 engineering laboratory search Ms. Beall has been

61

1 designated on that.
2        MR. HARRISON:  I'm asking for her
3 understanding.
4        MR. TEPE:  This is a 30(b)(6)
5 deposition.  NIST's testimony is going to come
6 from Ms. Beall on this.
7        MR. HARRISON:  It depends on what the
8 NIST is.  There is a NIST that is the FOIA
9 office and there's a NIST that's the engineering
10 laboratory that did the search.
11        At the moment I'm trying to determine
12 whether the FOIA office at NIST adopted a view
13 of the limits of this FOIA request which may or
14 may not have been a limit adopted by the
15 engineering laboratory -- which I will ask
16 Ms. Beall -- and whether that limit was that
17 NIST did not need to perform any search beyond
18 what was necessary to locate files transferred
19 to NIST from FEMA.
20        From the point of view of the FOIA
21 office, Ms. Fletcher, did you adopt that
22 limitation?

62

1        MR. TEPE:  Objection to form.  Go
2 ahead.
3        THE WITNESS:  Again, I will repeat
4 that I asked if they understood the request.
5 They did not come back to me and say this is how
6 I read the request.
7 BY MR. HARRISON:
8     Q     Putting the laboratory's
9 understanding aside of the limits of the task --
10 which I will ask Ms. Beall about -- what was
11 your understanding as the FOIA official of the
12 limit of NIST's obligation for searching?  Did
13 you, yourself, as the FOIA officer adopt the
14 limitation that there was no need for NIST to do
15 any search beyond locating files transferred to
16 NIST from FEMA?
17        MR. TEPE:  Objection to form.  You
18 also haven't laid a foundation for any
19 limitation.  You can answer.
20        THE WITNESS:  Yes.
21 BY MR. HARRISON:
22     Q     I took your answer to be yes to that

63

1 question.
2     A     Excuse me?
3     Q     Your answer was yes to the last
4 question?
5     A     Yes.
6     Q     In adopting that limitation that
7 NIST's obligation was to search only for records
8 transferred to NIST from FEMA, speaking from the
9 point of view of the FOIA office regarding that
10 search limitation, would you have considered
11 files transferred to NIST by a FEMA contractor
12 such as Greenhorne & O'Mara to be within the
13 scope of your search?
14        MR. TEPE:  Objection to form.  Calls
15 for speculation.
16        MR. HARRISON:  She's not speculating
17 about her own adoption of a FOIA search
18 limitation that she was in charge of so I don't
19 agree with that.
20        MR. TEPE:  You haven't established
21 any foundation for a FOIA limitation.
22        MR. HARRISON:  She just said yes to

64

1 my question that that was her office's view of
2 the limitation so I think the record supports
3 that.
4        MR. TEPE:  I don't think she said
5 that she supported your view of a FOIA
6 limitation.
7        MR. HARRISON:  Let's try again.
8 BY MR. HARRISON:
9     Q     I apologize Ms. Fletcher.  I'm going
10 to ask you the question again that you told me
11 you answered yes to and that question was was it
12 your position in the NIST FOIA office that the
13 limits of NIST's obligation on this Cole FOIA
14 request was that NIST only had to search for
15 records that were transferred to NIST from FEMA?
16 Did you not answer yes to that?
17     A     I answered yes to the fact that the
18 FOIA request was for what FEMA used for their
19 report from the engineering laboratory.
20     Q     I appreciate that clarification.
21        I'm going to attempt to state my
22 understanding of your answer and I would like

65

1  you to correct me if I get it wrong.
2      I understand you to be saying that in
3  your role as the NIST FOIA officer in processing
4  this FOIA request that you understood that
5  NIST's obligation was to search for records that
6  NIST had obtained that related to the FEMA
7  building performance study.  Am I hearing that
8  correct?
9      **A   Yes.  Correct.**
10     Q    In that regard would it have been
11 your view as the FOIA officer that it would have
12 been within the scope of your obligations to
13 search to look for records provided to NIST by
14 FEMA contractors such as Greenhorne & O'Mara if
15 those files transferred by the contractor were
16 regarding the building performance study?
17     MR. TEPE:  Objection to form.
18     THE WITNESS:  Could you rephrase it?
19 BY MR. HARRISON:
20     Q    Before I do that it may help to just
21 give a little prelude.
22     Do you recall the McAllister

66

1  inventory that related to the May 2002 transfer
2  from FEMA to NIST?
3      **A   Yes.**
4      Q    Do you recall that that transfer was
5  physically accomplished through the contractor
6  Greenhorne & O'Mara?
7      **A   I learned that, yes.**
8      Q    My question is -- it's not meant to
9  be limited to that transfer only but transfers
10 like that -- if there were records transferred
11 like that by Greenhorne & O'Mara or other FEMA contractors
12 to NIST like this one we're talking about, the
13 May 2002 transfer, if those record transfers
14 were building performance study records would
15 those have been within the scope of NIST's
16 obligation to search for this FOIA request?
17     **A   I believe the FOIA request asked what**
18 **FEMA used to do their building study so that's**
19 **what the engineering laboratory understood and**
20 **that's what I understood.**
21     Q    My question is more to the scope of
22 your search and how you understood the limits on

67

1  that scope of search.
2      Correct me if I'm wrong, there was a
3  time when NIST reached a conclusion in
4  processing this request -- I suspect this
5  determination was made by you but correct me --
6  that NIST could not determine which of the
7  records regarding the building performance study
8  that NIST had located had actually been used by
9  FEMA for the study and therefore they were
10 sending the matter back to FEMA to make that
11 determination.  Is that correct?
12     **A   Yes.**
13     THE COURT REPORTER:  Mick, this is
14 Joe.  When you get to a spot I need to take a
15 restroom break please.
16
17     (Recess.)
18
19 BY MR. HARRISON:
20     Q    Ms. Fletcher, I assume you understand
21 any time we take a break and resume you're still
22 under oath and expected to testify under the

68

1  penalty of perjury.  Do you understand?
2      **A   Yes.**
3      Q    As it happens, our break came right
4  at pretty much the end of my questions for you.
5      I do have one thing I would like to
6  ask you to remind me of.  I believe I asked you
7  this question and my memory isn't telling me the
8  answer.
9      I believe I asked you a question
10 about the national archives and whether any
11 records that were responsive or might have been
12 responsive to Mr. Cole's request that were in
13 NIST's possession had been transferred to the
14 national archives.  Unfortunately I don't
15 remember your answer.  Can you remind me?
16     **A   No, nothing has been transferred.**
17     Q    I appreciate that.
18     MR. HARRISON:  Mr. Tepe, would you
19 like to ask any clarifying questions of the
20 witness?
21     MR. TEPE:  Yes, I would.  Thank you.
22     MR. HARRISON:  Sure.  Go ahead.

69

1 BY MR. TEPE:
2    Q    Ms. Fletcher, when a FOIA request
3 comes into your office does the FOIA office make
4 a determination of which office within NIST
5 would be most likely to have responsive records?
6    **A    Yes.**
7    Q    Has NIST received other FOIA requests
8 for records relating to the collapse of the
9 World Trade Center?
10   **A    Yes.**
11   Q    When those types of requests come in
12 what office is most likely to have those
13 records?
14   **A    The engineering laboratory.**
15   Q    Is it the FOIA office's practice then
16 to, I think what's called, task out a search to
17 that office?
18   **A    Yes.**
19   Q    Are there FOIA office point of
20 contacts in each of the offices within NIST to
21 help you facilitate the responses to FOIA
22 requests?

70

1    **A    Yes, sir, and we train them**
2 **regularly.**
3    Q    You mentioned Darla Yonder.  Who is
4 she?
5    **A    She was a management analyst in my**
6 **office.**
7    Q    Is she the one who tasked out the
8 search to the engineering laboratory?
9    **A    Yes.**
10   Q    When any office comes back with the
11 results of their search is it the practice of
12 the FOIA office to second guess the work done by
13 that particular office who's been tasked for the
14 search?
15        MR. HARRISON:  Objection, vague.  I
16 don't know if second guess means quality control
17 or something else.
18        MR. TEPE:  Let me ask it this way --
19 you can strike that question.
20 BY MR. TEPE:
21   Q    What is the normal practice of the
22 FOIA office when it gets a response from an

71

1 office that has been tasked with a search?
2    **A    We review the records and we review**
3 **the search certification.  We also usually reach**
4 **out to the office and ask them if they have any**
5 **questions or if another office should get it.**
6        **We have very good communication with**
7 **all our office FOIA contacts.  We get the**
8 **records, we look at them, they give their**
9 **determination.  They are the record owners.**
10 **They're the experts on their records.**
11   Q    Was your review of what came back
12 from the engineering laboratory as potentially
13 responsive to Mr. Cole's request the same
14 practice that you usually performed in reviewing
15 FOIA responses from your offices?
16   **A    Yes.**
17        MR. TEPE:  I don't think I have any
18 other questions.
19 BY MR. HARRISON:
20   Q    I just have two additional questions
21 Ms. Fletcher and we can let you go.
22        Are you familiar with Therese

72

1 McAllister?
2    **A    Yes.**
3    Q    Am I saying her name correctly?
4    **A    We call her Terri.**
5    Q    My question, Ms. Fletcher, is do you
6 recall seeing a document in which Ms. McAllister
7 stated apparently early on in the handling of
8 Mr. Cole's FOIA request that it was her
9 expectation that there would be no responsive
10 records?
11   **A    I don't recall.  I don't recall that.**
12   Q    I assume from your answer that
13 Ms. McAllister never verbally expressed that
14 sentiment to you.
15   **A    Again, we tasked it to EL.  EL then**
16 **tasked it to the different people in EL.  Kellie**
17 **Beall and Dr. Grosshandler were our FOIA**
18 **contacts there.**
19   Q    You don't recall a verbal
20 communication from Ms. McAllister to this
21 effect?
22   **A    I do not.**

73

1    Q    My last question is does your office
2 give any guidance to agency contractors
3 regarding how to handle records in relation to
4 potential future FOIA requests?
5        MR. TEPE:  Object to form.  Outside
6 the scope.
7        THE WITNESS:  Do I still answer?
8 BY MR. HARRISON:
9    Q    Yes.
**10   A    Could you rephrase it?  Do we give**
**11 contractors information?**
12   Q    Yes.
13       We can just use an example like
14 Greenhorne & O'Mara or maybe for you maybe
15 SAIC -- do you give them any training or
16 guidance on how to maintain records, preserve
17 records, records to create, records not to
18 create in relation to FOIA obligations?
19       MR. TEPE:  Objection to form.
20 Outside the scope.
21       THE WITNESS:  We give the federal
22 employees who would have those contractors

74

1 training.  Yes, we do that for federal employees
2 but not contractors.
3    Q    That was my question.
**4    A    Okay.**
5        MR. HARRISON:  That's all I have.
6 Anything further Mr. Tepe?
7        MR. TEPE:  No.  We'll read and sign.
8
9        (Signature reserved.)
10
11       (Proceedings adjourned for the day at
12 11:55 a.m.)
13
14
15
16
17
18
19
20
21
22

75

1        CERTIFICATE OF REPORTER
  STATE OF NORTH CAROLINA
2 COUNTY OF JOHNSTON
3    I, Joseph C. Spontarelli, CCR, the reporter
4 by whom the foregoing remote videoconference
5 deposition was taken, do hereby certify that the
6 witness whose testimony appears in the foregoing
7 remote videoconference deposition was duly
8 identified and testified under the penalties of
9 perjury; that the testimony of said witness was
10 taken by me to the best of my ability and
11 thereafter reduced to typewriting under my
12 direction; that I am neither counsel for,
13 related to, nor employed by any of the parties
14 to the action in which this remote
15 videoconference deposition was taken, and
16 further that I am not a relative or employee of
17 any attorney or counsel employed by the parties
18 thereto, nor financially or otherwise interested
19 in the outcome of the action.
20
21
22 Joseph C. Spontarelli,
   Court Reporter

# EXHIBIT 3

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF COLUMBIA

3    ------------------------------------------------

4  DAVID COLE,

5            Plaintiff,

6        v.        Case No.:

7  WALTER G. COPAN, in his    1:15-cv-01991-EGS/GMH

8  official capacity as

9  Director of the National

10  Institute of Standards

11  and Technology, et al.,

12            Defendants.

13    ------------------------------------------------

14

15        ZOOM DEPOSITION OF

16        KELLIE A. BEALL

17        1:00 p.m. - 2:35 p.m.

18          June 29, 2022

19

20  Job #454524

21  Pages: 1-66

22  Reported By:  Joseph C. Spontarelli, CCR

**Page 2**

1        APPEARANCES OF COUNSEL

2

3  ON BEHALF OF THE PLAINTIFF

4  LAW OFFICE OF MICK HARRISON, ESQUIRE

5  By:  Mick Harrison, Esquire

6  and David Colapinto, Esquire

7  520 South Walnut Street #1147

8  Bloomington, Indiana 47402

9  (812)361-6220

10

11  ON BEHALF OF THE DEFENDANTS

12  OFFICE OF THE UNITED STATES ATTORNEY

13  By:  Sean M. Tepe, Esquire

14  Assistant United States Attorney

15  555 Fourth Street, N.W.

16  Washington, D.C. 20530

17  (202)252-2533

18

19  Also present:

20  Michael Bogomolny, Esquire

21  Jackson Schueler, PD Technician

22

**Page 3**

1            INDEX TO WITNESS

2

3  Witness          Examined By    Page

4  Kellie A. Beall    Mr. Harrison    5

5              Mr. Tepe      61

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

**Page 4**

1        P R O C E E D I N G S

2

3      THE COURT REPORTER:  Will counsel

4  please stipulate that in lieu of formally

5  swearing in the witness, the reporter will

6  instead ask the witness to acknowledge that

7  their testimony will be true under penalties of

8  perjury, that counsel will not object to the

9  admissibility of the transcript based on

10  proceeding in this way, and that the witness has

11  verified that she is in fact Kellie Beall?

12      MR. HARRISON:  I agree.

13      MR. TEPE:  I agree.

14      THE COURT REPORTER:  Ms. Beall,

15  do you hereby acknowledge that your testimony

16  will be true under the penalties of perjury?

17      KELLIE BEALL:  I do.

18

19      KELLIE A. BEALL,

20 having declared to provide truthful testimony,

21 was examined and testified as follows:

22

**5**

1　BY MR. HARRISON:
2　　Q　Ms. Beall, my name is Mick Harrison.
3　I'm the attorney for plaintiff David Cole in
4　this Freedom Of Information Act case.
5　　　We're here, as I expect you
6　understand by now, for a discovery deposition in
7　that FOIA case.  The case is Cole versus Copan,
8　Case No. 1:15-cv-01991 in the U.S. District
9　Court for the District of Columbia.
10　　　Have you ever done a deposition
11　before?
**12　　A　I have not.**
13　　Q　Let me give you a heads up on a
14　couple of procedural points that may be helpful.
15　　　After I ask a question, first of all
16　if you don't understand it or I don't state it
17　clearly feel free at any time to ask me to
18　repeat or to clarify it and I'll be happy to do
19　that for you.
20　　　Once I ask the question the agency's
21　counsel, Mr. Tepe, may object.  If he does you
22　should allow him patiently to state his

**6**

1　objection, and then at the end of his objection
2　he may advise you to answer or he may advise you
3　to not answer.  If he does either of those you
4　should follow his instruction.  If he does
5　neither of those I will ask you to answer the
6　question and you may answer it.
7　　　Is that procedure clear?
**8　　A　Yes.**
9　　Q　Please state your full name.
**10　　A　Kellie Ann Beall.**
11　　Q　Who is your current employer?
**12　　A　The National Institute of Standards**
**13　and Technology.**
14　　Q　You probably won't be surprised that
15　I will refer to that agency by its abbreviation
16　NIST.
17　　　What is your job title at NIST?
**18　　A　I am an IT project manager.**
19　　Q　Have you always had that same job
20　title, or have you had different jobs at NIST in
21　prior years?
**22　　A　I have had many different jobs at**

**7**

1　NIST.
2　　Q　The relevant time period for this
3　FOIA request is 2011 through pretty much today.
4　If you don't mind could you tell us your job
5　title history from 2011 to the present?
**6　　A　Sure.  That's simple.**
**7　　　In 2011 my job title was information**
**8　specialist, and my job title changed to IT**
**9　project manager just last year.**
10　　Q　What were your duties in the
11　information management specialist role?
**12　　A　As an information specialist my**
**13　job — the position description for the job just**
**14　basically says anything to do with**
**15　communications, information, data, reporting or**
**16　any sort of information dissemination, storage**
**17　or collection.  That could mean a lot of things.**
**18　I did things like websites and databases and**
**19　reports and editing and newsletters.  All kinds**
**20　of things.**
21　　Q　Did your duties have to do on
22　occasion with helping with either the processing

**8**

1　of FOIA requests or the search for documents
2　responsive to a FOIA request?
**3　　A　Yes.**
4　　Q　Did you come to be familiar at some
5　point in time with -- I assume you know my
6　abbreviation for FOIA -- Freedom Of Information
7　Act -- with a FOIA request made by David Cole?
**8　　A　Yes.**
9　　Q　Did you understand that Mr. Cole had
10　made his request initially to FEMA -- another
11　federal agency -- the Federal Emergency
12　Management Agency -- and that FEMA had
13　transferred Mr. Cole's request to NIST believing
14　that NIST had some responsive records?
**15　　A　Yes.**
16　　Q　Did you understand that in Mr. Cole's
17　request he was asking for background on raw data
18　used for the FEMA 403 building performance study
19　concerning the World Trade Center including
20　photos, videos, audio, field notes, memoranda
21　and laboratory samples?
**22　　A　Yes.**

9

1    Q    At some point in time did you become
2  involved in any activities related to Mr. Cole's
3  FOIA request?
4    A    Yes.
5    Q    How did you become involved in regard
6  to his request?
7    A    I was asked by the Deputy Director of
8  the engineering laboratory at that time where I
9  worked at that time if I could please work with
10 Terri McAllister who was a researcher at that
11 time to collect all of the responsive
12 materials — materials responsive to the
13 request.
14   Q    Did you say it was the Deputy
15 Director that asked you?
16   A    Yes.  Dr. Grosshandler.
17   Q    What did you understand exactly your
18 task to be when you were given that request by
19 Deputy Director Grosshandler?
20   A    I was to work with Terri McAllister
21 to understand what materials were responsive and
22 collect those materials.

10

1    Q    Did you proceed to perform that task?
2    A    I did.
3    Q    Did you work with Ms. McAllister in
4  performing that task?
5    A    I did.
6    Q    How would you describe or distinguish
7  the role you played in that regard with the role
8  that Ms. McAllister played at that time?
9    A    Ms. McAllister provided me with a
10 list of items that would be responsive to the
11 request, and then it was up to me to use the
12 databases and other resources available to me to
13 locate and collect those items.
14   Q    I appreciate that.
15        Do you recall the list that
16 Ms. McAllister gave you?
17   A    I do.
18   Q    Would that happen to be a list of
19 documents that Ms. McAllister's name is on dated
20 June 11, 2002 that lists or attempts to list
21 items transferred to NIST from FEMA in May of
22 2002 by Greenhorne & O'Mara?

11

1    A    That's the list, yes.
2    Q    Did Ms. McAllister give you any
3  additional lists to use in your search?
4    A    Not that I recall.
5    Q    Did you then proceed to attempt to
6  locate the items on that list?
7    A    I did.
8    Q    Did you locate every item on that
9  list?
10   A    No.
11   Q    Do you recall either which items you
12 could not locate or what types of items you
13 could not locate?
14   A    I believe you have the same list that
15 I have which is hand annotated by myself.
16 Looking back at that hand annotated list it
17 looks as though there were two items that were
18 not checked off on that list as found.
19   Q    I'm going to try to catch up with
20 you.
21        Do you have that annotated list in
22 front of you?

12

1    A    No.  I can get it.  It's in the
2  responses and it's actually, I believe, on page
3  19.
4    Q    That's what I was looking for.  I'm
5  scrolling down to page 19 as we speak.  I do
6  have it now.  Maybe I can help you since I have
7  it.
8        MR. TEPE:  Can I interrupt Mick for a
9  second?
10       MR. HARRISON:  Yes, please.
11       MR. TEPE:  For clarity, any document
12 that is being used in the deposition should be
13 introduced as an exhibit.  I think you should
14 probably introduce that as an exhibit.
15       MR. HARRISON:  Maybe.  I don't have a
16 huge problem with that.
17       Let me just state for the record the
18 document I'm looking at is a document produced
19 in discovery.  It's Bates stamped
20 Cole-15cv1991-NIST-0019 which is the first page
21 of the McAllister inventory with handwritten
22 notations.  I believe that's what the witness is

13

1  referring to.
2        I'm not sure yet whether we're going
3  to need to introduce it so let me just see.  I
4  see a lot of checkmarks on this document by the
5  numbers on the left of the numbered items with
6  only -- it looks like 8 has a circle not
7  located.  There is a number 2 on the second page
8  that doesn't have a checkmark.
9  BY MR. HARRISON:
10      Q    Did you place checkmarks by the
11 numbers on this list?
12      A    Yes.
13          MR. TEPE:  I'm going to object to any
14 testimony that's not based off an exhibit.
15          MR. HARRISON:  You're welcome to do
16 so.  We identified the document and you have it
17 and the witness knows what it is.  You can be
18 sure we'll be providing it to the Court.
19 BY MR. HARRISON:
20      Q    Was it your intention in putting the
21 checkmarks near the numbers on this McAllister
22 inventory, which is my shorthand for this

14

1  September 11, 2002 inventory, to indicate which
2  documents you had located?
3      A    Yes.
4      Q    Can you tell us what steps you took
5  to go about locating these items that you
6  checked?
7      A    Yes.
8          I followed the same procedure each
9  time I received a FOIA request.  I would start
10 by talking it over with Dr. Grosshandler and any
11 applicable researchers to make sure I understood
12 exactly what I was looking for and what was
13 responsive.
14         Then I would start with what we call
15 the WTC database, which was really just a
16 Microsoft Access database where items we
17 received for use in our study were logged into
18 that database.  I would start there and I would
19 use whatever information I had to search through
20 the database to try to find the item that
21 matched the item on the list I was given.
22         I had fields I could search within.

15

1  I could search a title field, I could search a
2  received from field, I could search an owner
3  field, I could search a document type field that
4  would say something like hard copy or video or
5  drawing or something like that.  I would search
6  all of those fields until I was able to find
7  something that I believed matched the item I was
8  looking for.
9          Then I would go retrieve the item
10 from wherever it was currently being stored.
11 The database actually would tell me where it was
12 currently being stored.  I would go retrieve the
13 item and look at the item itself to further
14 confirm whether or not I believed that was the
15 item in question.
16         Then I would move on to the next item
17 until I either found or did not find everything
18 on the list.  If there were items that I did not
19 find the next steps I normally would take would
20 be to confer further with the researchers that
21 were appropriate to ask to say I can't find
22 this.  Can you give me any more information to

16

1  try to find this than what you've already given
2  me.  Based on that I would either find it or I'd
3  have to finally give up and say I couldn't find
4  it.
5          Once everything was complete I would
6  be ready to compile them all together and pass
7  them back to the FOIA office for the rest of the
8  process.
9      Q    I'm not sure whether it's easier for
10 me to try to upload this on your counsel's
11 request or to have you pull up your copy, but I
12 would like to ask you a question that you may
13 need to refresh your memory on and it may
14 require this document to refresh your memory.
15 You'll have to tell me.
16         Can you tell me which items you did
17 not locate?
18     A    They would be the items not checked
19 off on that hand annotated list.  I can't
20 remember exactly.  I can remember just from
21 memory there was one that had to do with tenant
22 lists.  There was a second item, but I can't

17

1 remember what it was.
2     Q      Would it refresh your memory if I
3 said that that second item on my copy, page 2
4 under reports, item number 2, Draft World Trade
5 Center Building Survey Report by Guy Nordenson &
6 Associates would that be one that you did not
7 locate?
8     A      That sounds right, yes.
9     Q      I think that's sufficient.
10 Everything else is checked on this document.
11       What did you do once you acquired
12 these records that you had checked?  What did
13 you do with them?
14     A      My normal procedure was that I
15 created sort of a report or a listing that I was
16 going to include with the actual items back to
17 the FOIA office so that they could see here FOIA
18 office this is everything I found.  This is what
19 I'm now passing over to you.  I do believe that
20 is also in that document that you have.  I don't
21 remember on what page though.
22       The other thing I would do is

18

1 actually start making sure that I had the
2 electronic version of whatever it was, and then
3 I burned that onto CDs or DVDs in order to
4 transfer back to the FOIA office.
5     Q      Did you personally transfer those
6 DVDs or CDs to the FOIA office that had the
7 files you had located?
8     A      I did.
9     Q      Did you provide those to
10 Ms. Catherine Fletcher or to one of her
11 associates?
12     A      Yes, to one of her associates.
13     Q      Ms. Yonder -- am I saying that right?
14     A      It was likely Ms. Yonder at that
15 time.
16     Q      Did you get any acknowledgment from
17 the FOIA office that they had received the DVDs
18 or CDs that you provided them?
19     A      I would hand walk them over and hand
20 them to them directly.
21     Q      So you knew they had received them.
22     A      Correct.

19

1     Q      At any time during your search effort
2 did Ms. McAllister advise you there might be
3 building performance related records in NIST's
4 possession that might not be listed on the
5 McAllister inventory document she gave you?
6     A      No.
7     Q      That was a no?
8     A      Correct.  No, she did not.
9     Q      Did anyone else advise you to that
10 effect?
11     A      No.
12     Q      When you conducted your search of the
13 NIST World Trade Center database searching in
14 the different fields as you described, am I
15 correct in understanding your testimony that you
16 would search with key words intended to locate a
17 particular record on the McAllister inventory
18 list but you did not do a broader type of search
19 to see if there were building performance study
20 records not listed on the McAllister inventory
21 list?
22     A      Correct, I did not.  I used the list

20

1 as what was responsive to the request and those
2 were the things I searched for.
3     Q      Understood.
4       Do you know Mr. Eric Letvin?
5     A      I do.
6     Q      Did Mr. Letvin have any role in the
7 search for responsive records to Mr. Cole's FOIA
8 request?
9     A      Can you ask the question again?  I'm
10 sorry.
11     Q      Yes.  I'll reword it a little bit.
12       Did you have occasion to work with
13 Mr. Letvin on this FOIA request?
14     A      I don't recall working with him
15 directly on this, no.  That doesn't mean I
16 didn't.  I just don't recall.
17     Q      Did Mr. Letvin ever advise you that
18 he had an inventory of building performance
19 study records at NIST?
20     A      No, not that I recall.
21     Q      Did Mr. Letvin ever show you three to
22 four boxes of building performance study records

21

1 that had been received from FEMA?

2 **A   No.**

3 Q   Did Ms. McAllister ever make a

4 statement in writing or verbally that you read

5 or heard to the effect that at least initially

6 she did not expect there to be any responsive

7 records regarding this FOIA request?

8 **A   No, no one made such comment to me.**

9 Q   Was there anyone who helped you do

10 the search for these documents listed on the

11 McAllister inventory?

12 **A   No.**

13 **Although as I stated, my normal**

14 **procedure was if I did not find a document on my**

15 **own accord I would have asked for help.  I don't**

16 **specifically remember this 11 years ago, but**

17 **that was my normal behavior.**

18 Q   Understood.

19 You don't recall at the moment asking

20 for help for any particular items?

21 **A   I don't recall specifically doing it**

22 **no, but that was my normal behavior if I**

22

1 **couldn't find something was to ask for help.**

2 Q   Understood.

3 By the way, I didn't mention it to

4 you but if you ever need a break during our

5 examination you're welcome to ask for a break

6 and we will provide it for you.

7 **A   Thank you.**

8 Q   Did you get to see the package of

9 records that the FOIA office at NIST sent back

10 to FEMA in regard to Mr. Cole's request?

11 **A   No.**

12 Q   In the searches that you did of the

13 NIST World Trade Center database looking for

14 certain words in various fields to locate items

15 on the McAllister inventory, based on that

16 experience had there been records received by

17 NIST from a particular contractor, possibly a

18 FEMA contractor, such as Greenhorne & O'Mara and

19 someone told you that they thought there were

20 records from Greenhorne & O'Mara that had been

21 transferred was the database organized such that

22 you could have searched for Greenhorne & O'Mara

23

1 and likely located those records?

2 MR. TEPE:  Objection.

3 BY MR. HARRISON:

4 Q   You may answer.

5 **A   If somebody had asked me to search**

6 **for that yes, there is a method in the database**

7 **to search that way.  Yes.**

8 Q   If there had been a transfer of

9 building performance records from the FEMA

10 contractor called Gilsanz Murray Steficek do you

11 think you could have searched that database to

12 find any records that had been entered into it

13 from that source?

14 **A   Yes.**

15 MR. TEPE:  Objection to form.

16 THE WITNESS:  Sorry Sean.  I didn't

17 give you time to do that.  I apologize.

18 Did you hear my answer?

19 BY MR. HARRISON:

20 Q   Yes.  You're wise to repeat it when

21 in doubt.  Thank you.

22 Did you come to learn in your work at

24

1 NIST as an information specialist that NIST was

2 at least attempting to enter into its World

3 Trade Center database all records it received

4 that related to the building collapses at the

5 trade center on September 11, 2001?

6 MR. TEPE:  Objection to form.  I'm

7 not sure if I understand.  Are you asking about

8 Mr. Cole's FOIA request?

9 MR. HARRISON:  I'm asking how the

10 records were organized that she searched in

11 trying to locate responsive records so I

12 consider that to be yes.

13 BY MR. HARRISON:

14 Q   Do you understand the question

15 Ms. Beall?

16 **A   I do.  Should I answer?**

17 Q   Yes, please.

18 **A   Yes.**

19 **My understanding — although I was**

20 **not involved in this actual process — my**

21 **understanding was that at some point in time**

22 **during the beginnings of the investigation that**

25

1  NIST was doing a decision was made to start a
2  database to start logging those materials that
3  were received and start logging some general
4  information about each material -- where it came
5  from, what type of material it was, some sort of
6  title, et cetera.
7        My understanding is that there were
8  multiple people who did that data entry.  It
9  wasn't just one person.  I honestly have no idea
10 who those people were.
11       My exposure to the database did not
12 come until later when we started responding to
13 FOIA requests.
14  Q    Thank you.
15       Do you know the time period when you
16 would have started responding to FOIA requests
17 that would have involved that database?
18  A    No, I'm sorry I don't remember when
19 that all started.
20  Q    I take it it was prior to dealing
21 with Mr. Cole's request.
22  A    I can't say for sure, but I don't

26

1  believe that Mr. Cole's request was the first
2  request at all.  I believe there were many prior
3  to that.
4   Q    Other than the NIST World Trade
5  Center database did you make any search of any
6  NIST e-mail records or e-mail systems in looking
7  for responsive records?
8   A    No.
9   Q    Is that true even for the two items
10 you could not locate through the database?
11  A    Yes.
12       I only would have searched for e-mail
13 if e-mail had been specifically requested as
14 part of the FOIA request.  In this request there
15 was no request for e-mail.  I was just looking
16 for what was on the list that I was given.
17  Q    I understand.
18       Do you know whether or not NIST
19 received documents regarding the building
20 performance study in some cases by way of e-mail
21 attachments?
22  A    No, I do not know.

27

1   Q    Is the engineering laboratory at NIST
2  the entity responsible for maintaining the World
3  Trade Center computer database?
4   A    Yes.
5        Just for purposes of being accurate,
6  at that time the laboratory was called the
7  building and fire research laboratory.  It's now
8  called the engineering laboratory.  I don't know
9  if that matters.
10  Q    It's helpful so I appreciate the
11 clarification.
12       Do you know when the name change took
13 place?
14  A    I do not.
15  Q    From the records I've seen I believe
16 the records entered into the NIST World Trade
17 Center computer database have a number assigned
18 to them for either each document or each page.
19 It starts with the letters WTC.  Am I correct in
20 that regard?
21  A    Yes, that's correct.
22  Q    After the number for the particular

28

1  document, which is probably preceded by a dash,
2  is there also a dash and then the capital letter
3  I that goes with those document designations?
4   A    Actually there could be an I or there
5  could be another suffix at the end that was
6  related to a categorization that we began doing
7  in the database if we received many materials
8  from the same organization or entity.
9        We began categorizing them with a
10 suffix at the end of the numbering so you could
11 see an I at the end or you could see FEMA at the
12 end or you could see some other suffix.
13       MR. TEPE:  Counsel, if you're asking
14 questions from a document can you identify the
15 document for clarity of the record?
16       MR. HARRISON:  I'm asking about the
17 document designation system at the moment not a
18 particular document.
19       MR. TEPE:  What's the document
20 designation system?
21       MR. HARRISON:  The witness has
22 described for entries into the computer database

29

1  at NIST for the World Trade Center database that
2  the records would be what you and I would
3  probably call Bates stamped, but they were
4  numbered with the capital letters WTC a dash and
5  then a number and then as time progressed some
6  type of suffix which might be the letter capital
7  I which I assume, Ms. Beall, stands for
8  investigation. Am I right about that?
9         THE WITNESS: Yes, you're correct.
10        That was sort of the general category
11  going forward after we decided to start having
12  individual categories for large amounts of
13  material.
14  BY MR. HARRISON:
15    Q    But there might be then as records
16  came in and you got significant collections of
17  related documents -- let's say a number from
18  FEMA -- you might designate those documents with
19  a FEMA suffix in their document numbers, is that
20  correct?
21        MR. TEPE: Objection to form.
22        THE WITNESS: That is correct.

30

1         MR. HARRISON: That's the system I
2  was talking about Mr. Tepe. It's their
3  numbering system for entries into the computer
4  database. These are the records she searched
5  for responsive records. I just wanted to
6  understand how they were entered into the
7  database and I think I do now.
8  BY MR. HARRISON:
9    Q    Did anyone describe to you before you
10  started your search the scope of Mr. Cole's FOIA
11  request? Whether it would have been someone
12  from the FOIA office or someone from the
13  laboratory, did anyone sit down and say this
14  request includes A, B and C not X, Y and Z?
15        MR. TEPE: Objection to form.
16        THE WITNESS: Yes. I know that I did
17  confer with Ms. McAllister and Dr. Grosshandler
18  so that I would understand exactly what the
19  request was asking for. The end result of that
20  discussion was this list that we've been
21  discussing. That was what was responsive to the
22  request. I believe my understanding was that it

31

1  was documents transferred from FEMA to NIST that
2  had something to do with FEMA's building
3  performance study that they had done. That was
4  my understanding.
5  BY MR. HARRISON:
6    Q    Thank you.
7         When you collected your documents
8  that you had located from this list did
9  Ms. McAllister have any role in reviewing that
10  set of documents before you prepared the CDs or
11  DVDs to give to the FOIA office?
12    A    I don't recall that, but I can tell
13  you what my normal process was. My normal
14  process was that Dr. Grosshandler was
15  responsible for reviewing the collections that I
16  made before they were transferred to the FOIA
17  office.
18    Q    Can you state from your personal
19  knowledge that when you did personally transfer
20  the DVDs or CDs with the records you had
21  collected in your search that you provided to
22  the FOIA office a complete set? In other words,

32

1  no one had omitted any of the records you had
2  collected.
3    A    No, no one omitted anything.
4    Q    After the search that you completed
5  when you had turned over your DVDs or CDs to the
6  FOIA office did you have any further task or
7  work related to Mr. Cole's FOIA request?
8    A    I can't recall exactly the specific
9  request, but again I can tell you the normal
10  procedure would be that there could be follow-up
11  work after I delivered materials to the FOIA
12  office as part of the FOIA office's process
13  where they would identify the actual owner of a
14  material because the owner of the material would
15  not necessarily be from who we received it.
16        The owner of the material would have
17  to be identified, and then they would have to be
18  contacted to give them an opportunity to see if
19  they had any exemptions to disclosure for FOIA.
20  That determination would have to be made for
21  each and every item. That was the FOIA office's
22  process as I understand it so from time-to-time

33

1  **I would be asked to help in figuring out the**
2  **ownership of the materials.**
3         **I believe there's also in that**
4  **listing somewhere in that response that we sent**
5  **to you you'll see my list of items that I**
6  **transferred to the FOIA office, and I usually**
7  **included who I believed the owner of the**
8  **document to be to help them in that process that**
9  **they performed.**
10  Q    I did see that and appreciated it.
11        In regard to those items which had
12 ownership issues I noticed -- I think you were
13 the author on one of the documents provided --
14 there were notations made for some of the items
15 listed that you had located as to whether they
16 were recommended to be released or recommended
17 to be withheld.  Were you involved in making any
18 notations to that effect?
19  **A    The only time I would have made a**
20  **notation to that effect is if I had prior**
21  **knowledge that that item specifically had been**
22  **requested previously in a previous FOIA request,**

34

1  **and that the determination had previously been**
2  **made.  If I already knew that I would note it so**
3  **that it would just save time and the FOIA office**
4  **would know yes, we made this determination back**
5  **in a previous FOIA request.**
6  Q    You would not have been making any
7  personal recommendation, but basically noting
8  the history of similar requests.
9  **A    Yes.**
10  Q    Were you tasked to do any work on
11 ownership issues related to any of the items you
12 actually located from the McAllister inventory?
13  **A    I'm sorry.  Can you ask the question**
14 **again?**
15  Q    Yes.
16        We had discussed the possibility of
17 ownership issues coming up -- I'm assuming most
18 of those would have probably been regarding
19 photographs or videos or something that might be
20 intellectual property or business property from
21 an outside entity -- you said sometimes you
22 would be tasked -- after you collected records

35

1  and had given them to the FOIA office you would
2  be later tasked with helping with issues related
3  to ownership.  Do you recall telling me that?
4  **A    Yes.**
5         MR. TEPE:  Objection to form.
6         MR. HARRISON:  I think there was an
7  objection there.
8         MR. TEPE:  Yes, to the form of the
9  question.
10 BY MR. HARRISON:
11  Q    Do you recall being given any such
12 task in regard to Mr. Cole's FOIA request
13 regarding ownership issues after you gave the
14 collection of documents you had located to the
15 FOIA office?
16        MR. TEPE:  Objection to form.
17        THE WITNESS:  I don't remember.
18 BY MR. HARRISON:
19  Q    Do you recall any ownership issues
20 coming up regarding Mr. Cole's FOIA regarding
21 photographs from a Jonathan Barnett?
22        MR. TEPE:  Objection to form.

36

1         THE WITNESS:  I don't remember
2  specifically, no.
3  BY MR. HARRISON:
4   Q    Do you recall any ownership issue
5  arising in regard to the Cole FOIA search that
6  you did regarding any video from a Mr. Steficek?
7   **A    No, I don't remember.**
8   Q    If you had been tasked to investigate
9  ownership issues would there be a written record
10 of your having done that?
11        MR. TEPE:  Objection to form.
12        THE WITNESS:  I can tell you what my
13 normal process was when I was asked to help out
14 to figure out who owned a specific record.
15        It would usually be an e-mail
16 conversation back and forth between myself and a
17 FOIA staff member, or it could be a telephone
18 conversation where they were saying hey, we
19 thought this might have belonged to this person
20 but we contacted them and they said no.  Can you
21 look at the document again and see if you can
22 come up with any other ideas of who might own

37

1    it. That kind of thing.
2    BY MR. HARRISON:
3        Q    Thank you.
4            Other than those potential ownership
5    issues, do you recall being asked to do any
6    additional search regarding the Cole FOIA
7    request after you provided your CDs or DVDs with
8    the records you had collected to the FOIA
9    office?
10   **A    No, I don't recall being asked that.**
11       Q    I'm assuming that after this lawsuit
12   commenced in 2015 that you were not asked to do
13   an additional search on the Cole FOIA request
14   after the lawsuit commenced.
15   **A    I don't recall being asked that.**
16       Q    Was Therese McAllister assigned to
17   the engineering laboratory at the time that you
18   and she worked on this request?
19   **A    I believe so, yes.**
20       Q    Do you know whether Mr. Letvin was
21   also in the engineering laboratory at that time?
22   **A    I don't remember exactly when Eric**

38

1    **Letvin became part of that. I don't remember.**
2        Q    At the time that you did your search
3    as you described it with using the World Trade
4    Center database you testified that you did not
5    search e-mails at that time for responsive
6    records. I have an additional similar
7    question -- did you search any personal computer
8    hard drives for responsive records during your
9    search?
10   **A    No, I did not.**
11       Q    Were you asked to interview any
12   person or persons to assist you in locating
13   documents as part of your search?
14   **A    No.**
15       Q    Did you on your own initiative
16   interview anyone to help you with your search?
17   **A    As I previously stated, my normal**
18   **process was to confer with any researchers or**
19   **any other staff members that I needed to if I**
20   **had trouble locating items that were responsive.**
21   **If that had happened my normal process would**
22   **have been to do so.**

39

1        Q    I understand your answer, and I also
2    understand the passage of time in this case
3    Ms. Beall.
4            I expect you understand that this
5    case is about the adequacy of the FOIA search.
6    The distinction between a normal process versus
7    what actually happened in a particular case is
8    an important one.
9            I'm taking your answer to be that
10   from memory you cannot tell me at the moment
11   what actually happened in regard to any
12   interviews you might have done in this
13   particular case.
14   **A    That is correct; I cannot tell you**
15   **from memory.**
16       Q    I understand.
17           Do you think there would be a written
18   record had you done any interviews to aid you in
19   your search in Mr. Cole's FOIA request?
20   **A    No.**
21   **Interview is a word I wouldn't have**
22   **used. I assume you're using it meaning did you**

40

1    speak with people.
2        Q    You're correct.
3    **A    No, there wouldn't be a written**
4    **record.**
5        Q    Is there a contractor that works with
6    NIST in relation to the World Trade Center
7    database?
8            MR. TEPE: Objection to form.
9    Outside the scope.
10           THE WITNESS: I do believe that we
11   had contractors working in various aspects on
12   the investigation. I could not tell you the
13   exact aspects or who the contractors were or any
14   of that.
15   BY MR. HARRISON:
16       Q    Understood.
17           Do you recognize the name SAIC?
18           MR. TEPE: Objection. Outside the
19   scope.
20           THE WITNESS: I do, but not
21   specifically to this conversation. I recognize
22   that acronym.

41

1  BY MR. HARRISON:
2     Q    Do you know whether SAIC had a role
3  with NIST regarding the World Trade Center
4  database?
5          MR. TEPE:  Objection.  Outside the
6  scope of the 30(b)(6).
7          Are you asking with relation to
8  Cole's FOIA request?  It doesn't sound like it.
9          MR. HARRISON:  All my questions are
10 related to that.  We can disagree on that.
11         MR. TEPE:  If you want to establish
12 foundation that might be helpful.
13         MR. HARRISON:  That's what I'm trying
14 to do except I'm getting objections to the
15 foundation questions.
16         MR. HARRISON:  I'm trying to
17 determine whether there might be follow-up
18 questions regarding SAIC having a role in either
19 entering records into the computer database for
20 the World Trade Center at NIST or doing searches
21 or maybe organizing the structure of it.  If
22 they weren't involved at all I won't have to ask

42

1  those questions.
2  BY MR. HARRISON:
3     Q    My first question of the witness is
4  did SAIC have a role in regard to the NIST World
5  Trade Center computer database to your
6  knowledge?
7          MR. TEPE:  Outside the scope.  It
8  doesn't pertain to the adequacy of the search.
9  I'll allow it to see if there is something that
10 is relevant, but I'll just put the objection on
11 the record it's not within the scope of the
12 30(b)(6) or authorized under the scope of
13 discovery.
14 BY MR. HARRISON:
15    Q    You may answer Ms. Beall.
16    A    I don't know if they were involved at
17 all or not.
18    Q    Understood.
19         Were you asked to consult with any
20 subject matter experts regarding the Cole FOIA
21 search?
22    A    I know that I conferred with Terri

43

1  McAllister and she is a subject matter expert so
2  yes.
3     Q    Anyone else?
4     A    I don't recall.  I do recall that
5  Terri and I conferred.
6     Q    I believe you told us the nature of
7  your conversation with her regarding the search.
8  Was there anything else in your conversations or
9  consultations with Ms. McAllister that related
10 to your search or its limitations that you've
11 not shared with us yet?
12    A    Nothing else that I remember, no.
13    Q    Do you recall that one of the items
14 that you searched for and located was something
15 called an FTP site back-up?
16    A    No.
17         MR. TEPE:  Objection.
18 BY MR. HARRISON:
19    Q    That doesn't ring a bell?
20    A    It does not.
21    Q    This may or may not refresh your
22 memory -- there's an item on the McAllister

44

1  inventory that you had done your checkmarks on.
2  It looks like the very last item under CDs,
3  number 4, you have a checkmark by it and some
4  handwritten notes.  It says back-up of FTP site
5  for WTCBPS.  The handwritten note says
6  WTCI-063-FEMA photos and videos and likely lots
7  of dukes.  Is that your handwriting do you
8  think?
9     A    Yes.  All of the handwritten
10 notations on that index that you have are in my
11 handwriting.
12    Q    Based on perhaps not your memory but
13 your recollection of your system for creating
14 this document those handwritten notes and that
15 checkmark would that indicate that you had
16 located the back-up of FTP site for World Trade
17 Center building performance study?
18         MR. TEPE:  Objection to form.
19         THE WITNESS:  It would indicate that
20 I located something that I believed was that
21 yes, and included it in the collection.
22

45

BY MR. HARRISON:

Q    When you did your searches of the fields in the computer database for the items on the McAllister inventory would you have taken your search terms from words that actually appeared on the McAllister inventory?

A    **Yes. My normal process was that I started by typing in the exact item word-for-word. I started from there to see. Sometimes you would get lucky and the thing would show up. That was great when that happened.**

**When that didn't happen then you would start just using your knowledge of how databases usually work. You would start picking and choosing other words to search for and search and search until you finally exhausted any ideas of how else to search.**

Q    At any point after this lawsuit commenced in 2015 did anyone advise you of any particular records that Mr. Cole believed were missing from the documents produced to him to

46

see if you could maybe locate those specific items?

MR. TEPE:  Objection to form.

THE WITNESS:  No, I don't recall being asked to try again so to speak.  No.

BY MR. HARRISON:

Q    Did anyone ever advise you whether or not any of the building performance study records that NIST had acquired had been transferred to the national archives or a federal records center from NIST?

A    **No. There would be no reason to share that. That was not our process.**

Q    Is it your understanding having personally prepared the CDs or DVDs that you gave to the FOIA office of the records that you located that every item on the McAllister inventory that you had personally checked would have been provided to the FOIA office?

A    **Yes. I personally collected them, personally saved them onto CDs or DVDs and then I personally delivered them to the FOIA office**

47

myself.

Q    Bear with me.  I'm just screening my questions to avoid unnecessary ones.

Was it your understanding at the time you did your search for the Cole FOIA request that the items on the McAllister inventory that had been received by NIST had been scanned and entered into the computer database by the time of your search?

A    **Scanned?  Do you mean hard copies?**

Q    An electronic copy of some form.

A    **At some point — honestly I can't remember and somebody could look it up — we did scan all of the hard copy paper documents that we had in our collection into electronic versions.  I don't remember when that happened -- if that happened before or after this.  I'm going to guess that it happened before, but I can't definitively say for sure.**

Q    Understood.

Do you recall searching any paper records at the time of your search for the

48

possibility that they might not have been entered into the computer system?

A    **I don't recall specifically, but my normal process was that if I couldn't find something in electronic format in my electronic collection I would go to the room where all of the paper documents were stored and I would look for the actual hard copy.**

Q    I think I asked you Ms. Beall -- I just want to be sure we have it in the record -- I apologize if it's a duplicate question -- I believe I asked whether you had been provided and used Eric Letvin's inventory in your search and I believe you said no.  Correct me if I'm wrong about that.

MR. TEPE:  Objection.  What's Eric Letvin's inventory?

BY MR. HARRISON:

Q    Do you recall ever receiving an inventory of building performance study records from Mr. Letvin?

A    **No, I don't recall ever receiving an**

**49**

1  inventory from Eric Letvin.

2      Q    Did you ever use an inventory

3  produced by Mr. Letvin in your search?

4      **A    Not to my knowledge.  Not that I**

5  **recall.**

6          MR. HARRISON:  For counsel's benefit,

7  the basis for that question was a discovery

8  document you provided that referenced an

9  inventory that Mr. Letvin produced that he

10 collected three to four boxes of building

11 performance study records just so you know where

12 that's coming from.

13         MR. TEPE:  McAllister.

14         MR. HARRISON:  Pardon me.

15         MR. TEPE:  McAllister.

16         MR. HARRISON:  No.  That's not what

17 the document is.  Whether it turns out to be the

18 same documents I suppose would be a question to

19 ask.  Maybe we'll have to ask it at some point.

20 BY MR. HARRISON:

21     Q    Do you know after you provided your

22 collected records that you located responsive to

**50**

1  Mr. Cole's request that were on the McAllister

2  inventory whether anyone from the FOIA office

3  made an inquiry with you or Ms. McAllister or

4  Mr. Letvin or Mr. Grosshandler to ask whether

5  there might be other responsive documents beyond

6  the McAllister inventory?

7      **A    I do not recall being asked that.**

8      Q    I believe I asked you if you searched

9  Ms. McAllister's records and I believe you said

10 no.  Is that your recollection?

11     **A    That's correct.  I did not search**

12 **individual staff members.**

13     Q    The same would be true for Mr.

14 Letvin's records I take it?

15     **A    That's correct.  I did not.**

16     Q    Do you know whether NIST has a

17 back-up electronic document storage system that

18 might contain copies of the World Trade Center

19 database records?

20         MR. TEPE:  Objection.  Outside the

21 scope.

22

**51**

1  BY MR. HARRISON:

2      Q    You may answer.

3      **A    I know that the database itself and**

4  **other investigation administrative materials**

5  **were stored on a share drive that multiple**

6  **administrative staff like myself and researchers**

7  **had access to.  It is my understanding that NIST**

8  **backs up those share spaces -- all of them.**

9  **That's just how it works.**

10         **Does that answer your question?**

11     Q    I believe so.

12         As a clarification, the records that

13 would have been entered into the World Trade

14 Center database at NIST in the engineering

15 laboratory, would that database have been part

16 of the share drive you're talking about?

17         MR. TEPE:  Objection to form and

18 foundation.

19 BY MR. HARRISON:

20     Q    You may answer.

21     **A    Yes.**

22     Q    Did you conduct any search of any of

**52**

1  the back-up storage system files for your search

2  purposes for the Cole FOIA request?

3      **A    No.  I don't have access to those.**

4  **Those are NIST -- I don't know how to put it --**

5  **the people who manage the NIST systems have**

6  **access to that but I don't.**

7      Q    Would that be Ms. Fletcher's office?

8      **A    No.**

9          **I'm talking about our office of**

10 **information systems management IT people.**

11     Q    During your search for records

12 responsive to the Cole FOIA request as listed on

13 the McAllister inventory did you look for any

14 computer hard drives that NIST might have

15 possession of that actually came from FEMA?

16         MR. TEPE:  Objection to form.

17         THE WITNESS:  I searched for

18 everything that was on the list.  I don't recall

19 something specific to a hard drive being listed

20 on that list so I'm going to assume I did not

21 search for that.

22

53

1 BY MR. HARRISON:
2    Q    Did anyone ever advise you at any
3 point in time as you were doing your search that
4 FEMA had turned over FEMA computer hard drives
5 directly to NIST that were building performance
6 study related?
7    **A    No, I don't recall ever being told**
8 **that.**
9    Q    I think you've testified that you
10 limited your search of the NIST World Trade
11 Center computer database to the items on the
12 McAllister inventory.
13        Let me ask you a more general
14 question -- putting aside the limits of your
15 search and the task you were given have you ever
16 come to learn whether NIST received building
17 performance study records at times or from
18 sources not listed on the McAllister inventory?
19        MR. TEPE:  Objection to form.
20        THE WITNESS:  I'm not sure if I
21 understand the question.
22        Are you asking me if NIST received

54

1 materials at all from other people?
2 BY MR. HARRISON:
3    Q    I can help you.  I'll reword it for
4 you.  Let's make it more specific as a
5 hypothetical.
6        Did anyone ever advise you, for
7 example, that Gilsanz Murray Steficek, a firm
8 that had contracted with FEMA, had provided
9 building performance study records to NIST but
10 at a time other than the May 2002 transfer in
11 the McAllister inventory and those records were
12 not listed on the McAllister inventory?  Were
13 you ever informed of that?
14    **A    No, I was not.**
15    Q    Did anyone, including Ms. McAllister
16 or Mr. Letvin, ever inform you that they had
17 received building performance study records by
18 e-mail or e-mail attachment from FEMA or FEMA
19 contractors that were not listed on the
20 McAllister inventory?
21    **A    No, they did not.**
22    Q    Do you recall that one of the

55

1 categories of data records that Mr. Cole had
2 requested had to do with lab samples or lab
3 results?
4    **A    I do believe that that was listed in**
5 **the original FOIA request as a general list of**
6 **items that could be responsive.**
7    Q    Did you find any records in that
8 category in your search?
9    **A    Again, I searched for the things on**
10 **the McAllister list.  If it was listed there I**
11 **would have searched for it.  I don't recall**
12 **anything in that list being categorized that**
13 **way.**
14        **There's a number on the list that**
15 **says photos and graphics.  You could consider**
16 **that as laboratory samples depending on what the**
17 **research you were doing was.  Nothing**
18 **specifically listed that way, no.**
19        MR. HARRISON:  Let's take a
20 ten-minute break and we should be able to close
21 your examination Ms. Beall, but your counsel may
22 have some questions for you.  I just want to

56

1 check my notes before we close.
2
3        (Recess.)
4
5 BY MR. HARRISON:
6    Q    Ms. Beall, are you still able to hear
7 me okay?
8    **A    Yes.  Can you hear me?**
9    Q    Yes.  Thank you.
10        I just have three final questions and
11 I'll see if Mr. Tepe has questions for you.
12        Regarding the NIST World Trade Center
13 database, I've been talking about it as if it is
14 a single database and has always been a single
15 database.  Is there just one such thing or are
16 there different versions of the NIST World Trade
17 Center database?
18        MR. TEPE:  Objection to form.
19        THE WITNESS:  When I refer to WTC
20 database I'm referring to the one access
21 database that is used to -- that was used to log
22 items received for use in our investigation.

57

1 There's one of those.
2        There's also a database -- I think it
3 might be Microsoft Access but I can't remember
4 now -- that was also created specifically when
5 we did the project to scan all of the hard copy
6 documents. Basically all that is is a database
7 of a document was pulled from a specific file
8 folder in the room that stored the hard copy
9 documents and a PDF file was created from
10 whatever was in that file folder and the
11 database just basically lists all of the files
12 that were created from the hard copy so that we
13 tracked that project happening and made sure
14 everything was scanned.
15        There's another series of, I call
16 them spreadsheets, Excel spreadsheets that were
17 used to categorize and organize photos and
18 videos specifically.
19        We were working on categorizing them
20 and organizing them because we did a project to
21 post as many as were releasable on-line so that
22 people could get them directly. I would call

58

1 that a database from the perspective of a
2 spreadsheet type of situation.
3        Those are the three that I would call
4 the databases of information.
5 BY MR. HARRISON:
6    Q    I appreciate those distinctions.
7        The photos, videos, spreadsheet
8 database did that exist at the time you did your
9 search for responsive records for the Cole FOIA?
10   **A    I do believe that all of those**
11 **existed at that time.**
12   Q    Thank you.
13        Did you access all three of those
14 databases at one point or another in locating
15 the documents that you did locate?
16   **A    It isn't likely that I did for**
17 **various reasons.**
18        **Again, if I had not found -- once I**
19 **found the documents in the original database it**
20 **would tell me where the actual hard copy -- the**
21 **physical item was stored. Then I would go about**
22 **collecting the electronic version of it because**

59

1  that's what I was actually going to use as a
2  responsive record. That electronic version
3  would be stored in a different place depending
4  on what it was. If it was a scanned hard copy
5  it would be in one place. If it was a photo or
6  video it would be in a different place. I
7  likely would have used those other databases to
8  actually locate the electronic version of the
9  item so I could collect it.
10   Q    Understood.
11        Did you have any role yourself in
12 making entries into the NIST World Trade Center
13 computer database -- I'll refer to the
14 non-spreadsheet database at the moment -- did
15 you actually make entries into that yourself?
16   **A    A few. Very few. When I became**
17 **involved in the project towards the end when I**
18 **became involved with FOIA there were a few items**
19 **that sort of came to light that existed that I**
20 **should have been entered into the database and**
21 **seemed to not have been and I did enter those in**
22 **myself.**

60

1    Q    Did any of those items relate to the
2  Cole FOIA?
3    **A    I don't think so, but I couldn't say**
4  **for sure. I'd have to go back to the actual**
5  **database and see if any of those numbers that**
6  **you see there hand annotated if I actually**
7  **entered them in the database, but I don't**
8  **believe that's the case no.**
9    Q    I asked you about the way the records
10 are labeled that are entered into the World
11 Trade Center computer database, meaning the
12 non-Excel spreadsheet Microsoft Access database.
13        You mentioned a couple of the
14 suffixes that were used after WTC and then the
15 number and then you would have a suffix -- we
16 mentioned I for investigation I believe and FEMA
17 which I assume stands for the obvious -- FEMA
18 documents that came from FEMA as a source. Were
19 there any other suffixes that you recall that
20 were used?
21   **A    There were at least six or seven**
22 **others, but I could not tell you what they were**

61

1  unless I went back and looked.
2      Q     Do you remember a suffix that was the
3  letter A as in apple?
4      A    I don't.  No.
5      Q     I was thinking maybe it stands for
6  administrative files or something like that.
7      A    Sure.  That sounds logical, but I
8  don't remember it specifically.
9          MR. HARRISON:  Mr. Tepe, those are my
10 questions.  Do you have anything for the
11 witness?
12         MR. TEPE:  Yes.
13 BY MR. TEPE:
14     Q     Ms. Beall, do you recall being asked
15 whether or not you searched e-mail records
16 within the engineering laboratory?  Do you
17 recall that?
18     A    I remember, yes.
19     Q     You said that you didn't search
20 e-mails, correct?
21     A    That is correct.
22     Q     Was there any reason to search

62

1  engineering lab personnel e-mails to respond to
2  the Cole FOIA?
3      A    No.
4          The list of records that was given to
5  me to search for was a list of records that
6  would have been stored with all of the other
7  investigation materials.  Searching the WTC
8  database and those rooms where those materials
9  were held is where I looked.
10     Q     That's the only place you had reason
11 to look, is that right?
12     A    Correct.
13     Q     Similarly you were asked about
14 whether or not you searched hard drives of
15 personnel in the engineering laboratory.  Do
16 you recall that?
17     A    I do.
18     Q     You answered you had not.
19     A    That's correct.
20     Q     Was there any reason to search hard
21 drives in that fashion?
22     A    There was not.

63

1      Q     For the same reason that you answered
2  why there was not a reason for the e-mail
3  search?
4      A    Correct.
5      Q     You were asked if you had done any
6  search of a back-up storage device or database
7  for the World Trade Center database that we've
8  been discussing.  Do you recall that?
9      A    I do.
10     Q     I believe you said that you did not
11 conduct a search of that back-up, is that right?
12     A    That's correct.  For the same reason,
13 there would have been no need or reason for me
14 to do so.
15     Q     Your search was based on what we've
16 been calling the McAllister index for the most
17 part, is that right?
18     A    Yes, sir.
19     Q     And that's because subject matter
20 experts had told you that was the set of
21 materials responsive to Cole's FOIA request, is
22 that right?

64

1      A    That's correct.
2      Q     There was a supplemental set of
3  records that came from Greenhorne & O'Mara in
4  November of 2002.  Do you recall that?
5      A    Not specifically.  I don't recall
6  that specifically.
7      Q     If you look at the chat box --
8      A    Okay.  Hold on.  Let me find it.
9  Yes.
10     Q     Would you open that up?
11     A    I don't actually see anything in the
12 chat.  It's empty.  Is that just me that's not
13 seeing it?
14         MR. SCHUELER:  I received it.  I
15 dropped it in the chat again.
16         THE WITNESS:  Can somebody open it
17 and just share it?  I'm not actually seeing the
18 document in the chat.  I don't know why -- thank
19 you.  Yes, I see that.
20 BY MR. TEPE:
21     Q     Do you recognize this document?
22     A    I do.

65

1     Q     Were the materials that were
2   transferred in November represented here on
3   document number Cole-15cv1991-NIST0021 -- were
4   the documents on these CDs included in the
5   materials you collected with respect to Cole's
6   FOIA request?
7     **A     I believe that they were.  That's my**
8   **handwriting right there where I noted at the top**
9   **that the CDs were actually labeled with**
10  **different WTCI numbers than this memo.  As long**
11  **as you see that I'm included in 95I and 96I I**
12  **will say yes, I did.**
13          MR. TEPE:  I think those are all my
14  questions.
15          MR. HARRISON:  Thank you counsel.
16          MR. TEPE:  We'll read and sign.
17          MR. HARRISON:  I think we're good.
18
19          (Signature reserved.)
20
21          (Proceedings adjourned for the day at
22  2:35 p.m.)

66

1            CERTIFICATE OF REPORTER
   STATE OF NORTH CAROLINA
2   COUNTY OF JOHNSTON
3       I, Joseph C. Spontarelli, CCR, the reporter
4   by whom the foregoing remote videoconference
5   deposition was taken, do hereby certify that the
6   witness whose testimony appears in the foregoing
7   remote videoconference deposition was duly
8   identified and testified under the penalties of
9   perjury; that the testimony of said witness was
10  taken by me to the best of my ability and
11  thereafter reduced to typewriting under my
12  direction; that I am neither counsel for,
13  related to, nor employed by any of the parties
14  to the action in which this remote
15  videoconference deposition was taken, and
16  further that I am not a relative or employee of
17  any attorney or counsel employed by the parties
18  thereto, nor financially or otherwise interested
19  in the outcome of the action.
20
21          _____
22          Joseph C. Spontarelli,
            Court Reporter

# EXHIBIT 4

FEMA 403 / *May 2002*



# World Trade Center Building Performance Study:

*Data Collection, Preliminary Observations, and Recommendations*





**Federal Emergency Management Agency**

**Federal Insurance and Mitigation Administration, Washington, DC**

**FEMA Region II, New York, New York**



FEMA 403 / *May 2002*

# World Trade Center Building Performance Study:

## *Data Collection, Preliminary Observations, and Recommendations*

**Federal Emergency Management Agency**

**Federal Insurance and Mitigation Administration, Washington, DC**

**FEMA Region II, New York, New York**

GREENHORNE &
G&O
O'MARA, INC.

ASCE
*American Society of Civil Engineers*

**Report Editor:**

Therese McAllister

## Chapter Leaders and Authors:

Executive Summary  Gene Corley
    Ronald Hamburger
    Therese McAllister

Chapter 1  Therese McAllister
    Jonathan Barnett
    John Gross
    Ronald Hamburger
    Jon Magnusson

Chapter 2  Ronald Hamburger
    William Baker
    Jonathan Barnett
    Christopher Marrion
    James Milke
    Harold "Bud" Nelson

Chapter 3  William Baker

Chapter 4  Jonathan Barnett
    Richard Gewain
    Ramon Gilsanz
    Harold "Bud" Nelson

Chapter 5  Ramon Gilsanz
    Edward M. DePaola
    Christopher Marrion
    Harold "Bud" Nelson

Chapter 6  Robert Smilowitz
    Adam Hapij
    Jeffrey Smilow

Chapter 7  Therese McAllister
    David Biggs
    Edward M. DePaola
    Dan Eschenasy
    Ramon Gilsanz

Appendix  A  James Milke
    Venkatesh Kodur
    Christopher Marrion

Appendix B  John Fisher
    Nestor Iwankiw

Appendix C  Jonathan Barnett
    Ronald R. Biederman
    R. D. Sisson, Jr.

Appendix D  Ramon Gilsanz
    Audrey Massa

Appendix F  Edward M. DePaola

This report was produced by Greenhorne & O'Mara, Inc. (G&O) under Contract EMW-99-CO-0267 to the Federal Insurance and Mitigation Administration of FEMA

| | |
|---|---|
| **G&O Project Manager:** | Eric Letvin |
| **FEMA Project Officer:** | Paul Tertell |
| **ASCE Project Manager:** | James Rossberg |
| **G&O Technical Editors:** | Bob Pendley |
| | Deb Daly |
| **G&O Graphic Designers:** | Wanda Rizer |
| | Julie Liptak |

**Team Leader:**

Gene Corley

## Team Members:

**William Baker**, Partner,
Skidmore Owings & Merrill LLP

**Jonathan Barnett**, Professor of Fire Protection Engineering,
Worcester Polytechnic Institute

**David Biggs**, Principal, Ryan-Biggs Associates

**Gene Corley**, Structural Engineer, Senior Vice President,
Construction Technology Laboratories

**Bill Coulbourne**, Principal Structural Engineer,
URS Corporation

**Edward M. DePaola**, Principal,
Severud Associates Consulting Engineers, PC

**Robert Duval**, Senior Fire Investigator,
National Fire Protection Association

**Dan Eschenasy**, Chief Structural Engineer,
City of New York Dept. of Design & Construction

**John Fisher**, Professor of Civil Engineering,
Lehigh University

**Richard Gewain**, Senior Engineer,
Hughes Associates, Inc.

**Ramon Gilsanz**, Partner, Gilsanz Murray Steficek

**John Gross**, Structural Systems and Design Group Leader,
National Institute of Standards & Technology

**Ronald Hamburger**, Chief Structural Engineer,
ABS Consulting

**Nestor Iwankiw**, Vice President, Engineering and Research,
American Institute of Steel Construction

**Venkatesh Kodur**, Research Officer,
National Research Council of Canada

**Eric Letvin**, Director, Hazards Mitigation Division,
Greenhorne & O'Mara, Inc.

**Jon Magnusson**, Partner,
Skilling Ward Magnusson Barkshire, Inc.

**Christopher Marrion**, Associate, Arup Fire

**Therese McAllister,** Senior Structural Engineer,
Greenhorne & O'Mara, Inc.

**James Milke**, Professor of Fire Protection,
University of Maryland

**Harold E. "Bud" Nelson**,  Senior Research Engineer,
Hughes Associates, Inc.

**James Rossberg**, Director,
Structural Engineering Institute

**Saw-Teen See**, Managing Partner,
Leslie E. Robertson Associates, RLLP

**Robert Smilowitz**, Principal, Weidlinger Associates

**Bruce Swiren**, Senior EMP Specialist, FEMA Region II

**Paul Tertell**, Civil Engineer, FEMA

*Title page photograph courtesy of Val Junker, Mobius Communications, Inc., Princeton, NJ.*

# *Table of Contents*

**Executive Summary**

**1   Introduction**

1.1   Purpose and Scope of Study .................................................................................. 1-1

1.2   WTC Site .................................................................................................................. 1-2

1.3   Timeline and Event Summary ............................................................................... 1-4

1.4   Response of the Engineering Community ........................................................... 1-8

    1.4.1   Local Authorities ...................................................................................... 1-8

    1.4.2   SEAoNY Participation ............................................................................ 1-10

1.5   Overview of Building Codes and Fire Standards .............................................. 1-15

    1.5.1   Building Codes ......................................................................................... 1-15

    1.5.2   Unusual Building Loads .......................................................................... 1-16

    1.5.3   Overview of Fire-Structure Interaction ................................................ 1-17

        1.5.3.1   ASTM E119 Standard Fire Test ........................................... 1-18

        1.5.3.2   Performance in Actual Building Fires ................................ 1-18

1.6   Report Organization ............................................................................................. 1-20

1.7   References ............................................................................................................... 1-21

**2   WTC 1 and WTC 2**

2.1   Building Descriptions ............................................................................................ 2-1

    2.1.1   General ........................................................................................................ 2-1

    2.1.2   Structural Description .............................................................................. 2-1

    2.1.3   Fire Protection ......................................................................................... 2-11

        2.1.3.1   Passive Protection ................................................................ 2-12

        2.1.3.2   Suppression ........................................................................... 2-12

| | | | |
|---|---|---|---|
| | 2.1.3.3 | Smoke Management | 2-13 |
| | 2.1.3.4 | Fire Department Features | 2-13 |
| 2.1.4 | Emergency Egress | | 2-13 |
| 2.1.5 | Emergency Power | | 2-14 |
| 2.1.6 | Management Procedures | | 2-14 |
| 2.2 | Building Response | | 2-15 |
| 2.2.1 | WTC 1 | | 2-15 |
| | 2.2.1.1 | Initial Damage From Aircraft Impact | 2-15 |
| | 2.2.1.2 | Fire Development | 2-21 |
| | 2.2.1.3 | Evacuation | 2-24 |
| | 2.2.1.4 | Structural Response to Fire Loading | 2-24 |
| | 2.2.1.5 | Progression of Collapse | 2-27 |
| 2.2.2 | WTC 2 | | 2-27 |
| | 2.2.2.1 | Initial Damage From Aircraft Impact | 2-27 |
| | 2.2.2.2 | Preliminary Structural Analysis | 2-32 |
| | 2.2.2.3 | Fire Development | 2-34 |
| | 2.2.2.4 | Evacuation | 2-35 |
| | 2.2.2.5 | Initiation of Collapse | 2-35 |
| | 2.2.2.6 | Progression of Collapse | 2-35 |
| 2.2.3 | Substructure | | 2-35 |
| 2.3 | Observations and Findings | | 2-36 |
| 2.4 | Recommendations | | 2-39 |
| 2.5 | References | | 2-40 |

## 3   WTC 3

| | | |
|---|---|---|
| 3.1 | Design and Construction Features | 3-1 |
| 3.1.1 | Project Overview | 3-1 |
| 3.1.2 | Building Description | 3-1 |
| 3.1.3 | Structural Description | 3-2 |
| 3.2 | 1993 Attack | 3-5 |
| 3.3 | 2001 Attacks | 3-5 |
| 3.3.1 | Fire and Evacuation | 3-5 |
| 3.3.2 | Building Response | 3-6 |
| 3.4 | Observations | 3-8 |
| 3.5 | Recommendations | 3-8 |
| 3.6 | References | 3-8 |

## 4   WTC 4, 5, and 6

4.1   Design and Construction Features ................................................................ 4-1

    4.1.1   Structural Design Features ............................................................ 4-1

    4.1.2   Fire Protection Features ................................................................ 4-2

4.2   Building Loads and Performance ................................................................ 4-4

    4.2.1   Impact Damage to WTC 5 ........................................................... 4-7

    4.2.2   Fire Damage ................................................................................. 4-9

4.3   Analysis of Building Performance .............................................................. 4-10

    4.3.1   Steel and Frame Behavior ............................................................ 4-10

    4.3.2   WTC 5 – Local Collapse Mechanisms ......................................... 4-12

4.4   Observations and Findings ......................................................................... 4-16

4.5   Recommendations ...................................................................................... 4-21

4.6   References .................................................................................................. 4-21

## 5   WTC 7

5.1   Introduction ............................................................................................... 5-1

5.2   Structural Description ................................................................................. 5-3

    5.2.1   Foundations ................................................................................. 5-3

    5.2.2   Structural Framing ....................................................................... 5-4

    5.2.3   Transfer Trusses and Girders ....................................................... 5-4

    5.2.4   Connections ................................................................................. 5-8

5.3   Fire Protection Systems .............................................................................. 5-10

    5.3.1   Egress Systems ............................................................................. 5-10

    5.3.2   Detection and Alarm .................................................................... 5-10

    5.3.3   Compartmentalization .................................................................. 5-11

    5.3.4   Suppression Systems .................................................................... 5-12

    5.3.5   Power ........................................................................................... 5-13

5.4   Building Loads ........................................................................................... 5-13

5.5   Timeline of Events Affecting WTC 7 on September 11, 2001 ..................... 5-16

    5.5.1   Collapse of WTC 2 ...................................................................... 5-16

    5.5.2   Collapse of WTC 1 ...................................................................... 5-16

    5.5.3   Fires at WTC 7 ............................................................................ 5-20

    5.5.4   Sequence of WTC 7 Collapse ...................................................... 5-23

5.6    Potential Collapse Mechanism ....................................................................... 5-24

    5.6.1    Probable Collapse Initiation Events ............................................... 5-24

    5.6.2    Probable Collapse Sequence ......................................................... 5-30

5.7    Observations and Findings ........................................................................... 5-31

5.8    Recommendations .......................................................................................... 5-32

5.9    References ....................................................................................................... 5-32

# 6    Bankers Trust Building

6.1    Introduction .................................................................................................... 6-1

6.2    Building Description ...................................................................................... 6-1

6.3    Structural Damage Description ................................................................... 6-4

6.4    Architectural Damage Description ............................................................. 6-6

6.5    Fireproofing .................................................................................................... 6-10

6.6    Overall Assessment ....................................................................................... 6-10

6.7    Analysis ........................................................................................................... 6-11

    6.7.1    Key Assumptions .......................................................................... 6-12

    6.7.2    Model Refinement ........................................................................ 6-12

    6.7.3    Simulation of Nonlinear Behavior ............................................. 6-13

    6.7.4    Connection Details ....................................................................... 6-13

    6.7.5    Connection Behavior .................................................................... 6-14

6.8    Observations and Findings ........................................................................... 6-15

6.9    Recommendations .......................................................................................... 6-16

6.10    References ....................................................................................................... 6-16

# 7    Peripheral Buildings

7.1    Introduction .................................................................................................... 7-1

7.2    World Financial Center .................................................................................. 7-4

    7.2.1    The Winter Garden ........................................................................ 7-4

    7.2.2    WFC 3, American Express Building ............................................ 7-5

7.3    Verizon Building ............................................................................................ 7-7

7.4    30 West Broadway ......................................................................................... 7-13

7.5    130 Cedar Street ............................................................................................ 7-14

7.6    90 West Street ................................................................................................ 7-15

7.7    45 Park Place ........................................................................................................................ 7-17

7.8    One Liberty Plaza ................................................................................................................. 7-17

7.9    Observations and Findings .................................................................................................. 7-19

7.10   Recommendations ................................................................................................................ 7-19

7.11   References ............................................................................................................................. 7-19

## 8   Observations, Findings, and Recommendations

8.1    Summary of Report Observations, Findings, and Recommendations .................................... 8-1

8.2    Chapter Observations, Findings, and Recommendations ...................................................... 8-2

       8.2.1   Chapter 1: Building Codes and Fire Standards ........................................................ 8-2

       8.2.2   Chapter 2: WTC 1 and WTC 2 ................................................................................ 8-2
               8.2.2.1   Observations and Findings ......................................................................... 8-2
               8.2.2.2   Recommendations ...................................................................................... 8-5

       8.2.3   Chapter 3: WTC 3 .................................................................................................... 8-6
               8.2.3.1   Observations ............................................................................................... 8-6
               8.2.3.2   Recommendations ...................................................................................... 8-6

       8.2.4   Chapter 4: WTC 4, 5, and 6 ..................................................................................... 8-6
               8.2.4.1   Observations and Findings ......................................................................... 8-6
               8.2.4.2   Recommendations ...................................................................................... 8-7

       8.2.5   Chapter 5: WTC 7 .................................................................................................... 8-7
               8.2.5.1   Observations and Findings ......................................................................... 8-7
               8.2.5.2   Recommendations ...................................................................................... 8-8

       8.2.6   Chapter 6: Bankers Trust .......................................................................................... 8-8
               8.2.6.1   Observations and Findings ......................................................................... 8-8
               8.2.6.2   Recommendations ...................................................................................... 8-9

       8.2.7   Chapter 7: Peripheral Buildings ............................................................................. 8-10
               8.2.7.1   Observations and Findings ....................................................................... 8-10
               8.2.7.2   Recommendations .................................................................................... 8-10

       8.2.8   Appendix C: Limited Metallurgical Examination ................................................... 8-10
               8.2.8.1   Observations and Findings ....................................................................... 8-10
               8.2.8.2   Recommendations .................................................................................... 8-11

8.3    Building Performance Study Recommendations for Future Study ...................................... 8-11

       8.3.1   National Response ................................................................................................. 8-11

       8.3.2   Interaction of Structural Elements and Fire .......................................................... 8-11

       8.3.3   Interaction of Professions in Design ...................................................................... 8-12

       8.3.4   Fire Protection Engineering Discipline .................................................................. 8-12

       8.3.5   Building Evacuation .............................................................................................. 8-12

8.3.6    Emergency Personnel ................................................................................ 8-12

8.3.7    Education of Stakeholders ......................................................................... 8-13

8.3.8    Study Process ........................................................................................... 8-13

8.3.9    Archival Information ................................................................................. 8-13

8.3.10  SEAoNY Structural Engineering Emergency Response Plan .................... 8-13

## A    Overview of Fire Protection in Buildings

A.1    Introduction .................................................................................................... A-1

A.2    Fire Behavior ................................................................................................... A-1

　　A.2.1    Burning Behavior of Materials ................................................................. A-1

　　A.2.2    Stages of Fire Development ....................................................................... A-4

　　A.2.3    Behavior of Fully Developed Fires ........................................................... A-4

A.3    Structural Response to Fire ............................................................................. A-5

　　A.3.1    Effect of Fire on Steel .............................................................................. A-5

　　　　A.3.1.1    Introduction ............................................................................... A-5

　　　　A.3.1.2    Evaluating Fire Resistance ........................................................ A-6

　　　　A.3.1.3    Response of High-rise, Steel-frame Buildings in Previous Fire Incidents ............. A-9

　　　　A.3.1.4    Properties of Steel ..................................................................... A-10

　　　　A.3.1.5    Fire Protection Techniques for Steel ......................................... A-14

　　　　A.3.1.6    Temperature Rise in Steel .......................................................... A-14

　　　　A.3.1.7    Factors Affecting Performance of Steel Structures in Fire ........ A-17

　　A.3.2    Effect of Fire on Concrete ....................................................................... A-19

　　　　A.3.2.1    General ...................................................................................... A-19

　　　　A.3.2.2    Properties of Lightweight Concrete ........................................... A-19

　　A.3.3    Fire and Structural Modeling ................................................................... A-22

A.4    Life Safety ....................................................................................................... A-23

　　A.4.1    Evacuation Process .................................................................................. A-24

　　A.4.2    Analysis ................................................................................................... A-24

A.5    References ........................................................................................................ A-26

## B    Structural Steel and Steel Connections

B.1    Structural Steel ............................................................................................... B-1

B.2    Mechanical Properties ..................................................................................... B-2

B.3    WTC 1 and WTC 2 Connection Capacity ....................................................... B-4

　　B.3.1    Background ............................................................................................... B-4

B.3.2   Observations ............................................................................................................. B-5

B.3.3   Connectors ................................................................................................................ B-5

B.4   Examples of WTC 1 and WTC 2 Connection Capacity ....................................................... B-7

B.4.1   Bolted Column End Plates ......................................................................................... B-7

B.4.2   Bolted Spandrel Connections .................................................................................... B-8

B.4.3   Floor Truss Seated End Connections at Spandrel Beam and Core ................................. B-9

B.4.4   WTC 5 Column-tree Shear Connections ..................................................................... B-12

B.5   References ......................................................................................................................... B-14

## C   Limited Metallurgical Examination

C.1   Introduction .................................................................................................................... C-1

C.2   Sample 1 (From WTC 7) ................................................................................................... C-1

C.3   Summary for Sample 1 ..................................................................................................... C-5

C.4   Sample 2 (From WTC 1 or WTC 2) .................................................................................... C-5

C.5   Summary for Sample 2 ..................................................................................................... C-13

C.6   Suggestions for Future Research ....................................................................................... C-13

## D   WTC Steel Data Collection

D.1   Introduction .................................................................................................................... D-1

D.2   Project Background .......................................................................................................... D-1

D.3   Methods .......................................................................................................................... D-2

D.3.1   Identifying and Saving Pieces .................................................................................... D-2

D.3.2   Documenting Pieces .................................................................................................. D-5

D.3.3   Getting Coupons ....................................................................................................... D-8

D.4   Data Collected ................................................................................................................. D-10

D.5   Conclusions and Future Work .......................................................................................... D-13

D.6   References ....................................................................................................................... D-13

## E   Aircraft Information

General Specifications ............................................................................................................... E-1

## F   Structural Engineers Emergency Response Plan

## G   Acknowledgments

*Table of Contents*

## H    Acronyms and Abbreviations

## I    Metric Conversions

## Tables

Table 1.1    Timeline of Major Events ................................................................ 1-10

Table 2.1    Estimated Openings in Exterior Walls of WTC 1 ............................... 2-23

Table 5.1    WTC 7 Tenants .............................................................................. 5-2

Table 5.2    WTC 7 Fuel Distribution Systems ................................................... 5-14

Table 7.1    DoB/SEAoNY Cooperative Building Damage Assessment –
November 7, 2001 ........................................................................ 7-3

Table A.1    Peak Heat Release Rates of Various Materials (NFPA 92B
and NFPA 72) .............................................................................. A-3

Table A.2    Fire Duration in Previous Fire Incidents in Steel-frame
Buildings ................................................................................... A-10

Table A.3    Critical Temperatures for Various Types of Steel ............................. A-15

Table A.4    Test Methods for Spray-applied Fireproofing Materials ..................... A-18

## Figures

## Chapter 1

Figure 1-1    WTC site map. ............................................................................. 1-3

Figure 1-2    Approximate flight paths of aircraft. ............................................... 1-5

Figure 1-3    WTC impact locations and resulting fireballs. .................................. 1-5

Figure 1-4    Areas of aircraft debris impact. ..................................................... 1-6

Figure 1-5    Fireball erupts on the north face of WTC 2 as United Airlines Flight 175
strikes the building. ..................................................................... 1-7

Figure 1-6    View of the north and east faces showing fire and impact damage to both towers. .............. 1-7

Figure 1-7    Schematic depiction of areas of collapse debris impact, based on aerial
photographs and documented damage. ........................................... 1-9

Figure 1-8    Seismic recordings on east-west component at Palisades, NY, for events
at WTC on September 11, 2001, distance 34 km. ............................ 1-11

Figure 1-9A    Satellite photograph of the WTC site taken before the attacks. ......... 1-12

Figure 1-9B    Satellite photograph of the WTC site taken after the attacks. .......... 1-13

Figure 1-10    Comparison of high-rise building and aircraft sizes. ....................... 1-19

## Chapter 2

| | | |
|---|---|---|
| Figure 2-1 | Representative floor plan (based on floor plan for 94th and 95th floors of WTC 1). | 2-2 |
| Figure 2-2 | Representative structural framing plan, upper floors. | 2-4 |
| Figure 2-3 | Partial elevation of exterior bearing-wall frame showing exterior wall module construction. | 2-6 |
| Figure 2-4 | Base of exterior wall frame. | 2-7 |
| Figure 2-5 | Structural tube frame behavior. | 2-7 |
| Figure 2-6 | Floor truss member with details of end connections. | 2-8 |
| Figure 2-7 | Erection of prefabricated components, forming exterior wall and floor deck units. | 2-9 |
| Figure 2-8 | Erection of floor framing during original construction. | 2-9 |
| Figure 2-9 | Cross-section through main double trusses, showing transverse truss. | 2-9 |
| Figure 2-10 | Outrigger truss system at tower roof. | 2-10 |
| Figure 2-11 | Location of subterranean structure. | 2-11 |
| Figure 2-12 | Floor plan of 94th and 95th floors of WTC 1 showing egress stairways. | 2-14 |
| Figure 2-13 | Zone of aircraft impact on the north face of WTC 1. | 2-16 |
| Figure 2-14 | Approximate zone of impact of aircraft on the north face of WTC 1. | 2-17 |
| Figure 2-15 | Impact damage to the north face of WTC 1. | 2-18 |
| Figure 2-16 | Impact damage to exterior columns on the north face of WTC 1. | 2-18 |
| Figure 2-17 | Approximate debris location on the 91st floor of WTC 1. | 2-19 |
| Figure 2-18 | Landing gear found at the corner of West and Rector Streets | 2-19 |
| Figure 2-19 | Redistribution of load after aircraft impact. | 2-20 |
| Figure 2-20 | Expansion of floor slabs and framing results in outward deflection of columns and potential overload. | 2-25 |
| Figure 2-21 | Buckling of columns initiated by failure of floor joist connections. | 2-26 |
| Figure 2-22 | Catenary action of floor framing on several floors initiates column buckling failures. | 2-26 |
| Figure 2-23 | Aerial photograph of the WTC site after September 11 attack showing adjacent buildings damaged by debris from the collapse of WTC 1. | 2-28 |
| Figure 2-24 | Southeast corner of WTC 2 shortly after aircraft impact. | 2-28 |
| Figure 2-25 | Approximate zone of impact of aircraft on the south face of WTC 2. | 2-29 |
| Figure 2-26 | Impact damage to the south and east faces of WTC 2. | 2-30 |
| Figure 2-27 | Impact damage to exterior columns on the south face of WTC 2. | 2-30 |

Figure 2-28    Conflagration and debris exiting the north wall of WTC 2, behind WTC 1. ................. 2-31

Figure 2-29    A portion of the fuselage of United Airlines Flight 175 on the roof of WTC 5. ............... 2-32

Figure 2-30    North face of WTC 2 opposite the zone of impact on the south face, behind WTC 1. .................................................................................................... 2-33

Figure 2-31    Plot of column utilization ratio at the 80th floor of WTC 2, viewed looking outward. .................................................................................... 2-34

Figure 2-32    The top portion of WTC 2 falls to the east, then south, as viewed from the northeast. .......................................................................................... 2-36


**Chapter 3**

Figure 3-1     Developed north and west elevations. ................................................. 3-2

Figure 3-2     Developed south and east elevations. ................................................. 3-2

Figure 3-3     Typical hotel floor plan. ....................................................................... 3-3

Figure 3-4     Typical hotel floor framing plan. ........................................................ 3-4

Figure 3-5     Typical transverse bracing elevation. ................................................. 3-5

Figure 3-6     Exterior columns from the collapse of WTC 2 falling on the southern part of WTC 3. .................................................................... 3-6

Figure 3-7     Partial collapse of WTC 3 after collapse of WTC 2. ........................ 3-7

Figure 3-8     Remains of WTC 3 after collapse of WTC 1 and WTC 2. ............... 3-8


**Chapter 4**

Figure 4-1     Typical floor plan for WTC 5. ........................................................... 4-2

Figure 4-2     Typical column-tree system (not to scale). ...................................... 4-3

Figure 4-3     Typical interior bay framing in WTC 5. ............................................ 4-3

Figure 4-4     Stairway enclosure core locations in WTC 5. .................................. 4-4

Figure 4-5     Damage to WTC 4. ............................................................................. 4-5

Figure 4-6     Damage to WTC 5. ............................................................................. 4-5

Figure 4-7     Approximate locations of damaged floor areas in WTC 5. ............. 4-6

Figure 4-8     Damage to WTC 6. ............................................................................. 4-8

Figure 4-9     Impact damage to WTC 6. ................................................................ 4-8

Figure 4-10    Impact damage to the exterior façade of WTC 6. ........................... 4-9

Figure 4-11    WTC 5 façade damage. ...................................................................... 4-10

Figure 4-12    Impact damage to WTC 5. ................................................................ 4-11

Figure 4-13    WTC 5 on fire. ................................................................................... 4-13

Figure 4-14    Deformed beams in WTC 5. ................................................................. 4-13

Figure 4-15    Unburned bookstore in WTC 5. ......................................................... 4-14

Figure 4-16    Looking through the door into the undamaged stair tower in WTC 5. ........... 4-14

Figure 4-17    Buckled beam flange and column on the 8th floor of WTC 5 that was
weakened by fire. ............................................................................... 4-15

Figure 4-18    Internal collapsed area in WTC 5. ..................................................... 4-16

Figure 4-19    Internal collapsed area in WTC 5. ..................................................... 4-17

Figure 4-20    Internal collapsed area in WTC 5. ..................................................... 4-18

Figure 4-21    Internal collapsed area in WTC 5 with closeup of connection failure
at column tree. .................................................................................. 4-18

Figure 4-22    Connection samples. ......................................................................... 4-19

## Chapter 5

Figure 5-1     Foundation plan – WTC 7. ................................................................. 5-3

Figure 5-2     Plan view of typical floor framing for the 8th through 45th floors. ........... 5-4

Figure 5-3     Elevations of building and core area. .................................................. 5-5

Figure 5-4     Fifth floor diaphragm plan showing T-sections embedded in 14-inch slab. ..... 5-6

Figure 5-5     3-D diagram showing relations of trusses and transfer girders. ................ 5-6

Figure 5-6     Seventh floor plan showing locations of transfer trusses and girders. ........ 5-7

Figure 5-7     Truss 1 detail. .................................................................................. 5-8

Figure 5-8     Truss 2 detail. .................................................................................. 5-9

Figure 5-9     Truss 3 detail. .................................................................................. 5-10

Figure 5-10    Cantilever transfer girder detail. ....................................................... 5-11

Figure 5-11    Compartmentalization provided by concrete floor slabs. ...................... 5-12

Figure 5-12    Sequence of debris generated by collapses of WTC 2, 1, and 7. ............. 5-17

Figure 5-13    Pedestrian bridge (bottom center) still standing after WTC 2 has collapsed,
sending substantial dust and debris onto the street, but before WTC 1
(top center) has collapsed. ................................................................ 5-18

Figure 5-14    View from the north of the WTC 1 collapse and the spread of debris
around WTC 7. ................................................................................. 5-18

Figure 5-15    Debris from the collapse of WTC 1 located between WTC 7 (left)
and the Verizon building (right). ........................................................ 5-19

Figure 5-16    Damage to the southeast corner of WTC 7 (see box), looking from West Street. .............. 5-19

Figure 5-17    Building damage to the southwest corner and smoke plume from
south face of WTC 7, looking from the World Financial Plaza. ......................................... 5-20

Figure 5-18    WTC 7, with a large volume of dark smoke rising from it, just visible
behind WFC 1 (left). ................................................................................................... 5-21

Figure 5-19    Fires on the 11th and 12th floors of the east face of WTC 7. ................................ 5-22

Figure 5-20    View from the north of WTC 7 with both mechanical penthouses intact. ...................... 5-24

Figure 5-21    East mechanical penthouse collapsed. ........................................................... 5-25

Figure 5-22    East and now west mechanical penthouses gone. ............................................... 5-25

Figure 5-23    View from the north of the "kink" or fault developing in WTC 7. ........................... 5-26

Figure 5-24    Areas of potential transfer truss failure. ...................................................... 5-27

Figure 5-25    Debris cloud from collapse of WTC 7. ........................................................... 5-27

Figure 5-26    Debris generated after collapse of WTC 7. ...................................................... 5-28

## Chapter 6

Figure 6-1     North face of Bankers Trust building with impact damage
between floors 8 and 23. ............................................................................................. 6-1

Figure 6-2     Closeup of area of partial collapse. .............................................................. 6-2

Figure 6-3     Floor plan above the 2nd level (ground floor extension not shown). ..................... 6-3

Figure 6-4     Area of initial impact of debris at the 23rd floor. ............................................ 6-4

Figure 6-5     Approximate zones of damage – 19th through 22nd floors, 16th through
18th floors, 11th through 15th floors, and 9th through 10th floors. ................................... 6-5

Figure 6-6     Moment-connected beams to columns. ............................................................ 6-7

Figure 6-7     Column with the remains of two moment connections. ...................................... 6-7

Figure 6-8     Failed shear connection of beam web to column web. ...................................... 6-8

Figure 6-9     Suspended column D-8 at the 15th floor. ........................................................ 6-8

Figure 6-10    Area of collapsed floor slab in bays between C-8, E-8, C-7, and
E-7, from 15th floor. ................................................................................................... 6-9

Figure 6-11    Bankers Trust lobby (note debris has been swept into piles). ............................... 6-9

Figure 6-12    Office at north side of the 8th floor. ............................................................. 6-10

Figure 6-13    3-D ANSYS model of flange and shear plate moment connection. ........................ 6-14

Figure 6-14    3-D ANSYS model of flange and seat moment connection. .................................. 6-14

## Chapter 7

Figure 7-1     New York City DDC/DoB Cooperative Building Damage Assessment
Map of November 7, 2001 (based on SEAoNY inspections of September
and October 2001). ................................................................................. 7-2

Figure 7-2     Southeast corner of WFC 3. ................................................................. 7-5

Figure 7-3     View of Winter Garden damage from West Street, with
WTC 1 debris in front of WFC 2. ...................................................... 7-6

Figure 7-4     View of Winter Garden damage from West Street, with
WTC 1 debris leaning against WFC 3. .............................................. 7-6

Figure 7-5     Interior damage at floor 20 of WFC 3. .............................................. 7-7

Figure 7-6     Verizon building – damage to east elevation (Washington Street). ....................................... 7-8

Figure 7-7     Verizon building – damage to east elevation (Washington Street)
due to WTC 7 framing leaning against the building. ......................... 7-9

Figure 7-8     Verizon building – damage to east elevation (Washington Street). ....................................... 7-9

Figure 7-9     Verizon building – column damage on east elevation (Washington Street). ...................... 7-10

Figure 7-10    Verizon building – damage to south elevation (Vesey Street). .......................... 7-11

Figure 7-11    Verizon building – localized damage to south elevation (Vesey Street). ........................ 7-11

Figure 7-12    Verizon building – detail of damage to south elevation (Vesey Street). ....................... 7-12

Figure 7-13    30 West Broadway – south façade, 6th floor to roof, looking northeast. ........................ 7-13

Figure 7-14    130 Cedar Street and 90 West Street. ............................................. 7-14

Figure 7-15    Interior of 90 West Street showing typical construction features. ...................... 7-16

Figure 7-16    Buckling damage at top of column on floor 8 of 90 West Street. ...................... 7-17

Figure 7-17    Buckling damage at top of column on floor 23 of 90 West Street. .................... 7-18

Figure 7-18    One Liberty Plaza – south elevation, lower floors. ........................... 7-19

Figure 7-19    One Liberty Plaza – south elevation, upper floors. .......................... 7-20

## Appendix A

Figure A-1     Heat release rate for office module. .................................................. A-2

Figure A-2     Fire growth rates (from SFPE Handbook of Fire Protection Engineering). ....................... A-3

Figure A-3     Comparison of exposure temperatures in standard tests. ................... A-6

Figure A-4     Thermal properties of steel at elevated temperatures. ...................... A-11

Figure A-5     Stress-strain curves for structural steel (ASTM A36) at a
range of temperatures. ..................................................................... A-11

Figure A-6     Strength of steel at elevated temperatures. ...................................... A-12

*Table of Contents*

Figure A-7    Modulus of elasticity at elevated temperatures for structural
              steels and steel reinforcing bars. ...................................................... A-13

Figure A-8    Reduction of the yield strength of cold-formed light-gauge
              steel at elevated temperatures. ........................................................ A-13

Figure A-9    Steel temperature rise due to fire exposure for unprotected
              steel column. ................................................................................... A-16

Figure A-10   Steel temperature rise due to fire exposure for steel column
              protected with 1 inch of spray-applied fireproofing. ...................... A-16

Figure A-11   The effect of temperature on the modulus of elasticity strength
              of different types of concretes. ....................................................... A-20

Figure A-12   Reduction of the compressive strength of two lightweight concretes
              (one with natural sand) at elevated temperatures. ........................ A-21

Figure A-13   Usual ranges of variation for the volume-specific heat of normal-
              weight and lightweight concretes. .................................................. A-21

Figure A-14   Specific flow rate as a function of density (SPFE Handbook
              of Fire Protection Engineering). ..................................................... A-25

Figure A-15   Estimated evacuation times for high-rise buildings. ........................ A-26

## Appendix B

Figure B-1    Exterior column end plates. ................................................................ B-1

Figure B-2    Tensile stress-strain curves for three ASTM-designation steels. ............ B-3

Figure B-3    Expanded yield portion of the tensile stress-strain curves. ................... B-3

Figure B-4    Effect of high strain rate on shape of stress-strain diagram. ................ B-4

Figure B-5    Column tree showing bolt bearing shear failures of spandrel connection. ........... B-6

Figure B-6    Shear fracture failure of fillet welds connecting a W-shape
              column to a box core column. .......................................................... B-7

Figure B-7    Bent and fractured bolts at a column four-bolt connection. ................. B-8

Figure B-8    Typical truss top chord connections to column/spandrel beam
              and to the core beam. ..................................................................... B-10

Figure B-9    (A) Visco-elastic damper angles bolted to angle welded to spandrel plate
              and (B) failed bearing seat connection . .......................................... B-11

Figure B-10   (A) Bracket plate welded to the column/spandrel plate and (B)
              horizontal plate brace with shear connectors welded to the failed bracket. ...................... B-11

Figure B-11   Shear failure of floor joist connections from column/spandrel plate. .................. B-12

## Appendix C

Figure C-1      Eroded A36 wide-flange beam. ........................................................... C-1

Figure C-2      Closeup view of eroded wide-flange beam section. ........................... C-2

Figure C-3      Mounted and polished severely thinned section removed from the
wide-flange beam shown in Figure C-1. ........................................... C-2

Figure C-4      Optical microstructure near the steel surface. ................................. C-3

Figure C-5      Another hot corrosion region near the steel surface (etched with 4 percent nital). .............. C-3

Figure C-6      Microstructure of A36 steel. ............................................................ C-4

Figure C-7      Deep penetration of liquid into the steel. ....................................... C-4

Figure C-8      Qualitative chemical analysis. .......................................................... C-5

Figure C-9      Qualitative chemical analysis. .......................................................... C-6

Figure C-10     Grain boundary corrosion attack. ................................................... C-6

Figure C-11     Microstructure of a typical region showing the surface and grain boundary
corrosion attack of Sample 2. ...................................................... C-7

Figure C-12     Higher magnification of the region shown in Figure C-10. ............... C-7

Figure C-13     Regions where chemical analysis was performed. ........................... C-8

Figure C-14     Gradient of sulfides into the steel from the oxide-metal interface. ..................... C-12

## Appendix D

Figure D-1      Mixed, unsorted steel upon delivery to salvage yard. ...................... D-2

Figure D-2      Torch cutting of very large pieces into more manageable pieces of a
few tons each. .............................................................................. D-3

Figure D-3      Pile of unsorted mixed steel (background), with sorted, large steel
pieces (center) being lifted and cut into smaller pieces (left). ............ D-3

Figure D-4      Engineer climbing in unprocessed steel pile to inspect and mark
promising pieces ........................................................................... D-4

Figure D-5      Stenciled markings on WTC 2 perimeter column from floors 68-71. ................ D-5

Figure D-6      Steel pieces marked "SAVE." ......................................................... D-6

Figure D-7      Engineers measuring and recording steel piece dimensions. .............. D-6

Figure D-8      Engineer measuring spandrel plate thickness ($t_s$). ......................... D-7

Figure D-9      Measurement of 1/4 inch for web thickness ($t_w$). ........................ D-7

Figure D-10     Measured dimensions of the steel pieces. ...................................... D-8

Figure D-11     Burnt steel piece marked for cutting of coupon. ............................. D-9

*Table of Contents*

Figure D-12   Coupon cut from WTC 5 showing web tear-out at bolts. .................................................. D-9

Figure D-13   WTC 1 or WTC 2 core column (C-74). ....................................................................... D-10

Figure D-14   WTC 7 W14 column tree with beams attached to two floors. ......................................... D-11

Figure D-15   Built-up member with failure along stitch welding. .......................................................... D-11

Figure D-16   Engineer inspecting fire damage of perimeter column tree from
WTC 1 or WTC 2. ......................................................................................................... D-12

Figure D-17   Seat-connected in fire-damaged W14 column from WTC 7. ........................................... D-12

Figure D-18   WTC 1 or WTC 2 floor-truss section with seat connection
fractured along welds. ..................................................................................................... D-13